# EXHIBIT B

EFiled: Apr 17 2026 04:24PM EDT
Transaction ID 79085986
Case No. 2024-1270-LWW

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| KITUWAH, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS SCHROEDER, KENT PURDY, MARK KORROS, WILLIAM KILLIAN, AND EXPERIENTIAL VENTURES HOSPITALITY, LLC,<br><br>Defendants,<br><br>and<br><br>SPORTS HOSPITALITY VENTURES, LLC,<br><br>Nominal Defendant. | C. A. No. 2024-1270-LWW<br><br>**PUBLIC VERSION**<br>**April 17, 2026** |

**DEFENDANT EXPERIENTIAL VENTURES HOSPITALITY, LLC'S FIRST AMENDED VERIFIED COUNTERCLAIM**

Defendant and Counterclaim-Plaintiff Experiential Ventures Hospitality, LLC ("Experiential," or the "Counterclaim-Plaintiff"), by and through its undersigned counsel, brings this counterclaim against Plaintiff and Counterclaim-Defendant Kituwah, LLC ("Kituwah") and alleges as follows:

## NATURE OF THIS COUNTERCLAIM

1. This counterclaim concerns Kituwah's sacking of a joint venture that Experiential agreed to form with it on Kituwah's still-entirely-unfulfilled promise of

providing [redacted] in funding to develop sports-related hospitality projects under the Sports Illustrated Resorts brand.

2. Experiential is a hospitality development company that, prior to its now-failed relationship with Kituwah, was developing experience-based hospitality projects under the Sports Illustrated Resorts brand, pursuant to a License Agreement (the "License Agreement") with ABG-SI, LLC ("ABG-SI" and, together with its affiliate Authentic Brands Group, LLC, "Authentic") that Experiential shared with non-party ADMI, Inc. ("ADMI").

3. The primary vehicle for the joint venture was and remains Sports Hospitality Ventures, LLC ("SHV"). However, Experiential participated in SHV through Experiential Hospitality Holdings, LLC ("EHH"), a separate company it formed with Kituwah as part of the transaction involved with the venture.

4. Kituwah holds its interest in SHV through EHH as well. However, Kituwah also participates in SHV directly, having [redacted] in funding to projects developed by Experiential through SHV in [redacted] of the Sports Hospitality Ventures, LLC Limited Liability Company Agreement (the "SHV LLC Agreement").

5. The purpose of the joint venture was to accelerate Experiential's hospitality development projects using the Sports Illustrated Resorts brand, under the terms of the License Agreement, as amended. The underlying bargain the parties

struck was simple: Experiential brought its rights under the License Agreement to use the Sports Illustrated Resorts brand and its services as an experienced, skilled, and highly-reputable brand and hospitality developer; **Kituwah was supposed to bring money to fund the venture, but it never did.**

6. Instead, Kituwah's primary contribution to the venture was a campaign of obstruction, interference, delay, and betrayal that directly and proximately caused Authentic to purport to cancel the Sports Illustrated License Agreement eighteen months after the (now-failed) venture began, which rendered SHV functionally incapable of exercising the rights granted thereunder.[1]

7. With Kituwah now seemingly poised to begin developing Sports-Illustrated-branded hospitality projects directly with Authentic—if not actually doing so already—the purpose of its conduct seems clear: to cut Experiential out of

---

[1] In separate litigation, Experiential has brought suit against Authentic, derivatively on behalf of SHV, challenging, *inter alia*, (i) Authentic's purported cancellation of [redacted] the License Agreement and the amendments thereto that are discussed here and elsewhere in these First Amended Counterclaim, (ii) Authentic's subsequent purported cancellation of the entirety of that License Agreement and amendments, (iii) Authentic's interpretation of [redacted] the License Agreement and amendments thereto, and (iv) Authentic's contention that such [redacted], and (v) Authentic's contentions regarding the effect of such [redacted] Nothing in this First Amended Verified Counterclaim constitutes or shall operate as a waiver, admission, or concession with respect to the accuracy of any of Authentic's contentions or Experiential's arguments or positions in that matter.

the deal that it had invited Kituwah to join, induced by Kituwah's false promises and assurances that it would fund the resulting venture.

8. However, Kituwah cannot so easily escape from its obligations to Experiential.

9. Due to its failure to provide any funding whatsoever, Kituwah owes [redacted] in the amount of [redacted] to Experiential, which is an express intended third-party beneficiary of, *inter alia*, [redacted].)

10. Additionally, under the Experiential Hospitality Holdings, LLC Limited Liability Company Agreement (the "EHH LLC Agreement"), Experiential has a contractual right to receive, at minimum, 47.4737% of any and all profits or income that Kituwah derives from its projects with Authentic and affiliates thereof.

**PARTIES, JURISDICTION, AND VENUE**

11. Kituwah, LLC is a limited liability company formed under the laws of The Eastern Band of Cherokee Indians (the "EBCI"). Kituwah is the controlling economic participant in EHH, a named third-party beneficiary of [redacted]

12. Experiential Ventures Hospitality, LLC is a limited liability company formed under the laws of Florida.

13. This Court has jurisdiction over these counterclaims because they arise out of the same transactions and occurrences as Kituwah's claims asserted in this litigation, under 6 Del. C. § 18-111, under Section 16.6(b) of the EHH LLC Agreement, in which Kituwah and Experiential consent to jurisdiction in this Court, under [redacted], and under this Court's ancillary and/or cleanup jurisdiction.

14. Venue is proper, including in light of Kituwah's claims asserted in this litigation, under Section 16.6(b) of the EHH LLC Agreement, which specifies this Court as the appropriate venue for disputes thereunder, and [redacted].

## FACTUAL ALLEGATIONS

### A. Experiential Secures an Exclusive License to Use the Sports Illustrated Resorts Brand to Develop Hospitality Projects

15. Counterclaim-Plaintiff Experiential is an experiential hospitality development company that, *inter alia*, develops and consults on experience-based hospitality projects including hotels, resorts, casinos, restaurants, coworking spaces,

entertainment related venues, and other associated businesses, both within the United States and abroad.

16. As part of its business, Experiential develops relationships with prominent brands in order to sublicense, promote, and manage those brands. In connection with that work with prominent brands, the Experiential organization also constructs (or renovates) and manages branded hotels and resorts and associated visitor experiences.

17. One of the brands with which Experiential worked was Sports Illustrated, which is owned and controlled by Authentic.

18. On June 1, 2021, Experiential and ADMI licensed the exclusive right to develop Sports-Illustrated-Resorts-branded hospitality projects (including resorts and hotels) from Authentic. This was accomplished via a License Agreement between Experiential, ADMI, and ABG-SI, dated June 1, 2021 (the "License Agreement").

19. Originally, Experiential and ADMI each held a 50% interest in the License Agreement.

20. The License Agreement set, *inter alia*, [redacted]. In return, the License Agreement granted Experiential and ADMI, *inter alia*, [redacted]

[redacted].

21. Contemporaneous with the execution of the License Agreement, ADMI, ABG-SI, and Experiential also executed Amendment No. 1 to the License Agreement on June 1, 2021.

22. On May 1, 2022, ADMI, ABG-SI, and Experiential executed Amendment No. 2 to the License Agreement, [redacted].

**B. Experiential Looks for Partners to Develop Hospitality Projects Under the Sports Ilustrated Resorts Brands**

23. Experiential's creation of the Sports Illustrated Resorts branding and concepts created great interest early on, including a rebranding of a hotel in Cap Cana, Dominican Republic under the Sports Illustrated Resorts brand. So great was the interest that, by early 2022, Experiential began looking for funding partners and strategic partners for specific projects it had sourced.

24. In September of 2022, Kituwah approached Experiential to explore funding a project in Orlando, Florida. However, after learning more about Experiential's potential with the Sports Illustrated Resorts brand and what they had accomplished so far, Kituwah inquired about forming a more comprehensive

partnership, stating that it could provide [redacted] in funding for projects to be developed by Experiential.

25. The offer appeared attractive: Kituwah seemed excited to engage with Experiential, represented that it had significant resources at its disposal to fund Experiential's development projects, and had experience developing certain hotel projects on its own account. Indeed, as a part of (and controlled by) EBCI, Kituwah had the ability to work with EBCI to integrate gambling, betting, and related activities that could produce valuable synergies when coupled with hospitality projects developed under the Sports Illustrated Resorts brand.

26. Kituwah was interested in associating itself with the Sports Illustrated Resorts brand in hospitality projects that included a gaming gambling component because it provided a valuable business opportunity. Experiential was similarly interested in exploring gaming and gambling activities in connection with the hospitality projects it planned to develop, as they would provide a significant additional income stream.

27. While the License Agreement excluded Experiential from conducting gambling activities in connection with the Sports Illustrated Resorts brand, the opportunities the proposed venture presented were sufficiently enticing that Authentic sought to directly participate in it as well.

28. Authentic, Experiential, ADMI, and Kituwah began discussing a possible joint venture in which Kituwah would provide funding for hospitality development projects under the Sports Illustrated Resorts brand, Experiential's team would develop those projects, and gaming, gambling, and casino activities would be incorporated into them.

29. Initially, Kituwah, due to its relationship with EBCI, wanted to be named the exclusive gaming, gambling, and casino partner of both Authentic and the proposed venture that would result from joining forces with Experiential.

30. Had Kituwah been named the exclusive gaming, gambling, and casino partner of the proposed venture, Kituwah would have occupied a monopolistic position, able to charge higher-than-competitive rates in connection with any hospitality development project's gambling activities by virtue of being the sole alternative. Such a monopolistic position would have permitted Kituwah to significantly reduce the share of gaming, gambling, and casino revenues that would have flowed into the proposed venture.

31. Kituwah's request to be named the exclusive gaming, gambling, and casino partner was rejected, in part because Authentic had a preexisting contractual relationship with another entity that used the Sports Illustrated Resorts brand in connection with such activities.

32. Despite that rejection, Kituwah ultimately agreed to move forward with the proposed venture with Experiential and ADMI to develop hospitality projects using the Sports Illustrated Resorts brand and work collectively with the new entity SHV, to negotiate with ABG on future gaming rights within Sports Illustrated Resorts properties.

33. After a month of discussions and negotiations, the parties arrived at what seemed like a workable plan: Experiential would use its resources, expertise, and personnel to develop hospitality projects in a joint venture, Kituwah would invest [redacted] [redacted] to fund those projects, and they would share in the resulting profits—with the greater portion going to Kituwah, as source of the funding. Authentic, for its part, agreed to alter the terms of the existing License Agreement, both to facilitate the transaction and to significantly increase the scope of the License Agreement—[redacted].

34. Authentic, Experiential, Kituwah, and ADMI agreed in principle to pursue the joint venture that would result in the creation of EHH and SHV in November of 2022 and began due diligence, led by the law firm of Dorsey & Whitney, LLP. Dorsey & Whitney—which initially represented Kituwah in filing its claims against Experiential, its co-defendants, and nominal defendant SHV—[redacted]

[redacted], at Kituwah's request.

## C. The Integrated Transaction Structure and the Resulting Venture

35. The venture structure was created and finalized in late January of 2023, through a series of related transactions and contracts. These include, without limitation, the January 25, 2023, Asset Purchase and Contribution Agreement between Experiential, ADMI, Kituwah, ABG-SI, EHH, and SHV (the "Contribution Agreement"); the EHH LLC Agreement; the SHV LLC Agreement; the January 29, 2023 Pledge Agreement between Experiential and Kituwah (the "Pledge Agreement"); Amendment No. 3 to the License Agreement, executed on January 25 & 26, 2023 ("Amendment No. 3"); and Amendment No. 4 to the License Agreement, executed on or about January 26, 2023 ("Amendment No. 4").

36. While the primary vehicle for the venture is SHV, Kituwah and Experiential do not hold any interest in SHV directly.

37. Rather, Kituwah and Experiential hold their interests in SHV through EHH, a company owned 52.5263% by Kituwah and 47.4737% by Experiential.

38. Experiential is also an express intended third-party beneficiary of [redacted]

39. [redacted]

[redacted]

40. As a result of the transactions and the agreements executed to effectuate the venture, [redacted].

41. The contributions of the various participants in SHV in exchange for these membership units are summarized below. In keeping with the venture's overall general purpose of developing hospitality projects using the Sports Illustrated Resorts brand, [redacted].

42. Experiential also contributed its interest under [redacted]. However, and quite significantly, Experiential also contributed [redacted]—to the venture.

43. Kituwah, for its part, contributed very little up front in return for the lion's share of the interest in EHH and, through it, SHV. But Experiential (and ADMI) did not end negotiations with other interested strategic investment partners because Kituwah promised the largest upfront capital contribution to the joint venture. Rather, Experiential chose to work with Kituwah because it had committed to deploying [redacted] in a manner that would help Experiential and the resulting venture rapidly expand [redacted]—a commitment Kituwah has entirely failed to honor.

**i) ABG-SI Receives a [redacted] Stake in SHV in Exchange for [redacted]**

44. ABG-SI participates in the venture directly through SHV, holding a [redacted] in SHV that it received in return for [redacted]. (*See* SHV LLC Agreement Schedule A.). ABG-SI's contributions were valued at [redacted]. (*Id.*)

45. Amendment No. 3 to the License Agreement recognized, *inter alia*, [redacted]

[redacted].

46. Amendment No. 3 to the License Agreement also, *inter alia*, [redacted].

47. Amendment No. 4 to the License Agreement altered [redacted].

**ii) ADMI Transfers Its Interest in the License Agreement to Experiential and SHV and Receives a 23.75% Stake in SHV**

48. ADMI participates in the venture directly through SHV, [redacted].

49. As part of the transactions creating the venture, ADMI transferred its [redacted] in two steps that are set out in the

Contribution Agreement and [redacted] of the SHV LLC Agreement, with the result being that [redacted].)

50. [redacted]

51. [redacted]

**iii) Experiential Contributes** [redacted]

52. Experiential [redacted] and participates in the venture through EHH, a separate company. EHH is a member of SHV [redacted].

53. [redacted]

54. EHH then [redacted]

[redacted]

55. Experiential's transfer of [redacted], was essential to the venture, which depended upon Experiential's ability to develop hospitality projects under the Sports Illustrated Resorts brand, pursuant to the License Agreement. [redacted]. Indeed, the structure and purpose of the venture was to continue developing these existing hospitality projects and to seek new ones for further development.

56. Experiential's [redacted] were the most critical assets of the resulting venture. They were also, by their nature, susceptible to misappropriation by other participants therein—particularly Experiential's [redacted].

57. However, Experiential was protected from that eventuality by various aspects of the EHH LLC Agreement, [redacted].

58. The EHH LLC Agreement prevented Kituwah from cutting Experiential out via a side-deal with Authentic by providing that:

> The Members agree that, for so long as each is a Member of the Company, any business opportunity to work with ABG-SI LLC or any affiliate of ABG-SI LLC, including but not limited to any license or other monetization of any brand from or in partnership with ABG-SI LLC, whether or not related to the Amended SI Brand License, will be exclusively the business opportunity of the Company and not of any member individually. The Members agree that they will present each such business opportunity to the Board and will not engage in such business opportunity unless the Board affirmatively decides against pursuing such business opportunity. Any failure to present any such business opportunity to the Board or the engagement in any such business opportunity by any Member without compliance with this Section 15.4 shall be deemed a breach of this Agreement.

(EHH LLC Agreement § 15.4.)

59. Sections 3.5 and 4.8 of the EHH LLC Agreement also restrict participation in so-called "Restricted Ventures," which are defined as:

> any sporting-related business or any other spin-off or activity which uses the Sport Illustrated brand under the Amended SI Brand License, regardless of location, or any other hospitality-related business or activity (including those related to wellness or food and beverage), located within 100 miles of any SI Property that would reasonably compete with any SI Property.

(EHH LLC Agreement at 6 (definition of "Restricted Ventures").)

60. Section 3.5 of the EHH LLC Agreement bars Kituwah, Experiential, and their affiliates from participating in both Restricted Ventures and the ventures described in Section 15.4 of that agreement, and establishes that Experiential,

Kituwah, and EHH itself all would have a right in any such barred ventures as well as a right to the profits or income derived therefrom.

61. Specifically, Section 3.5 of the EHH LLC Agreement provides:

> The Members and their respective Affiliates may engage in and possess an interest in other business ventures, including competing ventures, **except for Restricted Ventures and any venture described in Section 15.4**. **Except for Restricted Ventures and any venture described in Section 15.4**, neither the Company nor any Member has any **right, by virtue of this Agreement, in any other ventures engaged in by a Member or any income or profits derived from such ventures**. No Member is required to devote the Member's full time and attention to the affairs of the Company, unless the Member expressly agrees otherwise in this Agreement or another written agreement. **Members shall be responsible for any breaches of this Section 3.5 by any of their respective Affiliates.**

(Emphasis added.)

62. [redacted]

63. Similarly, [redacted] the EHH LLC Agreement [redacted] provide in Section 4.8 [redacted] that:

[redacted]

[redacted]

(EHH LLC Agreement § 4.8; [redacted].)

64. Experiential, as a member of EHH, party to the EHH LLC Agreement, and [redacted] has the right and standing to enforce the prohibition on participation in Restricted Ventures outside the scope of the venture.

65. As a member of EHH, Experiential has the ability to seek injunctive relief for any violations of the EHH LLC Agreement, including, *inter alia*, violations of Sections 3.5, 4.8, and 15.4 thereof, pursuant to Section 16.9 of the EHH LLC Agreement.

66. Section 16.9 of the EHH LLC Agreement reads, in full:

> Specific Performance; Remedies Cumulative. Each Member acknowledges and agrees that the subject matter of this Agreement is unique, that the other Members would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, and that the remedies at law would not be adequate to compensate such other parties not in default or in breach. Accordingly, the other Members will be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement in addition to any other remedy to which they may be entitled, at law or in equity. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other available rights or remedies.

**iv) Kituwah Agrees to Fund Hospitality Development Projects**

67. Like Experiential, Kituwah participates in the venture through EHH.

68. [redacted]

69. [redacted]

70. Kituwah's capital contribution to the venture was relatively minimal, consisting of a $7,000,000 capital contribution to EHH. (*See, e.g.*, EHH LLC Agreement § 9.1(a), Schedule A, & Exhibit 1.) In return for this $7,000,000 capital contribution, Kituwah received 525,263 membership units in EHH. (*See id.*, Schedule A.)

71. Even though Experiential's capital contribution to EHH [redacted], the majority of membership units went to Kituwah, with 52.5263% of EHH units being held by Kituwah and 47.4737% of EHH units being held by Experiential.

72. The reason for that apparent disparity is found in [redacted]

[redacted]

73. [redacted]

[redacted]

74. [redacted]

[redacted]

75. [redacted]

[redacted]

76. [redacted]

## D. The SHV LLC Agreement and Integrated Transaction Structure Required Kituwah to Fund the Venture

77. While the purpose of the joint venture was to fund hospitality projects that exploited the Sports Illustrated Resorts brand under the terms of the License Agreement, Kituwah's [redacted] funding commitment to Experiential, ADMI, and Authentic was, very literally, the *sine qua non* of the entire venture: a commitment without which Experiential would never have agreed to join, let alone contribute its [redacted] and give Kituwah a majority position in EHH.

78. The [redacted] and EHH LLC Agreement [redacted] establish the joint venture's purpose as, *inter alia*, the development, licensing, and operation of Sports Illustrated–branded hospitality properties.

79. [redacted]

80. [redacted]

[redacted]

81. As discussed above, participants in EHH are subject to a similar prohibition (*see* EHH LLC Agreement at 6 (definition of "Restricted Ventures") & §§ 3.5 & 4.8) and also are prohibited from pursuing business opportunities with Authentic outside the scope of the joint venture, "whether or not related to the" License Agreement, as amended (*id.* § 15.4).

82. But the reason the entire integrated transaction structure described above was created in the first place was Kituwah's [redacted]: Experiential needed funding for its development pipeline, and Kituwah offered to provide it on a rolling basis. Experiential would never have agreed to join the venture, let alone contribute its [redacted] and give Kituwah a majority position in EHH, had Kituwah not committed to providing [redacted] [redacted].

83. Indeed, Kituwah's funding commitment was the essential financial underpinning of the SHV venture and the primary reason Kituwah was granted its position in the ownership and governance structure [redacted] in EHH.

84. [redacted], was expressly designed on the

assumption [redacted].

85. The parties understood that the ability to execute and develop Sports-Illustrated-Resorts-branded properties depended upon Kituwah fulfilling its funding obligations. [redacted]

86. [redacted]

87. Accordingly, Kituwah could not wholly refuse to fund every single hospitality project presented to it in the course of the joint venture. Indeed, doing so would defeat the purpose of the joint venture—[redacted]

88. The significance of Kituwah's role in and obligations to the joint venture are made clear by its contrasting status with respect to the [redacted] vis-à-vis Experiential.

89. [redacted]

90. [redacted]

91. [redacted], despite holding its interest through EHH.

92. [redacted]

93. [redacted]

94. [redacted]

95. [redacted]

**E. <u>Kituwah Works to Defeat the Joint Venture</u>**

96. [redacted], Kituwah instead engaged in a prolonged campaign of delay, obstruction, interference with the proper functioning of SHV for months.

97. Worse, this behavior coincided with Kituwah's pursuit of a direct relationship with Authentic that excluded Experiential, EHH, and SHV, in violation of, *inter alia*, Sections 3.5 and 15.4 of the EHH LLC Agreement.

98. Perhaps most telling is Kituwah's complete failure to fulfill its obligations to SHV, EHH, and Experiential [redacted]

[redacted]; and (ii) to fund any SHV development project whatsoever.

99. Kituwah's campaign devastated the joint venture. Experiential's ability to develop hospitality projects using the Sports Illustrated Resorts brand not only continued to suffer from the same lack of funding that Kituwah was supposed to solve, but they were now required to navigate the delays, obstructions, and interferences interposed by Kituwah. As a result, as discussed further below, Authentic purported to first terminate [redacted] License Agreement and then terminate the License Agreement entirely. As a functional matter this rendered SHV incapable of exploiting the License Agreement that the venture was formed to exploit—defeating the entire purpose of the joint venture.

**i) Kituwah's Campaign to Defeat the Joint Venture Begins**

100. On or about October 16, 2023, Travis Crisp—[redacted], and who had been installed as SHV's Chief Operating Officer at Kituwah's insistence—requested a meeting with Daniel Dienst, an Authentic employee who also served as [redacted]. Schroeder, the CEO of SHV, EHH, and Experiential, was only informed by Dienst, but ***not*** by the Kituwah-installed Crisp.

101. While Experiential did not become aware of the fact until long after the fact, on October 26, 2023, Crisp, who was supposed to be acting as COO for SHV, discussed a gaming proposal between Authentic and the EBCI, which fully controlled Kituwah, with Dienst via text message. This discussion was never mentioned to Experiential or Schroeder, SHV's CEO, despite the fact that any such deal would violate the terms of [redacted].

102. In parallel with these covert contacts between Kituwah and Authentic, the pattern of Kituwah's campaign to defeat the joint venture began to emerge into public view.

103. Kituwah frequently made frivolous objections to potential hospitality development projects that served no purpose other than to lose valuable opportunities.

104. For example, in early October of 2023, Schroeder set up a meeting with the Tohono O'odham tribe and other SHV Executives (including members of the Experiential team) regarding a proposed hospitality development project near the Arizona cities of Glendale and Phoenix (the "Glendale Project"). Experiential and its team had been working on the Glendale Project, which predated the joint venture, for over a year at that point, having brought the project with it to SHV. Critically,

the Glendale Project could have partially satisfied the milestones contained in the amended License Agreement had it been funded and allowed to move forward.

105. Purportedly because the Glendale Project would involve another Native American tribe, Sam Owl, then a insisted upon being present for the meeting with the Tohono O'odham tribe. However, it soon became clear that Owl objected to the Glendale Project encompassing casino, gaming, and gambling activities under the auspices of the Tohono O'odham, rather than Kituwah and the EBCI.

106. Owl, acting on behalf of Kituwah, accused Schroeder of having exceeded his authority by pursuing the development of the Glendale Project with the Tohono O'odham proving gambling, gaming, and casino services. Owl did so despite the facts that (i) Kituwah had no contractual right to be the sole provider of gambling, gaming, and casino services to the SHV and EHH venture, (ii) Schroeder, as CEO of both SHV and EHH, [redacted], and (iii) neither EHH nor SHV ever enacted any policy that would prevent those companies or Schroeder, in his capacity as CEO, from pursuing the development of

hospitality projects involving gaming, casinos, or gambling, either in general or with organizations and tribes other than Kituwah and the EBCI in particular.

107. Kituwah blocked the Glendale Project from that point forward, including through the making of vague and still-unfulfilled promises by Owl to introduce Schroeder to other Native American tribes that could provide such services, by refusing to approve funding for the project, and by interposing additional, frivolous objections to the Glendale Project.

108. One tactic deployed by Kituwah was delay, failing to respond to reasonable inquires for days, weeks, or even at all, thereby frustrating and impeding the ability of SHV and the Experiential team working on its behalf [redacted], to meet [redacted].

109. For example, when Mark Hubble stepped down as Kituwah CEO in or around November of 2023, it took Kituwah until 2024 to replace him. Whether by design or coincidence, this timing proved unfortunate because it coincided with the several hospitality development projects evolving to the point that they were ready to be presented to Kituwah for funding. However, Kituwah's interim CEO proved incapable of making decisions regarding potential hospitality development projects on the Kituwah side, frustrating the ability of the Experiential team, working on

behalf of SHV, to satisfy [redacted].

110. Kituwah's interim CEO also proved incapable of providing input that would have assisted in the development of other projects, thereby frustrating and impeding the ability of the Experiential team, working on behalf of SHV, to satisfy [redacted].

111. Once Sam Owl took over as Kituwah CEO in January of 2024, Kituwah's campaign of obstruction, delay, betrayal, and interference accelerated. These actions, as detailed below, collectively, and in many cases individually, frustrated the ability of the Experiential team, working on behalf of SHV, to satisfy [redacted] with respect to nascent hospitality development projects, both directly and indirectly, due to sheer amount of time and effort the Experiential team had to devote to responding to Kituwah's campaign.

112. Owl's leadership did not end Kituwah's communications with Authentic regarding a deal that would exclude SHV and Experiential, despite, *inter alia*, the exclusivity of the License Agreement and the prohibitions on Kituwah engaging in such side deals in Sections 3.5 and 15.4 of the EHH LLC Agreement.

113. For example, February 21, 2024, Dienst, the Authentic executive, sent a "HIGHLY CONFIDENTIAL" email to both Owl and Crisp, the Kituwah-installed

SHV COO, proposing a revenue structure for Sports-Illustrated-branded casinos. SHV appeared nowhere in that revenue structure.

114. Under Owl's leadership, Kituwah interposed frivolous objections and unnecessary bureaucratic roadblocks that Kituwah lacked standing to assert under the terms of the EHH [redacted] Agreement[redacted], failed to timely respond to requests and inquiries, failed to follow through on promises to respond and provide information, and interjected unnecessary delay into SHV's development process.

115. For example, on a number of occasions Schroeder discussed well-vetted, prime location development projects with Owl to gauge Kituwah's potential interest in them in the future—a "first look" opportunity extended to Kituwah as a courtesy and in order to streamline the development pipeline. All of these "first-look" proposals included detailed financials and many included additional contributed equity, contributed land, or other significant incentives. Nevertheless, Kituwah, via Owl, would invariably either reject a proposal out of hand, put off giving a response until the project no longer seemed viable, or interpose frivolous and/or groundless objections to these early proposals. Doing so frustrated the ability of the Experiential team, working on behalf of SHV, [redacted]. Worse, this course of conduct by Kituwah ended up causing SHV to miss [redacted], depriving SHV of the resulting income, and

ultimately leading to Authentic's purported cancellation of [redacted] under the License Agreement, and ultimately of the License Agreement itself.

116. In another example, once Owl took over as CEO of Kituwah he rejected out-of-hand and without offering any explanation or alternative proposal a proposed SHV Fiscal Management Policy that Kituwah's former CEO, Mark Hubble, had drafted while still in office, based on Kituwah's own Fiscal Management Policy. This left SHV without a financial management policy, obstructing the Experiential team's progress in developing projects on SHV's behalf, which in turn frustrated that team's progress in satisfying, *inter alia*, [redacted].

117. As part of its campaign against SHV, Kituwah also engaged in prolonged communications, including covert meetings, with Authentic regarding the possibility of Kituwah licensing the Sports Illustrated Resorts brand for gaming—despite the facts [redacted], (iii) that Kituwah was barred from pursuing such opportunities independently by Section 15.4 of the EHH LLC Agreement, and (iv) [redacted]

[redacted]

118. Eventually Kituwah expanded its campaign to include false and disparaging statements about the work and professionalism of Experiential and the Experiential team that was providing its services to SHV [redacted]. Such statements included false accusations that Experiential and its team were wasting money, comingling funds, and mismanaging SHV—despite the fact that it was Owl and Kituwah, which still had yet to fund a single project, that were obstructing the proper functioning of SHV. Such false and disparaging statements were made to members of the Experiential team, to members of SHV's Board, and to Authentic.

119. Not only were such statements personally distressing for members of Experiential's team, but they amounted to a direct interference with the orderly operation of SHV, as Experiential and its team were forced to waste significant time and resources explaining basic aspects of the development process to Owl and Kituwah.

120. The apparent goal of making these false and disparaging statements was to convince Authentic to work directly with Kituwah, leaving Experiential out in the cold.

121. Kituwah's obstructionist and delaying tactics frustrated the ability of Experiential and its team, working on behalf of SHV, to make proposals satisfying the requirements of [redacted] for numerous projects and otherwise Experiential and its team from satisfying those requirements for numerous projects.

**ii) Kituwah Prevents Formation of the [redacted], Defeating the Purpose of the Joint Venture**

122. Kituwah's obstruction of the formation of SHV's [redacted] was particularly damaging to SHV, EHH, and Counter-Plaintiff's efforts in support of the joint venture.

123. The purpose of the [redacted]

124. [redacted]

125. [redacted]

126. A major purpose in forming SHV was to develop hospitality experiences that would exploit [redacted]

127. ADMI selected an ADMI board member to comprise the [redacted]. Schroeder, by virtue of being the CEO of SHV, [redacted]

[redacted]

128. However, from the beginning Kituwah never selected any [redacted] and/or the implied covenant of good faith and fair dealing.

129. Eventually, Schroeder, the CEO and Chairman of the Board of SHV, Experiential, and EHH, was forced to repeatedly request that Kituwah [redacted]

130. Kituwah ignored Schroeder's repeated requests and failed to select even one single [redacted]. That failure, which continues to this day, is a material breach of the SHV LLC Agreement and/or the implied covenant of good faith and fair dealing.

131. The purpose of Kituwah's failure to [redacted] is clear: to obstruct and defeat the functioning of SHV, all the while pinning the blame on Experiential.

132. But in fact the blame lay entirely with Kituwah: if the [redacted], which meant that development projects that could have satisfied [redacted] could never move forward to the point where they were able to do so. That, in turn, would deprive SHV of income required [redacted].

133. Put differently, the purpose of Kituwah's refusal to comprise the [redacted] was to ensure that SHV [redacted] Authentic to pursue a deal with Kituwah directly.

134. In this regard it is telling that the Cherokee Rose development project—which was initially developed by Kituwah itself prior to the formation of SHV, [redacted], and was fully ready to be funded and approved by [redacted]—was never able to be submitted to, let alone approved by, a [redacted] that did not exist.

135. Also telling is the fact that the sole development project that was granted a sublicense by SHV—the Travel and Leisure Vacation Club condominium

project in Tuscaloosa, Alabama—was funded entirely by third-party Travel and Leisure, without requiring any payment from Kituwah. Even then, the sublicense was only granted by virtue of a vote of the entire SHV Board, a solution that was neither practicable at scale nor [redacted].

136. Kituwah's refusal to comprise the [redacted] caused significant delays and other problems for SHV, prevented SHV from being able to meet [redacted], impeded the ability of SHV and Counter-Plaintiff to bring hospitality development projects to Kituwah for funding, and deprived SHV of the income that would result from completed projects.

**iii) Kituwah Refuses to Fund Any Project, Defeating the Purpose of the Joint Venture**

137. Despite the fact that the entire purpose of the joint venture was for Kituwah to fund hospitality development projects using the Sports Illustrated Resorts brand through SHV, Kituwah wholesale refused to fund a single one of those projects. [redacted]. Ultimately, as detailed below, Kituwah's refusal to provide its promised funding caused SHV to be unable to meet [redacted] and lose

income it would have received from completed projects. That in turn caused SHV to lose the right to exploit the Sports Illustrated Resorts brand that formed part of the fundamental purpose of the venture.

138. The Experiential team working for SHV [redacted] presented a number of proposed hospitality development projects to Kituwah for funding that satisfied all of the requirements of [redacted]. In each case, Kituwah refused to fund those projects, frequently giving false and/or pretextual explanations for its refusal.

139. From the time the SHV LLC Agreement was signed, Kituwah also failed to provide any funding contributions to [redacted] that, up until Kituwah joined SHV and EHH, was [redacted]—despite the fact that the SHV LLC Agreement expressly [redacted].

140. This failure is striking—and telling—because the Cherokee Rose development project would have, if properly funded and developed, operated to satisfy [redacted].

Kituwah's failure to fund Cherokee Rose was a breach of the covenant of good faith and fair dealing implied under the [redacted].

141. Kituwah also failed to fund any of [redacted]. If properly funded and developed, these [redacted] would have operated to satisfy [redacted]. Kituwah's failure to fund any of the [redacted] was a breach of the covenant of good faith and fair dealing implied under the SHV LLC Agreement.

142. Kituwah's complete failure to provide any of the [redacted] subverted the purpose of SHV, EHH, and the entire venture and transaction, a main purpose of which was to provide the financial support necessary for SHV to carry out the purposes of the venture. That in turn deprived SHV of the income that would result from completed projects.

143. Kituwah's refusal to fund any development project directly prevented SHV from meeting its contractual objectives, [redacted].

144. SHV's ability to engage with potential development partners, secure branding rights for proposed locations, negotiate sublicense opportunities, and advance existing project evaluations was frustrated by the absence of funding that Kituwah was required to provide.

145. Kituwah's refusal to fund also prevented SHV from meeting [redacted]. Kituwah knew that its funding was essential to SHV's ability to perform, yet it withheld funding [redacted]s.

146. The absence of Kituwah's capital caused delays in SHV's project pipeline, damaged the venture's relationships with partners and licensors, and impaired SHV's ability to satisfy financial and operational obligations [redacted]. These consequences were foreseeable, and [redacted].

147. Kituwah's breach was a substantial factor in creating or worsening the operational issues described in its Verified First Amended Complaint. Allegations concerning SHV's inability to advance development projects, satisfy financial obligations, or achieve operational benchmarks are directly attributable to Kituwah withholding the funding required to perform those tasks. Indeed, the very reason

that Experiential and ADMI [redacted] and entered into the venture with Kituwah was that it promised that it would [redacted].

148. As a result of Kituwah's nonperformance, Counterclaim-Plaintiff and SHV have suffered substantial harm, including the loss of development opportunities, diminished enterprise value, damage to commercial and licensing relationships, and other financial losses arising from Kituwah's refusal to carry out its contractual duties.

**F. <u>Kituwah Causes the Failure of the Joint Venture, Harming Experiential</u>**

149. As a direct and proximate result of Kituwah's campaign of obstruction, interference, delay, and betrayal, SHV failed to meet [redacted] and to miss a purported [redacted], leading to the purported cancellation of the License Agreement by Authentic, which functionally prevents SHV from exercising its rights under the License Agreement.

150. In November of 2023, Authentic requested that SHV focus exclusively on developing "new build" hospitality projects under the Sports Illustrated Resorts brand, instead of rebranded renovations as had previously been pursued.

151. Schroeder, the CEO of SHV and seeking to maintain a good working relationship with an important partner to—and co-venturer in—SHV, agreed, subject to and in return for Authentic's agreement that it would agree to amend the

[redacted]. That amendment was necessary because new construction necessarily requires a longer timeline to complete than renovating and rebranding existing venues, which in turn meant it would take much longer for those projects to be completed and begin returning money to SHV.

152. Having reached an oral agreement with Authentic, SHV proceeded to honor its own commitment to focus only on "new-build" development projects, to the exclusion of rebranded renovations.

153. Kituwah subsequently exploited this oral agreement to destroy the joint venture, taking a number of actions that made no rational economic sense unless Kituwah was planning to pursue business opportunities with Authentic directly, cutting Experiential and ADMI out of the deal. Indeed, several events that transpired as the venture began to collapse strongly indicated that Authentic and Kituwah were coordinating with each other and planning to work together outside the scope of SHV.

154. The key trigger even seems to have been a meeting on or about May 16, 2024, between Kituwah, EBCI (which controlled Kituwah), and Authentic. In attendance were the most senior leaders of all the three organizations: EBCI Principal Chief Michell Hicks, Kituwah CEO Sam Owl, Authentic CEO and

Founder Jamie Salter, Authentic Vice Chairman Daniel Dienst [redacted], and Authentic Executive Vice President Michael Sherman.

155. The May 16, 2024, meeting was orchestrated by Travis Crisp, the SHV COO installed at Kituwah's insistence. However, despite the objective significance of such a high-level meeting, Crisp never informed Christopher Schroeder, the CEO of SHV, EHH, and Experiential, of the meeting—a telltale sign that Crisp was working on behalf of Kituwah, not SHV, when he organized it.

156. Rather, Schroeder was only informed that the meeting was happening when he was told about it by Dienst on May 14, 2024.

157. When Dienst informed Schroeder that the May 16, 2024, meeting was going to take place, Dienst said it was about retail space that EBCI had at the Cherokee casino. However, that seems not to have been the entire truth.

158. Experiential subsequently discovered that Dienst had separately sent Crisp an email about that same May 16, 2024, meeting. That email, titled "Confidential Project Una De Ooh Na," included an attachment titled "**SI Casino diligence list**."

159. The implication is clear enough: the "Confidential Project Una De Ooh Na" was to discuss a deal between EBCI, Kituwah, and Authentic—not retail space at a casino. And despite Kituwah's agreement that any such "business opportunity

… will be exclusively the business opportunity of" EHH, nobody from the Experiential side of EHH or SHV was there for it. (EHH LLC Agreement § 15.4.)

160. After the May 16, 2024, meeting, things rapidly came to a head for Experiential and SHV.

161. First, on June 21, 2024, Authentic purported to cancel SHV's [redacted]—the very thing the joint venture was formed to exploit—due to the supposed failure [redacted]. This loss [redacted] was directly and proximately caused by Kituwah's failure to fund a single project, leaving SHV without any way to [redacted].

162. Authentic's letter was perplexing because it applied a [redacted] that Authentic had earlier agreed to modify in exchange for SHV's agreement to work exclusively on "new build" projects going forward.

163. Authentic's June 21, 2024, cancellation [redacted] was also concerning because the same oral agreement also modified the [redacted]. Due to Kituwah's wholesale refusal to fund a single hospitality development project and extended campaign of obstruction, interference, and delay, SHV did not have the funds on hand to make [redacted], *inter alia*, the lack of income from funded projects.

164. Accordingly, Schroeder, acting as CEO for SHV, contacted Authentic and sought to reduce to writing the [redacted] to which Authentic had previously orally agreed.

165. Had Authentic honored its oral agreement and amended [redacted] to something more realistic and in line with Authentic's demands for "new-build" properties, it would have made the upcoming [redacted] unnecessary. This would have been highly beneficial to SHV and all its Members, including both Authentic and Kituwah.

166. Authentic's response was that it would only agree to such an amendment if Sam Owl approved such a change.

167. Authentic's requirement of Owl's approval was nearly inexplicable: as Kituwah CEO, [redacted].

168. When Schroeder contacted Owl to obtain his approval—which would only have benefitted Kituwah as co-venturer in EHH and SHV—Owl rejected the request.

169. Owl's rejection of a modification of the License Agreement that inured to the benefit of SHV and, by that measure, Kituwah, was similarly almost inexplicable.

170. The only rational reason Owl and Kituwah could possibly have had for rejecting such an amendment was if they were trying to engineer the collapse of SHV. And the only reason that would be in the financial and economic interests of Kituwah was if Kituwah planned to work with Authentic directly, cutting Experiential and ADMI out of the deal.

171. The subsequent conduct of Kituwah and Authentic both only made the explanation that they planned to forge ahead together, without Experiential, more likely.

172. EHH, the separate company through which Experiential and Kituwah participated in SHV, had sufficient funds on hand to loan SHV [redacted] needed to make the [redacted].

173. When Schroeder proposed that EHH make such a loan, Kituwah, which controlled half of the voting Managers on the Board of EHH, rejected the proposal without explanation.

174. At that point ADMI, the other co-venturer in SHV, offered to loan [redacted] to SHV itself so that the [redacted].

175. Kituwah again rejected this proposal, and again did so without explanation.

176. As a result of Kituwah's refusal to agree to allow Authentic to amend the terms of a License Agreement between Authentic and SHV and Kituwah's

rejection of the loans from both EHH and ADMI, SHV was unable to [redacted].

177. On July 8, 2024, Authentic purported to cancel the entirety of SHV's rights under the License Agreement for failure to make the [redacted]. As a practical matter, this ended SHV's ability to use the Sports Illustrated Resorts brand that the venture was formed to exploit.

178. Authentic's purported cancellation of the License Agreement functionally destroyed the venture. Indeed, even if SHV were to have forged ahead and used the brand, none of its local partners would have allowed the use of such contested intellectual property.

179. In a final attempt to salvage the relationship between Experiential, SHV, and Authentic, on or about July 11, 2024, Schroeder and other members of the Experiential team went to meet Authentic at its New York offices. Also in attendance was Sam Owl, on behalf of Kituwah.

180. During the meeting, Authentic informed Experiential and SHV that it was cancelling the License Agreement in full. However, it made Experiential an offer, if Experiential was willing to agree to the cancellation. The general terms of the offer would have given Schroeder and Experiential a small stake in some future license with a supposedly-as-yet-undetermined licensee, but would have ended SHV's license permanently.

181. In the course of the July 11, 2024, meeting, Authentic outlined that proposal on a whiteboard. A photograph of that proposal outline is below:




182. Notably, the second item on the whiteboard list was again nearly inexplicable: "Paperwork Re: Loan Payback **& Direction of Tuscaloosa Payments to Kituwah**[.]" (Emphasis added.). As explained by Authentic, it was asking that

SHV and Experiential agree to direct from the Tuscaloosa, Alabama development that Experiential had pursued with Travel and Leisure—which had fully funded the development itself, without receiving a single cent of funding from Kituwah.

183. Authentic's sudden solicitude for the financial interests of Kituwah, to the extent of asking Experiential to redirect payments to Kituwah, made no sense—unless Kituwah and Authentic were working together. And, when Authentic's concern for Kituwah is considered together with the May 16, 2024, "Confidential Project Una De Ooh Na" meeting between Kituwah, EBCI, and Authentic about an "SI Casino," Authentic's subsequent deferral to Kituwah over whether to amend the deadlines in the License Agreement, Kituwah's rejection of that emendation and the venture-saving loans from EHH and ADMI, it paints a picture: Authentic and Kituwah were working together, and planned to do so in the future in a deal that would give them each a bigger slice of the proverbial pie by excluding Experiential, EHH, and SHV.

184. Schroeder and Experiential rejected the terms of Authentic's proposal, which would not have helped SHV in any way.

185. Kituwah's failure to provide a single cent of the funding it committed to provide was the direct and proximate cause of SHV's inability to perform the obligations and objectives set forth in the SHV LLC Agreement and other agreements executed in connection with the SHV venture. SHV was designed as a

development stage entity with no independent revenue stream capable of supporting large scale resort development, and its ability to function depended on the capital Kituwah committed to supply—which was, of course, the reason Experiential joined in the venture with Kituwah in the first place. Kituwah's failure to provide that funding caused SHV to lack the capital required to make its [redacted], causing the functional loss of the License Agreement. That harmed Experiential, which had only joined in the venture created by the LLC Agreements and [redacted] on the understanding that Kituwah would provide funding for the projects SHV was to develop.

186. Kituwah's actions, *inter alia*, prevented and otherwise frustrated SHV's ability to satisfy the requirements of [redacted] with respect to certain development projects, such that Kituwah may not depend upon the failure to satisfy those conditions as an excuse for its refusal to fund those certain development projects. Those actions also, *inter alia*, interfered with SHV's and the Counter-Plaintiff's relationships with Authentic, Travel and Leisure, and others, precipitating Authentic's purported cancellation of the License Agreement instead of agreeing to amend or otherwise extend [redacted].

187. Because SHV did not receive the funding required [redacted] and Counter-Plaintiff and SHV were obstructed in their duties by

Kituwah, SHV was unable to secure or advance multiple Sports Illustrated-branded development projects that had been identified as primary near-term opportunities. These opportunities included domestic and international resort locations contemplated within the parties' development pipeline, many of which required capital commitments, deposits, predevelopment expenditures, or other financial assurances that SHV could not make in the absence of funding.

188. Kituwah's non-performance and campaign of obstruction, delay, and interference also prevented SHV from satisfying obligations associated with the Sports Illustrated Resorts brand, including obligations relating [redacted]. The inability to meet these obligations impaired SHV's standing with licensors and reduced its ability to maintain or expand licensing rights.

189. SHV's lack of capital further undermined its relationships with development partners, architects, consultants, landowners, and other third parties essential to the project pipeline. These partners reasonably required evidence of committed financing before proceeding, and the absence of required funding resulted in stalled negotiations, withdrawn interest, and lost opportunities. Kituwah's campaign of obstruction, delay, and interference only served to exacerbate these problems.

190. The absence of committed funding also caused SHV to incur operational inefficiencies, delays, and cost escalations because projects could not be advanced in a timely manner. SHV was forced to suspend or slow work on development initiatives that required upfront investment, which in turn caused delays that damaged the credibility and momentum of the venture. Kituwah's campaign of obstruction, delay, and interference only served to exacerbate these problems.

191. Kituwah's failure to fund further impaired SHV's ability to satisfy obligations related to technology infrastructure, marketing systems, reservation pathways, and brand standards development, all of which were necessary to support the SI branded hospitality platform. Without capital, SHV could not develop the essential systems required to present a cohesive and revenue generating brand product. Kituwah's campaign of obstruction, delay, and interference only served to exacerbate these problems.

192. These harms were foreseeable to Kituwah, as the parties expressly acknowledged within the integrated transaction structure that a failure to provide funding would materially damage SHV and frustrate the core purpose of the venture.

193. Because SHV lacked the capital Kituwah was obligated to provide, Experiential were unable to realize the [redacted]

[redacted]. Kituwah's breach therefore caused substantial and continuing harm to SHV and to Experiential, including loss of enterprise value, impairment of project opportunities, damage to commercial relationships, and exposure to claims that would not have arisen had Kituwah performed its funding obligations. The same is true of Kituwah's campaign of obstruction, delay, and interference.

194. Kituwah's refusal to fund was not a minor or technical breach but a fundamental violation that struck at the heart of the parties' venture. [redacted], the economic structure of the venture, the contemplated project pipeline, and the business plan were all predicated upon the existence of [redacted] but did not provide. SHV's losses, and the damages suffered by Experiential, flow directly from Kituwah's breaches. Kituwah's campaign of obstruction, delay, and interference likewise caused damaged suffered by Experiential.

195. Regardless of whether Kituwah had been coordinating with Authentic, its rejection of all three proposals—the emendation of the License Agreement, the loan from EHH, and the loan from ADMI—all served only to defeat the entire purpose of the joint venture and were so unreasonable as to constitute a breach of the obligation of good faith and fair dealing implied under the terms of both the EHH

LLC Agreement and the SHV LLC Agreement, harming Experiential as outlined above. That is doubly true if Kituwah actually was coordinating with Authentic.

196. Together, Kituwah's failure to provide a single cent of funding for any of the development projects that were the entire point and purpose of the joint venture created by the SHV LLC Agreement and the EHH LLC Agreement indicates Kituwah's course of obstruction, delay, and interference in the course of the short life of the resulting venture. Kituwah's rejection of three lifelines for SHV that could have prevented the purported cancellation of the License Agreement demonstrate, among other things, that Kituwah never intended to honor the LLC Agreements; that Kituwah's contrary representations were knowingly false at the time they were made; and that such representations were made to induce Experiential to join and turn over its interests under the License Agreement to the venture, with the aim of using the venture to develop a business relationship with Authentic that Kituwah could then pursue after causing the collapse of the joint venture.

197. Kituwah's conduct, as detailed above, demonstrates that it will not provide any funding for any projects under [redacted].

## G. Experiential Is Entitled to a Share of Any Income or Profits Kituwah Derives from Any Business It Pursues with Authentic

198. The actions of Kituwah and Authentic in the months leading up to the purported cancellation (and functional loss) of the License Agreement demonstrate that Kituwah and Authentic were coordinating their activities and decisions regarding SHV—particularly the May 16, 2024, "Confidential Project Una De Ooh Na" meeting between Kituwah, EBCI, and Authentic about an "SI Casino."

199. Similarly, Kituwah's rejection of the emendation of the License Agreement to extend the GMR payment deadlines and its rejection of loans from both EHH and ADMI to SHV to make that payment only makes economic sense if Kituwah was coordinating with and planned to pursue separate business with Authentic. The same inference can be drawn from Authentic's inclusion of a payout for Kituwah in its July 21, 2024, proposal demonstrates that Authentic planned to work with Kituwah after the collapse of SHV that Kituwah intentionally caused.

200. A recent mid-March post on Kituwah's LinkedIn profile confirms the existence of such a partnership between Kituwah and Authentic, with Kituwah discussing "**our partnership with Authentic Brands Group**, which **helped** create a high school externship opportunity for EBCI students." (https://www.linkedin.com/posts/kituwahllc_how-can-partnerships-drive-native-economic-activity-7438223051730653186-SY8c/, last visited April 7, 2026

(emphasis added).) In recognizes an existing "partnership with Authentic Brands Group" that also "helped create" the opportunity for EBCI students—as opposed to a partnership "to create" such opportunities—the post confirms that Kituwah and Authentic have an ongoing partnership of some kind. (*Id.*) Indeed, that partnership is referred to as an "example" of the observation in the prior sentence that "Strong partnerships help us create real opportunities for our youth to learn, grow, and prepare for the future of our economy." (*Id.*)

201. A screenshot of Kituwah's LinkedIn post is pasted below, having been retrieved on April 7, 2026:

**Kituwah, LLC**
287 followers
3w •

+ Follow ···

How can partnerships drive Native economic growth?

At Kituwah LLC, we believe one of the most important investments we can make is in the next generation of leaders from the Eastern Band of Cherokee Indians. Strong partnerships help us create real opportunities for our youth to learn, grow, and prepare for the future of our economy.
One example is our partnership with Authentic Brands Group, which helped create a high school externship opportunity for EBCI students.

This program gives students hands-on exposure to business, branding, and professional environments, helping them see what careers and leadership opportunities can look like beyond the classroom.

Programs like this are about more than experience, they're about preparing our youth to one day lead our businesses, organizations, and economic ventures. By connecting students with real-world opportunities today, we are helping build the foundation for a stronger, self-sustaining Cherokee economy tomorrow.

At Kituwah, partnerships aren't just about business, they're about investing in our people and empowering future generations to take the lead.

What role will you play in supporting Native growth?




202. The existence of an ongoing partnership between Kituwah and Authentic is significant because Kituwah is still bound by the EHH LLC Agreement, which prohibits Kituwah from pursuing development opportunities with Authentic outside of the joint venture and gives Experiential a right to Kituwah's profits or income from any such developments.

203. Kituwah's development of projects with Authentic violates, *inter alia*, Section 15.4 of the EHH LLC Agreement, which provides that:

> The Members agree that, for so long as each is a Member of the Company, any business opportunity to work with ABG-SI LLC or any affiliate of ABG-SI LLC, including but not limited to any license or other monetization of any brand from or in partnership with ABG-SI LLC, whether or not related to the Amended SI Brand License, will be exclusively the business opportunity of the Company and not of any member individually. The Members agree that they will present each such business opportunity to the Board and will not engage in such business opportunity unless the Board affirmatively decides against pursuing such business opportunity. Any failure to present any such business opportunity to the Board or the engagement in any such business opportunity by any Member without compliance with this Section 15.4 shall be deemed a breach of this Agreement.

(EHH LLC Agreement § 15.4.)

204. Authentic Brands Group, LLC is an affiliate of ABG-SI, as are any and all brands and companies owned or otherwise controlled by Authentic Brands Group.

205. Any Kituwah development projects using the Sports Illustrated Resorts brand also constitute "Restricted Ventures" under the EHH LLC Agreement, which term is defined as:

> any **sporting-related business or any other spin-off or activity which uses the Sports Illustrated brand under the Amended SI Brand License**, **regardless of location**, or any other hospitality-related business or activity (including those related to wellness or food and beverage), located within 100 miles of any SI property that would reasonably compete with any SI Property.

(EHH LLC Agreement at 6 (definition of "Restricted Ventures" (emphasis added).).

206. The first sentence of Section 3.5 of the EHH LLC Agreement provides that "Members and their respective Affiliates may engage in and possess an interest in other business ventures, including competing ventures, **except for Restricted Ventures and any venture described in Section 15.4**." (*Id.* § 3.5 (emphasis added).)

207. The exception in the final clause of this first sentence of Section 3.5 of the EHH LLC Agreement creates a rule that prohibits "Members and their respective affiliates" from "engag[ing] in and possess[ing] an interest in other business ventures" that either constitute "Restricted Ventures" or that are a "venture described in Section 15.4[]" of the EHH LLC Agreement.

208. The second sentence of Section 3.5 of the EHH LLC Agreement provides that,

> **Except for Restricted Ventures and any venture described in Section 15.4**, neither the Company nor any Member has any right, by virtue of this Agreement, in any other ventures engaged in by a Member or any income or profits derived from such ventures.

(EHH LLC Agreement § 3.5 (emphasis added).).

209. The exception in the introductory clause of the second sentence of Sections 3.5 of the EHH LLC Agreement creates a right, granting any "Member" of EHH a "right, by virtue of this Agreement," both "in" any "Restricted Ventures and

any venture described in Section 15.4," as well "in … any income or profits derived from" any "Restricted Ventures and any venture described in Section 15.4[.]"

210. The creation of a prohibition and right by the exceptional clauses in the first two sentences of Section 3.5 of the EHH LLC Agreement is confirmed by the final sentence of that section, which provides that "Members shall be responsible for any breaches of this Section 3.5 by any of their respective Affiliates." The prohibition and right created by the exceptional clauses are the only parts of Section 3.5 of the EHH LLC Agreement that could be breached—the remainder is permissive.

211. When Kituwah signed the EHH LLC Agreement, it "acknowledge[d] and agree[d] that the subject matter of th[at] agreement is unique, that the other Members would be damaged irreparably in the event any of the provisions of th[e] [EHH LLC] Agreement are not performed in accordance with their specified terms or are otherwise breached, and that the remedies at law would not be adequate to compensate such other parties not in default or in breach." (EHH LLC Agreement § 16.9.).

212. Section 16.9 of the EHH LLC Agreement further provides that EHH "Members will be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement in addition to any other remedy to which they may be entitled, at law or in equity." Section 16.9 of the EHH

LLC Agreement also makes clear that "[t]he rights and remedies under th[e] [EHH LLC] Agreement are cumulative and are in addition to and not in substitution for any other available rights or remedies."

213. The EHH LLC Agreement is a valid, enforceable, and binding contract.

214. Kituwah and Experiential both remain Members of EHH to this day.

215. Accordingly, Experiential is entitled to, at minimum, 47.4737% of the greater of "any income or profits" that Kituwah "derive[s] from" any "Restricted Ventures" and from "any venture described in Section 15.4" of the EHH LLC Agreement that Kituwah has received and will receive in the future. (EHH LLC Agreement § 3.5.). This includes, without limitation, Kituwah's income and profits from any business relationship it pursues with Authentic or any affiliate of Authentic.

216. Experiential is not in default of its obligations under the EHH LLC Agreement, nor has it breached the EHH LLC Agreement. Indeed, Kituwah's First Amended Complaint does not allege that Experiential has breached any specific provision of the EHH LLC Agreement. Nor does Kituwah's First Amended Complaint allege that Experiential has defaulted on its obligations under the EHH LLC Agreement. In fact, the First Amended Complaint contains no cause of action for breach of the EHH LLC Agreement.

217. Accordingly, Experiential is entitled to an injunction directing Kituwah to pay to Experiential at least 47.4737% of the greater of any and all future "income or profits" that Kituwah "derive[s] from" any "Restricted Ventures" or from "any venture described in Section 15.4" of the EHH LLC Agreement that it pursues with Authentic or its affiliates. (EHH LLC Agreement § 3.5.).

**COUNT I**
**<u>(Breach of EHH LLC Agreement)</u>**

218. Counterclaim-Plaintiff Experiential repeats and realleges every allegation set out above as if fully restated herein.

219. The EHH LLC Agreement is a valid, binding, and enforceable contract.

220. Experiential is a Member of EHH, has performed all of its obligations under the EHH LLC Agreement, and is not in breach of any provision of that contract.

221. Kituwah is a Member of EHH and undertook binding contractual obligations under the EHH LLC Agreement, including by agreeing: (a) that any business opportunity to work with Authentic or affiliates of Authentic would belong exclusively to EHH; (b) not conduct, engage in or possess any interest in any business opportunities with Authentic or affiliates of Authentic; (c) not to engage in or possess any sporting-related business or any other spin-off or activity which uses the "Sports Illustrated brand" under the Amended SI Brand License, regardless of

location; (d) not to conduct any other hospitality-related business or activity (including those related to wellness or food and beverage), located within 100 miles of any "SI property" that would reasonably compete with any "SI Property;" (e) that Experiential, as a Member of EHH, has a right, by virtue of the EHH LLC Agreement, both in any "Restricted Ventures" as well as any in any ventures described in Section 15.4 of the EHH LLC Agreement; and (f) that Experiential, as a Member of EHH, has a right, by virtue of the EHH LLC Agreement, to any profits or income derived by Kituwah from either any "Restricted Ventures" or any venture described in Section 15.4 in the EHH LLC Agreement (respectively, "EHH Agreements (a), (b), (c), (d), (e), and (f)").

222. Kituwah further agreed that: the subject matter of the EHH LLC Agreement is unique; that Experiential would be damaged irreparably in the event any of the provisions of the EHH LLC Agreement are not performed in accordance with their specified terms or are otherwise breached; and that the remedies at law would not be adequate to compensate Experiential for any breach of the EHH LLC Agreement by Kituwah.

223. Kituwah further agreed that Experiential, as a Member of EHH, is entitled to injunctive relief to prevent breaches of the provisions of the EHH LLC Agreement and to enforce specifically the EHH LLC Agreement in addition to any other remedy to which Experiential may be entitled, at law or in equity.

224. Kituwah has materially breached EHH Agreements (a)-(f), all of which are contained in the EHH LLC Agreement, by pursuing business opportunities ventures, and/or Restricted Ventures with Authentic and/or its affiliates, while excluding EHH and Experiential; by failing to present to EHH and Experiential business opportunities ventures, and/or Restricted Ventures that Kituwah has pursued and/or is pursuing with Authentic and/or its affiliates; by failing to give EHH and Experiential their right in business opportunities ventures, and/or Restricted Ventures Kituwah has pursued and/or is pursuing with Authentic and/or its affiliates; and by failing to give EHH and Experiential their right in any and all profits and/or income derived from business opportunities ventures, and/or Restricted Ventures that Kituwah has pursued and/or is pursuing with Authentic and/or its affiliates.

225. Additionally and/or alternatively, based on Kituwah's course of conduct and recent posting about its partnership with Authentic, Kituwah is poised to materially breach EHH Agreements (a)-(f), all of which are contained in the EHH LLC Agreement, in the future by pursuing business opportunities ventures, and/or Restricted Ventures with Authentic and/or its affiliates, while excluding EHH and Experiential; by failing to present to EHH and Experiential business opportunities ventures, and/or Restricted Ventures that Kituwah is poised to pursue with Authentic and/or its affiliates; by failing to give EHH and Experiential their right in business

opportunities ventures, and/or Restricted Ventures Kituwah is poised to pursue with Authentic and/or its affiliates; and by planning to deny EHH and Experiential their right in any and all profits and/or income derived from business opportunities ventures, and/or Restricted Ventures that Kituwah is poised to pursue with Authentic and/or its affiliates.

226. Kituwah's breaches and anticipated breaches directly and foreseeably caused and/or will cause EHH and/or Experiential to lose development opportunities, sustain financial harm, suffer operational, reputational, and commercial setbacks, and lose income.

227. As a result of Kituwah's breaches and anticipated breaches, SHV, EHH, and/or Experiential have suffered and/or will suffer substantial damages, including loss of enterprise value, impairment of project opportunities, disruption of licensing and development relationships, loss of income, and other financial losses arising from Kituwah's non-performance.

228. Kituwah's course of conduct with respect to Experiential and Authentic demonstrates that there is an actual controversy concerning Kituwah's obligations to EHH and Experiential under the EHH LLC Agreement with respect to Kituwah's pursuit of business opportunities ventures, and/or Restricted Ventures with Authentic, to the exclusion of EHH and Experiential.

229. Pursuant to 10 Del. C. §§ 6501-6505, this Court is authorized to issue a declaratory judgment.

230. Accordingly, Experiential is entitled to an award of actual damages in an amount to be proven at trial; a portion, the amount of which will be proven at trial but not less than 47.4737%, of any and all income and/or profits that Kituwah has derived from its breach of EHH Agreements (a)-(f).

231. Additionally and/or alternatively, Experiential is entitled to an injunction directing Kituwah to pay Experiential a portion, the amount of which will be proven at trial but that is not less than 47.4737%, of any and all income and/or profits that Kituwah derives from its breach of EHH Agreements (a)-(f) in the future.

232. Additionally and/or alternatively, Experiential is entitled to a declaration that Kituwah must present to EHH and Experiential any and all business opportunities ventures, and/or Restricted Ventures that Kituwah pursues with Authentic and/or its affiliates; that Kituwah must give EHH and Experiential their right in any and all business opportunities ventures, and/or Restricted Ventures Kituwah pursues with Authentic and/or its affiliates; and that Kituwah must give EHH and Experiential their right in any and all profits and/or income derived from business opportunities ventures, and/or Restricted Ventures that Kituwah pursues with Authentic and/or its affiliates.

**COUNT II**
**(Breach of SHV LLC Agreement)**

233. Counterclaim-Plaintiff Experiential repeats and realleges every allegation set out above as if fully restated herein.

234. Kituwah undertook binding contractual commitments and obligations under the SHV LLC Agreement and [redacted].

235. [redacted].

236. Kituwah materially breached the SHV LLC Agreement, including by failing to provide the committed capital, by refusing to make funds available for SHV's development projects, licensing, and operational needs, by failing to comprise the [redacted], by failing to fund the Cherokee Rose development project, by failing to fund any of the [redacted], by rejecting valid and qualified projects that were referred to Kituwah for funding, and by violating its agreement that all monetization of the Sports Illustrated Resorts brand would belong to SHV and be done at the company level. These failures

represent substantial deviations from Kituwah's contractual duties and directly undermined SHV's ability to perform its obligations.

237. Kituwah's course of conduct demonstrates that it will not provide any funding for any projects under [redacted] of the SHV LLC Agreement [redacted].

238. Kituwah's breaches directly and foreseeably caused SHV to lose development opportunities, sustain financial harm, and suffer operational, reputational, and commercial setbacks. [redacted], because the parties recognized that such a failure would cause significant and difficult to quantify losses.

239. As a result of Kituwah's breach, Experiential and SHV suffered substantial damages, [redacted], loss of enterprise value, impairment of project opportunities, disruption of licensing and development relationships, and other financial losses arising from Kituwah's non-performance.

240. Accordingly, Experiential is entitled to an award of damages in an amount to be proven at trial, including [redacted], as well as

actual damages and/or compensatory damages for Kituwah's other breaches of the SHV LLC Agreement.

**COUNT III**
**<u>(Breach of the Implied Covenant of Good Faith & Fair Dealing)</u>**
**(Both in Addition to and In the Alternative to Counts I and II)**

241. Counterclaim-Plaintiff Experiential repeats and realleges every allegation set out above as if fully restated herein.

242. Both the EHH LLC Agreement and the SHV LLC Agreement contains an implied covenant of good faith and fair dealing, which prohibits the parties from taking actions that are arbitrary, unreasonable, or inconsistent with the reasonable expectations created by the agreement and the integrated transaction structure, from abusing their discretion, and from by using their discretion to defeat the purpose of those LLC Agreements. The implied covenant ensures that each party receives the benefit of the bargain and that the agreement's core purpose is not undermined by one party's conduct.

243. Kituwah violated the implied covenant by undertaking actions that subverted the purpose of the joint venture and the LLC Agreements, including: by abusing its discretion regarding the funding of development projects by wholly refusing to fund any and all development projects that were the purpose of the joint venture when Kituwah was obligated to exercise that discretion in good faith; by failing to fund the Cherokee Rose development project; [redacted]

[redacted]; by refusing to agree to amend the License Agreement in 2024, when doing so would have prevented SHV's functional loss of the License Agreement that was fundamental to the purpose of SHV, EHH, and the venture as a whole; by rejecting the proposed loan from EHH to SHV, when doing so would have allowed SHV to make [redacted] and avoid the purported default on and functional loss of the License Agreement that was fundamental to the purpose of SHV, EHH, and the venture as a whole; by rejecting the proposed loan from ADMI to SHV, when doing so would have allowed SHV to make [redacted] and avoid functionally losing the License Agreement that was fundamental to the purpose of SHV, EHH, and the venture as a whole; by working outside of the venture with Authentic to engineer a purported default on the License Agreement by SHV and to otherwise seek business opportunities with Authentic on its own account; by engaging in a wholesale pattern of delay, interference, obstruction, and sabotage aimed at defeating the purpose of the venture and the LLC Agreements; and by failing to provide the funding required to support SHV's development and operational activities, despite knowing that SHV depended entirely on that capital to meet its obligations.

244. Kituwah's conduct was intentional, unreasonable, and inconsistent with the purpose of the venture and the LLC Agreements.

245. Kituwah's conduct defeated a central objective of the LLC Agreements, which was to develop and commercialize Sports-Illustrated-Resorts-branded hospitality properties through a funded and functioning venture.

246. As a direct and proximate result of Kituwah's breach of the implied covenant, Experiential suffered substantial damages, including loss of development opportunities, impairment of commercial relationships, operational delays, reputational harm, financial losses, and deprivation of the economic benefits the LLC Agreements were intended to provide.

247. Accordingly, Experiential is entitled to an award of damages in an amount to be proven at trial, including compensatory damages, actual damages, mitigation damages that include, without limitation, attorneys' fees and legal costs, and/or rescissory damages.

248. Additionally and/or alternatively, this Court should impose a constructive trust, including, without limitation, to capture any proceeds obtained by Kituwah in the future from any business opportunities that it pursues with Authentic or any affiliates of Authentic.

**COUNT IV**
**(Fraudulent Inducement)**

249. Counterclaim-Plaintiff Experiential repeats and realleges every allegation set out above as if fully restated herein.

250. As described above, Counterclaim-Defendant Kituwah, through its employees, officers, agents, members, and/or representatives, represented to Experiential (a) that Kituwah was willing to provide [redacted] of funding for the development of sports-related hospitality development projects using the Sports Illustrated Resorts brand in a joint venture with Experiential and (b) that Kituwah would provide such funding to such a joint venture were Experiential to agree. By no earlier than 2024, it became apparent that Kituwah had no intention of providing any funding.

251. Taken together, Kituwah's failure to provide a single cent of funding for any of the development projects that were the entire point and purpose of the joint venture created by the SHV LLC Agreement and the EHH LLC Agreement, Kituwah's course of obstruction, delay, and interference in the course of the short life of the resulting venture, Kituwah's rejection of three lifelines for SHV that could have prevented the purported cancellation of the License Agreement, Kituwah's apparent coordination with Authentic, and Kituwah's continued work with Authentic following the purported cancellation of the License Agreement demonstrates that Kituwah's representations were false when they were made and that Kituwah made such representations knowing or believing that they were false, or, alternatively, with reckless indifference to their truth, such that both were misrepresentations.

252. Kituwah made those misrepresentations intending to induce Experiential to: (a) agree to the terms of the transaction that formed the joint venture, including the Contribution Agreement, the EHH LLC Agreement, and the SVH LLC Agreement, in reliance on Kituwah's representations; (b) transfer its interest in the License Agreement to EHH, which would then transfer the same interest to SHV, in reliance on Kituwah's representations, (c) contribute Experiential's services and the services of Experiential's employees to the joint venture, EHH, and SHV in reliance on Kituwah's representations, and (d) participate in the joint venture created by the EHH LLC Agreement and the SVH LLC Agreement in reliance on Kituwah's representations.

253. Relying on Kituwah's misrepresentations, Experiential: (a) agreed to the terms of the transaction that formed the joint venture, including the Contribution Agreement, the EHH LLC Agreement, and the SVH LLC Agreement; (b) [redacted], (c) [redacted] and (d) participated in the joint venture created by the EHH LLC Agreement and the SVH LLC Agreement.

254. Experiential's reliance on Kituwah's representations was reasonable in the circumstances, including the absence of any indications or suggestions from Kituwah that its representation was false or misleading.

255. As a direct and proximate result of relying on Kituwah's representation, Experiential suffered substantial damages, in an amount to be proven at trial, including loss of development opportunities, impairment of commercial relationships, operational delays, reputational harm, financial losses, the purported loss of Experiential's interest in the License Agreement, the functional loss of the ability to exercise rights under the License Agreement, and deprivation of the economic benefits the SHV LLC Agreement and EHH LLC Agreement were intended to provide.

256. Recission of the SHV LLC Agreement, the EHH LLC Agreement, and/or the Contribution Agreement is impracticable or impossible including, without limitation, because of the passage of time, events that have occurred within the scope of the venture, outlined about, material changes in the position of Experiential and others, and/or the impact of rescission on the rights of other persons not presently before this Court.

257. Accordingly, Experiential is entitled to an award of damages in an amount to be proven at trial, including actual damages, mitigation damages that

include, without limitation, attorneys' fees and legal costs, and/or rescissory damages.

258. Additionally and/or alternatively, this Court should impose a constructive trust, including, without limitation, to capture any proceeds obtained by Kituwah in the future from any business opportunities that it pursues with Authentic or any affiliates of Authentic.

**COUNT V**
**(Unjust Enrichment)**

259. Counterclaim-Plaintiff Experiential repeats and realleges every allegation set out above as if fully restated herein.

260. As set forth above, without justification Kituwah failed to fund the joint venture and SHV and instead kept such funds for itself.

261. Kituwah's actions in this regard resulted in an impoverishment to Experiential.

262. Kituwah was enriched as a result of the impoverishment of Experiential.

263. It would be against the fundamental principles of justice and equity for Kituwah to retain the benefit of funds it improperly withheld in its failure to fund SHV.

WHEREFORE, Counterclaim-Plaintiff Experiential respectfully requests that the Court enter judgment in their favor and against Counterclaim-Defendant Kituwah, LLC, and grant the following relief:

(a) An injunction directing Kituwah to pay Experiential a portion, the amount of which will be proven at trial but that is not less than 47.4737%, of any and all income and/or profits that Kituwah derives in the future from its breach of EHH Agreements (a)-(f);

(b) An award of damages, in an amount to be proven at trial, including actual damages, compensatory damages, damages arising from lost development opportunities, impairment of enterprise value, damage to commercial and licensing relationships, operational disruptions, impairment of project opportunities, disruption of licensing and development relationships, a portion of any and all income and/or profits that Kituwah has derived from its breach of EHH Agreements (a)-(f) that is not less than 47.4737% of that income and/or profits, and all other financial losses caused by Kituwah's breaches;

(c) An award of [redacted] as specified in the SHV LLC Agreement for Kituwah's breach of its [redacted] therein;

(d) An award of rescissory damages, in an amount to be proven at trial;

(e) An award of mitigation damages, in an amount to be proven at trial, that include, attorneys' fees and legal costs;

(f) The imposition of a constructive trust, including, without limitation, to capture any proceeds obtained by Kituwah in the future from any business opportunities that it pursues with Authentic or any affiliates of Authentic;

(g) An award of compensatory damages, in an amount to be proven at trial, including damages arising from lost development opportunities, impairment of enterprise value, damage to commercial and licensing relationships, operational disruptions, and all other financial losses caused by Kituwah's fraud;

(h) a declaration that Kituwah must present to EHH and Experiential any and all business opportunities ventures, and/or Restricted Ventures that Kituwah pursues with Authentic and/or its affiliates; that Kituwah must give EHH and Experiential their right in any and all business opportunities ventures, and/or Restricted Ventures Kituwah pursues with Authentic and/or its affiliates; and that Kituwah must give EHH and Experiential their right in any and all profits and/or income derived from business opportunities ventures, and/or Restricted Ventures that Kituwah pursues with Authentic and/or its affiliates;

(i) An award of prejudgment and post-judgment interest at the maximum rate permitted by Delaware law;

(j) An award of attorneys' fees, costs, and expenses as permitted by contract, statute, or applicable law; and

(k) Such other and further relief as the Court deems just, proper, and equitable.

SMITH KATZENSTEIN & JENKINS LLP

*/s/ Kelly A. Green*

Kelly A. Green (No. 4095)
1000 N. West Street, Suite 1501
P.O. Box 410
Wilmington, DE 19899
302-652-8400
kag@skjlaw.com

*Attorneys for Defendants and Counterclaim Plaintiff*

Of Counsel:

Jared Siegel (admitted pro hac vice)
SWEETNAM, SCHUSTER & SCHWARTZ LLC
200 Vesey Street, 24th Flr.
New York, New York 10281
T: (470) 395-7842
jsiegel@sweetnamlaw.com

Dated: April 9, 2026