# EXHIBIT B

# Exhibit D

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ORANGE**

DOUGLAS R. DOLLINGER, individually, and THE LAW OFFICES OF DOUGLAS R. DOLLINGER, P.C.,

Plaintiffs,

-against-

FFRANK C. GILMORE, ESQ.; THE GILMORE LAW GROUP PLLC; EMELIA BAER CELLURA, individually and as Trustee of the JOSEPH R. CELLURA LIVING TRUST, if any, and doing business as HALF CRAZY MAMA; FLOCK PRESENTS, LLC; MOLLY M. LEGOY, ESQ., as Special Administrator of the ESTATE OF JOSEPHR. CELLURA; THE JOSEPH R. CELLURA LIVING TRUST, if any; MALIBU55, INC.; JOHN DOE TRUSTS 1–5, and JOHN DOE TRUSTEES 1–5,

, Defendants,

-and-

ADMI, INC., TARSIN MOBILE, INC.; SIR INC.; and GLOBAL BRANDS CAPITAL CORP.,

Nominal Defendants.

# Summons

Index No. __________

Purchased: July 7, 2026

To the above named Defendant(s):

| | | |
|---|---|---|
| FRANK C. GILMORE, ESQ.<br>1495 Ridgeview Drive, Ste. 90<br>Reno, Nevada 89519 | THE GILMORE LAW GROUP PLLC.<br>1495 Ridgeview Drive, Ste. 90<br>Reno, Nevada 89519 | EMELIA BAER CELLURA<br>309 Marewood Ct<br>Reno, Nevada 89511 |
| HALF CRAZY MAMA<br>309 Marewood Ct<br>Reno, Nevada 89511 | THE JOSEPH R. CELLURA LIVING TRUST<br>309 Marewood Ct<br>Reno, NV 89511 | MOLLY M. LEGOY, ESQ.<br>702 Plumas St.<br>Reno, Nevada 89509 |
| MALIBU55, INC.<br>309 Marewood Ct<br>Reno, NV 89511 | FLOCK PRESENTS, LLC<br>440 N. Barranca Avenue, #4955<br>Covina, California 91723 | TARSIN MOBILE, INC.<br>10580 N. McCarran Blvd<br>#115-256 Reno, NV 89503 |
| SIR INC.<br>10580 N. McCarran Blvd<br>#115-256 Reno, NV 89503 | GLOBAL BRANDS CAPITAL CORP.<br>10580 N. McCarran Blvd #115-256<br>Reno, NV 89503 | ADMI, INC.<br>570 County Rt. 49<br>Middletown, New York 10940 |

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is Plaintiffs' place of business and location of legal services rendered.

Dated: Orange County, New York
July 7, 2026

Douglas R. Dollinger, Esq.

DOUGLAS R. DOLLINGER, ESQ.
Plaintiff Entity and Pro Se
570 County Route 49
Middletown, New York 10940
ddollingeresq@gmail.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ORANGE**

DOUGLAS R. DOLLINGER, individually, and THE LAW OFFICES OF DOUGLAS R. DOLLINGER, P.C.,

Plaintiffs,

-against-

FRANK C. GILMORE, ESQ.; THE GILMORE LAW GROUP PLLC; EMELIA BAER CELLURA, individually and as Trustee of the JOSEPH R. CELLURA LIVING TRUST, if any, and doing business as HALF CRAZY MAMA; FLOCK PRESENTS, LLC; MOLLY M. LEGOY, ESQ., as Special Administrator of the ESTATE OF JOSEPH R. CELLURA; THE JOSEPH R. CELLURA LIVING TRUST, if any; MALIBU55, INC.; JOHN DOE TRUSTS 1–5, and JOHN DOE TRUSTEES 1–5,

Defendants,

-and-

ADMI, INC., TARSIN MOBILE, INC.; SIR INC.; and GLOBAL BRANDS CAPITAL CORP.,

Nominal Defendants.

**VERIFIED COMPLAINT**

Index No. _______

Purchased: July 7, 2026

**NOW COMES**, Plaintiffs Douglas R. Dollinger, individually, and The Law Offices of Douglas R. Dollinger, P.C. (collectively, "Plaintiff"), allege, upon knowledge as to themselves and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. This action arises from a fraudulent scheme through which Plaintiff Douglas R. Dollinger, a New York attorney, was induced to compromise and delay enforcement of more than $2.2 million in earned legal fees owed by Joseph Cellura, Emelia Baer Cellura, ADMI, Inc., Tarsin Mobile, Inc., SIR Inc., Global Brands Capital Corp., and related entities, based upon false

representations that a binding and funded settlement agreement had been properly authorized and would be performed.

2. Beginning in or about 2020, Plaintiff rendered extensive legal services to ADMI, Tarsin Mobile, SIR, Global Brands Capital Corp. ("GBCC"), and affiliated entities in connection with corporate governance, licensing rights, investor disputes, litigation, protection of corporate assets, and related business matters. By February 2023, the unpaid legal fees owed to Plaintiff exceeded approximately $2.2 million.

3. In or about September 2023, Defendant Frank C. Gilmore, Esq., a Nevada attorney, entered the matter and represented that he had authority to negotiate and finalize a settlement of Plaintiff's legal-fee claims on behalf of the relevant entities and principals. Between approximately October 2023 and December 2023, Gilmore directed interstate communications, settlement drafts, and legal representations into New York for the purpose of inducing Plaintiff to compromise his claims and refrain from immediate enforcement proceedings.

4. On December 11, 2023, in reliance upon Gilmore's representations, Plaintiff executed a proposed settlement agreement reducing his claim from approximately $2.2 million to approximately $1.6 million payable in installments, including a second payment represented to be secured through escrow proceeds arising from the transfer, assignment, or disposition of interests associated with the Sports Illustrated licensing structure. Plaintiff relied upon representations that the settlement had been authorized by the necessary parties, that the agreement would be fully executed, and that funds existed and were on hand to satisfy the settlement obligations.

5. Those representations were false. Plaintiff later discovered that the settlement agreement had not been approved or executed by all necessary parties, that Gilmore lacked authority to bind the entities and parties as represented, that required signatures and approvals had never been obtained, and that the purported escrow structure did not exist in the manner represented to

Plaintiff. Plaintiff would not have compromised his legal-fee claims or delayed enforcement had the true facts been disclosed.

6. At the same time Plaintiff was being induced to compromise and delay collection efforts, substantial corporate and investor funds belonging to ADMI and related entities were being diverted into accounts and entities controlled by Joseph R. Cellura and Emelia Baer Cellura, including Malibu55, Inc., Half Crazy Mama, and Flock Presents LLC. Upon information and belief, those diverted funds exceeded $18 million and included proceeds from ADMI transactions, Travel + Leisure Co.-related financing, and Sports Hospitality Ventures ("SHV")-related licensing proceeds.

7. Plaintiff further alleges that Defendant Gilmore knowingly participated in and facilitated the fraudulent settlement process by misrepresenting settlement authority, execution status, and escrow funding, and later compounded that conduct by using inconsistent and unauthorized versions of the purported settlement agreement in judicial proceedings while Plaintiff's ability to recover his fees continued to deteriorate.[1]

8. Plaintiff brings this action to recover damages arising from fraudulent inducement, aiding and abetting fraud, attorney deceit, and related misconduct; to recover unpaid legal fees; to trace and recover diverted corporate funds; to impose constructive trusts and equitable restraints over assets traceable to those diversions; and to prevent further concealment or dissipation of assets that should have remained available to satisfy Plaintiff's claims.

## THE PARTIES

9. Plaintiff Douglas R. Dollinger is a natural person residing at 570 County Route 49, Middletown,

[1] Certain disputes involving related parties were previously litigated in the United States District Court for the Southern District of New York and subsequently transferred to Nevada. The present action concerns separate claims arising from alleged fraudulent inducement, diversion of corporate funds, attorney deceit, and related conduct arising from Plaintiff's New York-based legal-fee claims and does not seek review or modification of any prior federal court rulings.

New York 10940, and is an attorney duly licensed to practice law in the State of New York.

10. Plaintiff The Law Offices of Douglas R. Dollinger, P.C. is a New York professional corporation with its principal office at 570 County Route 49, Middletown, New York 10940.

11. ADMI is a Nevada corporation headquartered in New York, named as a nominal defendant solely and corporate obligor because Plaintiff rendered legal services to ADMI and ADMI incurred the legal fee obligations that form the basis of this action. ADMI does not dispute the existence of the debt and is not alleged to have engaged in the wrongful conduct described herein. ADMI is included so that the Court may determine the amount owed and address the diversion of corporate funds that impaired ADMI's ability to satisfy that obligation.

12. Defendant Frank C. Gilmore, Esq. is, upon information and belief, a resident of Nevada and an attorney admitted to practice in Nevada who, at all relevant times, acted individually and through Defendant The Gilmore Law Group PLLC and represented himself as counsel authorized to negotiate and finalize settlement of Plaintiff's fee claims on behalf of one or more of the individuals and entities involved in this matter.

13. Defendant The Gilmore Law Group PLLC is, upon information and belief, a Nevada professional limited liability company with its principal place of business in Reno, Nevada, through which Gilmore practiced law and through which he conducted the settlement negotiations and related communications described herein.

14. Defendant Emelia Baer Cellura is sued individually and in her capacities as an officer of Malibu55 and as a trustee of a trust believed to hold or control assets derived from the transactions described herein. Upon information and belief, Emelia Baer Cellura also conducted financial transactions and maintained bank accounts under the name "Half Crazy Mama" and Flock Presents LLC through related entities or business names used by her in connection with the diversion,

transfer, movement, concealment, and retention of funds described in this Complaint.

15. Upon Information and belief, Emelia Baer Cellura participated in or benefitted from the transfer of assets traceable to diverted corporate funds into personal, affiliated, estate-related, or trust-related accounts and structures. She is therefore a proper defendant and necessary party to permit the Court to grant complete relief.

16. Defendant Half Crazy Mama is, upon information and belief, an alter ego of and controlled by Emelia Baer Cellura and was used to receive or disburse funds derived from diverted corporate or related assets and to support personal or non-corporate expenditures.

17. Defendant Flock Presents LLC is, upon information and belief, an alter ego of and controlled by Emelia Baer Cellura and was used to receive or disburse funds derived from diverted corporate or related assets and to support personal or non-corporate expenditures.

18. Defendant Molly M. LeGoy, Esq. is sued in her capacity as Special Administrator of the Estate of Joseph R. Cellura and, upon information and belief, individually to the extent she personally participated in the direction, facilitation, preservation, concealment, or transfer of assets traceable to the diverted corporate funds described herein.

19. Defendant The Joseph R. Cellura Living Trust, if any, is sued because, upon information and belief, assets formerly associated with Joseph R. Cellura deceased June 21, 2025, and/or assets derived from the diversion of corporate funds were transferred into, held by, or administered through that trust or a substantially similar trust vehicle for the benefit of Emelia Baer Cellura or related interests.

20. Defendant Malibu55, Inc. is, upon information and belief, a Nevada corporation controlled by Joseph and/or Emelia Cellura and was used as a recipient and redistribution point for diverted corporate funds.

21. Defendants "John Doe Trusts 1–5" are unknown trust entities, including but not limited to

business trusts or similar structures, that upon information and belief received, held, controlled, or facilitated the transfer of assets traceable to the diverted corporate funds described herein. Their true names and capacities are presently unknown to Plaintiff, who therefore sues such defendants by fictitious names and will amend this Complaint when their identities are ascertained.

22. Defendants "John Doe Trustees 1–5" are individuals or entities who serve or served as trustees, administrators, or persons exercising control over such trust entities, and who may have possession, custody, or control of assets traceable to the diverted funds. Their identities are presently unknown.

23. Nominal Defendant Tarsin Mobile, Inc. is a corporate entity affiliated with the enterprise for which Plaintiff rendered legal services and whose governance, debts, and transactions are relevant to the claims alleged herein.

24. Nominal Defendant SIR Inc. is a corporate entity affiliated with the enterprise for which Plaintiff rendered legal services and whose transactions and asset structure are relevant to the claims alleged herein.

25. Nominal Defendant Global Brands Capital Corp. is a corporate entity associated with the Voting Trust structure and the Sports Illustrated licensing venture for which Plaintiff rendered legal services and whose rights, governance, and proceeds are relevant to the claims alleged herein.

26. The remaining nonresident defendants knowingly authorized, benefitted from, ratified, or accepted the benefits of Gilmore's New York-directed settlement negotiations and communications, which were undertaken on their behalf and for their benefit for purposes of resolving Plaintiff's New York-based legal-fee claims. Those defendants further accepted and retained the benefits of Plaintiff's delay in enforcement and collection efforts resulting from the settlement process directed into New York.

27. The corporate nominal defendants are named because they incurred the fee obligations at

Case 1:26-cv-07073-MKV Document 23-2 Filed 08/26/26 Page 11 of 110

issue, because their assets and transactions form the source of the diversions alleged herein, and because complete relief requires adjudication of Plaintiff's fee claims and tracing of the related corporate funds.

28. Plaintiff does not allege that the nominal defendants, as entities, were the principal tortfeasors in the diversion scheme; rather, they are the corporate obligors and corporate victims whose presence is necessary to grant full relief.

**JURISDICTION AND VENUE**

29. This Court has subject-matter jurisdiction over this action because the claims asserted arise under the common law and statutes of the State of New York, including claims sounding in breach of contract, account stated, fraudulent inducement, aiding and abetting fraud, attorney deceit under fraudulent conveyance or voidable transfer, conversion, constructive trust, unjust enrichment, and related equitable relief.

30. This Court has personal jurisdiction over Defendant Gilmore pursuant to CPLR 302(a)(1) because Gilmore transacted business within New York and purposely availed himself of the privilege of conducting activities within this State by directing settlement negotiations, legal communications, and proposed contractual instruments into New York to Plaintiff, a New York attorney, for the purpose of inducing Plaintiff to compromise a New York-centered legal-fee claim. Between approximately October 2023 and December 2023, Gilmore transmitted multiple settlement drafts, emails, and legal communications to Plaintiff in New York, and those communications were the principal mechanism through which Gilmore sought to procure Plaintiff's execution of the settlement agreement.

31. This Court also has personal jurisdiction over Defendant Gilmore pursuant to CPLR 302(a)(1) and 302(a)(3) because Gilmore committed tortious acts outside New York causing injury

to Plaintiff within New York, including false representations concerning corporate authority, the existence or availability of escrow funding, and the validity of the settlement process, all of which induced Plaintiff in New York to compromise and delay enforcement of a fee claim exceeding $2.2 million.

32. This Court has personal jurisdiction over Defendant Emelia Baer Cellura pursuant to CPLR 302(a)(1) and 302(a)(3) because she participated in, received, controlled, and benefitted from the legal services; the diversion and concealment of corporate funds that should have remained available to satisfy obligations owed in New York, including Plaintiff's legal fees, and because the resulting injury to Plaintiff in New York was foreseeable and intended.

33. This Court has personal jurisdiction over the Cellura Estate, the Trust, Malibu55, Inc., Half Crazy Mama, and Flock, pursuant to CPLR 302(a)(1) and 302(a)(3) because they received, held, transferred, concealed, or benefitted from corporate funds diverted in derogation of obligations owed to Plaintiff in New York, and because those acts form part of an interstate scheme whose consequences in New York were foreseeable and intended.

34. This Court has personal jurisdiction over Defendant Molly M. LeGoy, Esq. pursuant to CPLR 302(a)(1) and 302(a)(3). Upon information and belief, LeGoy, in her capacity as Special Administrator of the Estate of Joseph R. Cellura and/or individually, participated in or directed activities related to the receipt, preservation, administration, or transfer of assets traceable to the diversion of corporate funds that give rise to Plaintiff's claims. Such conduct forms part of the same transaction or series of transactions at issue in this action and has caused injury to Plaintiff within the State of New York. Upon information and belief, such injury in New York was foreseeable, and Defendant derived substantial benefit from interstate activities connected to those transactions.

35. This Court has personal jurisdiction over Defendants John Doe Trusts 1–5 pursuant to

CPLR 302(a)(1) and 302(a)(3). Upon information and belief, such defendants are trust entities, including but not limited to business trusts or similar structures, that received, held, controlled, or facilitated the transfer of assets traceable to the diverted corporate funds described herein. Such conduct constitutes the transaction of business and/or the commission of tortious acts outside the State causing injury within the State of New York. Upon information and belief, such defendants purposefully availed themselves of interstate financial systems and instruments, and the resulting injury to Plaintiff in New York was foreseeable.

36. This Court has personal jurisdiction over Defendants John Doe Trustees 1–5 pursuant to CPLR 302(a)(1) and 302(a)(3). Upon information and belief, such defendants are individuals or entities acting as trustees, administrators, or persons exercising custody or control over trust assets, including assets traceable to the diverted corporate funds described herein. Such defendants, through their control and administration of such assets, participated in transactions and/or conduct that constitute the transaction of business and/or tortious activity giving rise to Plaintiff's claims and causing injury within the State of New York. Upon information and belief, such injury was foreseeable, and such defendants derived substantial benefit from interstate financial activity connected to those transactions.

37. Venue is proper in Orange County pursuant to CPLR 503 because Plaintiff resides in Orange County and because substantial events giving rise to the claims asserted herein, including Plaintiff's reliance upon Defendants' communications and the injury to Plaintiff's New York practice and receivables, occurred in this County.

38. ADMI, Inc., Tarsin Mobile, Inc., SIR Inc., and Global Brands Capital Corp. are joined herein as nominal and necessary defendants because Plaintiff's legal services were performed on their behalf, substantial corporate funds and transactions involving those entities are implicated in the relief sought herein, and complete relief cannot be accorded among the

parties without their presence. Each of said entities retained or benefitted from legal services rendered by Plaintiff in New York, transacted business through interstate and New York-directed activities, and is subject to the jurisdiction of this Court pursuant to CPLR §§ 301 and 302.

**PLAINTIFF'S LEGAL SERVICES AND THE FEE DEBT**

39. Beginning no later than 2019, Plaintiff served as legal counsel to ADMI, Tarsin Mobile, SIR, Global Brands Capital, and affiliated entities in a broad range of matters involving corporate governance, investor communications, licensing rights, protection of company assets, dispute resolution, contract negotiation, and the investigation and recovery of misappropriated funds.

40. Plaintiff's services were not peripheral; they were central to the corporate enterprise and were rendered over a sustained period in reliance upon the understanding that the corporate entities would satisfy the professional obligations they incurred.

41. By February 2023, the total legal fees owed to Plaintiff for services rendered to the corporate entities exceeded $2.2 million. That debt was known to the relevant actors, formed the subject of negotiations in late 2023, and was sufficiently concrete that Gilmore later proposed a settlement under which Plaintiff's claim would be reduced to approximately $1.6 million, thereby confirming the existence of an underlying legal-fee obligation of a greater amount.

42. The corporate entities had the ability, or would have had the ability but for the diversions alleged herein, to satisfy Plaintiff's fee claims. The Sports Illustrated licensing venture, related transactions, associated asset sales, and investor-related proceeds generated or were expected to generate substantial funds, and the Voting Trust structure contemplated that proceeds from corporate assets and transactions would be used to satisfy corporate obligations, including

professional service debts such as those owed to Plaintiff.

## THE VOTING TRUST STRUCTURE AND THE LIMITS OF CELLURA'S AUTHORITY

43. Corporate governance of the entities was structured through Voting Trust Agreements executed in April 2020, pursuant to which Joseph R. Cellura was appointed trustee with limited authority to negotiate certain corporate transactions involving the entities and their shareholders. The Voting Trust structure contemplated that proceeds from corporate assets and transactions would be distributed among shareholders and used to satisfy corporate debt obligations, including investor notes and professional fees incurred by the entities.

44. Importantly, the Voting Trust structure did not authorize Joseph Cellura or Emelia Baer Cellura to bind the corporate entities to a global settlement of Plaintiff's legal-fee claims, nor did it authorize them unilaterally to impose nondisclosure or related provisions restricting disclosure of alleged corporate misconduct, nor did it grant them unfettered authority to divert licensing-related proceeds into personal or affiliated entities.

45. That authority was ultimately terminated in or about June 2023, after corporate officers and stakeholders began questioning the movement of corporate funds and the handling of corporate assets.

46. Plaintiff's later review of the governing documents and declarations confirmed that the authority Gilmore represented to Plaintiff in late 2023 was inconsistent with the actual authority granted under the Voting Trust structure. In other words, the very premise of the settlement negotiations—that Gilmore could secure binding authority through Joseph or Emelia Cellura alone—was materially false or, at minimum, materially misleading.

## DISCOVERY OF THE DIVERSION OF CORPORATE FUNDS

47. Following the termination of Joseph Cellura's authority and the growing internal concern about missing corporate assets, internal reviews of financial records revealed that commencing January 2023

and continuing to date, substantial funds belonging to ADMI and related entities had been diverted into entities controlled by Joseph and Emelia Cellura, including Malibu55, Inc., Half Crazy Mama, and Flock. These funds were not being used to satisfy corporate debt obligations, investor obligations, or Plaintiff's legal-fee claims. Instead, they were being routed into affiliated entities, held in intermediary accounts, and used for personal or non-corporate expenditures.

48. Upon information and belief, and based on the financial reviews, declarations, and records produced to date, the diversions included approximately $7.8 million from ADMI-associated funds, approximately $6 million from Travel + Leisure Co.-related funds, and approximately $4.5 million from SHV-related proceeds. Whether those figures are ultimately refined in discovery, the pattern is already clear: large sums that should have remained within the corporate enterprise or been available to satisfy corporate obligations were transferred into entities and accounts controlled by the Celluras.

49. Upon information and belief, after the diversion of corporate funds from ADMI, Inc. and related entities and their deposit into accounts associated with Malibu55, Inc., Half Crazy Mama, Flock, and other accounts controlled by Joseph R. Cellura and Emelia Baer Cellura, portions of those funds were further transferred, assigned, or placed into additional financial accounts, trusts, custodial accounts, or similar arrangements established for the benefit of members of the Cellura family. Such transfers included, upon information and belief, accounts or trusts created for the benefit of minor children or other family beneficiaries. These subsequent transfers were made without fair consideration and occurred after substantial corporate obligations, including Plaintiff's legal fee claims, had accrued. The transfers were undertaken for the purpose of concealing the location of the diverted funds and hindering the ability of creditors, including Plaintiff, to recover those assets. Plaintiff therefore seeks discovery concerning the identity of all transferees, intermediaries, custodians, trustees, and financial institutions through which such funds were

moved, and seeks appropriate equitable relief including avoidance of fraudulent transfers, the imposition of a constructive trust, disgorgement, and recovery of any assets traceable to the diverted corporate funds.

50. A substantial part of the scheme operated through what Plaintiff refers to as the "Malibu Accounts"—accounts and related financial channels controlled by Joseph Cellura and Emelia Baer Cellura that functioned as intermediary clearing accounts for the receipt, transfer, and redistribution of corporate funds and, upon information and belief, were utilized to conceal, layer, and transfer those funds through a trust structure allegedly created for the benefit of Joseph Cellura and Emelia Baer Cellura, thereby hindering the tracing and recovery of those assets. Plaintiff further alleges, upon information and belief, that the manner in which those accounts and trust structures were utilized raises substantial questions concerning the reporting and treatment of the funds for tax and accounting purposes.

51. Corporate funds were transferred into the Malibu Accounts, commingled with other funds, and redistributed into additional entities and accounts controlled by the Celluras. The use of these intermediary accounts obscured both the origin and the ultimate destination of the diverted corporate funds and prevented corporate creditors, including Plaintiff, from tracing and recovering those assets.

52. Upon information and belief, funds transferred through the Malibu Accounts were subsequently distributed to additional entities, accounts, and financial arrangements controlled directly or indirectly by the Celluras.

53. The evidence produced to date also reveals substantial balances and recurring transfers into Emelia Cellura's personal and affiliated accounts, including regular support transfers into a Wells Fargo business checking account in the name of Half Crazy Mama and a large balance in an American Express high-yield savings account in her own name. Those accounts are relevant

Case 1:26-cv-07073-VMK Document 23-2 Filed 08/07/26 Page 18 of 110

not because every dollar therein is presently proven to be corporate property, but because their balances and funding pattern are consistent with Plaintiff's allegation that personal and affiliated accounts were used to warehouse or recycle value derived from diverted corporate funds.

54. These diversions occurred while Plaintiff's legal fees remained unpaid and while the corporate entities otherwise lacked or were caused to lack sufficient funds to satisfy the obligations they had incurred to Plaintiff.

55. In practical terms, Defendants stripped or concealed the very assets from which Plaintiff's fees should have been paid.

**GILMORE'S ENTRY INTO THE MATTER AND THE SETTLEMENT NEGOTIATIONS**

56. In or about September 2023, Gilmore informed corporate officers and related actors that he had been retained to replace Plaintiff as counsel to ADMI, SIR and GBCC to address corporate litigation and settlement issues. Gilmore then began communicating with corporate officers and requesting corporate records and financial documents while simultaneously falsely presenting himself to Plaintiff as counsel authorized to negotiate a resolution of Plaintiff's fee claims on behalf of the relevant entities and individuals.

57. Between approximately October 2023 and December 2023, Gilmore transmitted multiple drafts of a proposed settlement agreement to Plaintiff through interstate communications directed into New York. Those communications represented that the proposed settlement agreement would resolve Plaintiff's outstanding legal-fee claims against the corporate entities and that the agreement had been authorized or would be authorized by the parties necessary to bind the entities.

58. On December 11, 2023, Plaintiff executed the settlement agreement transmitted by Gilmore. (A true and correct copy of the agreement executed by Plaintiff is annexed hereto as **Exhibit "A").** That agreement reduced Plaintiff's claim from approximately $2.2 million to approximately

$1.6 million and provided for payment in two installments, including a second payment that the agreement stated would be paid from escrow upon the transfer, assignment, or other disposition of VTA beneficiaries' interest concerning ADMI's shareholder interest in SHV, the holder of the Sports Illustrated license.

59. The inclusion of that escrow provision was materially important. It represented, expressly and by necessary implication, that escrow funding existed or would be available from the contemplated licensing transaction to satisfy the second payment. Plaintiff understood this to mean that the payment source was real and tied to a transaction that would generate proceeds available to him.

60. Upon information and belief, at the time Gilmore drafted and circulated the settlement agreement he knew, or recklessly disregarded, that no such escrow funds then existed that would satisfy the promised payment, and yet he nevertheless presented the settlement structure as a legitimate and funded mechanism through which Plaintiff would be paid. Plaintiff relied upon that representation when he executed the settlement agreement and delayed litigation.

61. The Sports Illustrated license was subsequently assumed by Travel + Leisure Co. from SHV in July 2024, which was the very term expressed concerning transfer, assignment, or disposition contemplated by the settlement language requiring the $800,000 in escrowed funds to be paid to Dollinger. Yet despite the occurrence of such a transaction, Plaintiff never received the promised escrow payment.

62. This confirms that the escrow representation was false or materially misleading when made and that Plaintiff was induced to compromise his claim by reference to a payment mechanism that did not exist in the manner represented.

**DISCOVERY THAT THE SETTLEMENT WAS NOT AUTHORIZED OR EXECUTED**

63. After Plaintiff executed the settlement agreement and sought confirmation that

the agreement had been fully executed by the other parties, Gilmore failed to produce a fully executed copy. Plaintiff later discovered that key parties required to bind the entities had never signed the agreement and that the necessary approvals had not been obtained.

64. Plaintiff further discovered that Gilmore did not represent the parties as claimed, and in fact did not possess authority to bind the entities in the manner represented and that the corporate officers or stakeholders and individuals whose authorization was required had not approved the settlement as Gilmore had led Plaintiff to believe. Plaintiff would not have executed the settlement agreement or compromised his legal-fee claims had he known these facts. (A true and correct copy of an email from John C. Shackelford, Esq. the attorney for Timothy Wilbanks a named party to the settlement advising Gilmore to "cease his claim he represented Mr. Wilbanks **Exhibit "B"). In pertinent part he states:**

> On Jan 17, 2024, at 12:16 PM, John Shackelford <jshack@shackelford.law> wrote:
>
> I represent Tim Wilbanks and your letter to Bruce Houle dated January 11th 2024 was sent to me and Mr. Wilbanks has requested I respond to factually incorrect assertions made about him in your
>
> letter. You do not, nor have you ever, represented Mr. Wilbanks regarding Bruce Houle or regarding anything else. Further, Mr. Wilbanks is not nor has he ever been a principal of ADMI, Inc. (ADMI). Mr. Wilbanks did permit himself to be installed as CEO and Chairman of the Board of SIR Incorporated (SIR) and he authorizes me to advise you and as counsel to Joe Cellura that effective immediately he hereby resigns any and all positions he may have or had in SIR, including being CEO and Chairman of the Board. Lastly, please cease from representing to any one that you represent Mr. Wilbanks or that he was a principal of ADMI.
>
> John
>
> John C. Shackelford, Esq.

65. Other text messages and related communications produced to date further reinforce Plaintiff's allegation that Gilmore knew the execution of the settlement documents was incomplete, that the settlement process was irregular, and that it was nevertheless pursued without the authority of the individuals identified as necessary signatories to the Settlement. These communications further support Plaintiff's allegation that Gilmore falsely represented that he was authorized to act

for, and represented, each of those parties in order to induce Plaintiff to rely upon the purported settlement, when, in fact, those individuals had not authorized Gilmore to act on their behalf and were not represented by him. Plaintiff confirms that Ghiselli and other necessary parties did not sign the final December 11, 2023 settlement, based on their discovery of the missing funds; that required signatures were absent, and that Plaintiff was never provided with a properly executed final agreement wherein Gilmore's acts constitute material acts of deceit and fraud.

**THE FEDERAL FILING AND THE INCONSISTENT SETTLEMENT VERSIONS**

66. Matters were aggravated further when Gilmore later submitted to a federal court a declaration stating that the settlement attached thereto was a "true and accurate copy" of the operative settlement agreement, despite the existence of materially inconsistent versions and despite the absence of valid execution by all necessary parties. By presenting one version as authentic while other versions and surrounding facts showed execution irregularities and missing authority, Gilmore further entrenched the deception surrounding the settlement process and impaired Plaintiff's ability to obtain a straightforward adjudication of the fee dispute.

67. The use of inconsistent settlement versions is not alleged merely as a technical irregularity. It is alleged because it reinforces Plaintiff's contention that the settlement was used as a device to delay and obstruct Plaintiff's fee recovery while the funds that should have satisfied those fees were being diverted and concealed, and because it supports Plaintiff's claim that Gilmore engaged in intentional attorney deceit.

**THE ESTATE, THE TRUST, AND THE CONTINUED SHELTERING OF ASSETS**

68. Joseph R. Cellura died on June 21, 2025, and his estate is represented by Molly M. LeGoy, Esq., as Special Administrator. Upon information and belief, by the time of his death substantial assets that should have remained reachable by creditors or traceable to diverted corporate funds

had already been removed from his estate, placed into affiliated entities, or transferred into trust structures for the benefit of Emelia Baer Cellura and related interests.

69. Upon information and belief, trust documents were circulated after Gilmore had notice of disputes concerning diverted corporate funds, disputes over authority under the Voting Trust structure, and claims asserted by ADMI, GBCC, and related stakeholders. Plaintiff alleges that the trust structure was used, at least in part, to receive, hold, or shield assets derived from or connected to the same diverted corporate funds that should have been available to satisfy Plaintiff's fee claims and related corporate obligations.

70. Upon information and belief, after disputes arose concerning the diversion of corporate funds belonging to ADMI and related entities and after notice of Plaintiff's claims for unpaid legal fees exceeding $2.2 million, additional asset-concealment structures were created or activated for the purpose of further concealing and shielding the diverted funds. Upon information and belief, among those structures was the creation or use of one or more trust entities, including but not limited to business trusts, whose identities are presently unknown and are therefore designated herein as John Doe Trusts 1–5. Upon information and belief, funds traceable to the corporate assets diverted by Joseph R. Cellura and Emelia Baer Cellura were transferred into, through, or otherwise held by accounts or trust structures associated with such John Doe Trusts. The creation and use of these trust structures occurred after disputes had arisen concerning the diversion of corporate assets and after the accrual of substantial creditor claims, including Plaintiff's legal fee claims.

71. Plaintiff therefore alleges that such John Doe Trust structures, together with any accounts or custodial arrangements administered by unknown trustees designated herein as John Doe Trustees 1–5, were used as mechanisms to conceal, transfer, or hold assets derived from the diversion of corporate funds, and that discovery is required concerning the formation of such

trusts, the identity of their beneficiaries, the source of funds deposited into such trusts, and the financial institutions through which those funds were transferred.

72. Upon information and belief, Defendants designated herein as John Doe Trustees 1–5, acting as trustees, administrative trustees, or persons exercising control over the John Doe Trusts, presently exercise custody, direction, or control over one or more accounts, trust assets, custodial arrangements, or financial instruments into which assets traceable to the diverted corporate funds were transferred. The possession, custody, and control of such assets by the John Doe Trustees make them necessary parties for purposes of tracing, restraint, attachment, constructive trust, accounting, and turnover relief.

73. The estate and trust are therefore necessary parties because, absent their inclusion, Plaintiff cannot obtain complete relief with respect to assets traceable to the diversions alleged herein, nor can the Court impose appropriate equitable remedies over the full body of property derived from those diversions.

**RELIANCE, INJURY, AND NEW YORK CONNECTION**

74. The settlement negotiations conducted by Gilmore were directed to Plaintiff in the State of New York through interstate electronic communications including emails and transmitted settlement drafts. Gilmore knowingly engaged in these communications with a New York attorney concerning the resolution of legal-fee claims arising from services substantially performed in New York.

75. Plaintiff reviewed, negotiated, and ultimately executed the settlement agreement within the State of New York in reliance upon the representations made by Gilmore regarding authority, execution, and the availability of settlement funds.

76. As a direct and foreseeable result of Gilmore's conduct, Plaintiff suffered injury in the State of New York, including the compromise of legal-fee claims exceeding $2.2 million and the

delay and impairment of Plaintiff's ability to recover those fees while corporate funds were being diverted and concealed.

77. Had Plaintiff known that the settlement agreement lacked required authorization and execution, that the represented escrow structure did not exist as represented, and that corporate funds were being diverted and concealed, Plaintiff would have immediately pursued litigation, attachment, injunctive relief, expedited discovery, restraint, and turnover remedies directed at preserving assets available to satisfy Plaintiff's claims.

## FIRST CAUSE OF ACTION

**Breach of Contract / Contractual Fee Liability (Against Nominal Defendants**
(ADMI, Inc., Tarsin Mobile, Inc., SIR Inc., and Global Brands Capital Corp.)

78. Plaintiff repeats and realleges paragraphs 1 through 77 as though fully set forth herein.

79. Plaintiff rendered extensive legal services to the nominal corporate defendants, which services were requested, accepted, used, and relied upon by those entities and their principals in connection with corporate governance, licensing, investor matters, protection of company assets, and related legal affairs.

80. By February 2023, the legal fees owed to Plaintiff for those services exceeded $2.2 million, and the existence of a substantial fee obligation was acknowledged by the later settlement negotiations that sought to reduce Plaintiff's claim to approximately $1.6 million.

81. The nominal corporate defendants incurred contractual obligations to Plaintiff for those services and failed to pay the amounts due. To the extent those entities were stripped of the means to satisfy Plaintiff's invoices by reason of the diversions alleged herein, such diversions do not extinguish the entities' underlying fee liability.

82. By reason of the foregoing, Plaintiff is entitled to damages against the nominal corporate defendants in an amount not less than $2.2 million, together with interest and such other relief as the Court deems just.

## SECOND CAUSE OF ACTION

**Account Stated**
(Against Nominal Defendants ADMI, Tarsin Mobile, SIR and Global Brands Capital Corp)

83. Plaintiff repeats and realleges paragraphs 1 through 82 as though fully set forth herein.

84. Plaintiff rendered invoices and/or statements for legal services to the nominal corporate defendants, who accepted the services, retained their benefit, and did not timely object to the fee balances in the ordinary course.

85. The subsequent negotiation of a settlement reducing Plaintiff's claim from approximately $2.2 million to approximately $1.6 million further confirms that a substantial fee debt was acknowledged and treated as real by the parties involved.

86. By reason of the foregoing, an account was stated in Plaintiff's favor in an amount not less than $2.2 million, or, alternatively, in the amount acknowledged in the settlement negotiations, together with interest and costs.

## THIRD CAUSE OF ACTION

**Fraudulent Inducement**
(Against Frank C. Gilmore and The Gilmore Law Group PLLC)

87. Plaintiff repeats and realleges paragraphs 1 through 86 as though fully set forth herein.

88. Gilmore made material misrepresentations of existing fact to Plaintiff, including that he possessed authority to negotiate and finalize a binding settlement on behalf of the corporate entities and relevant principals, that the settlement had been or would be authorized by the necessary parties, and that the second payment of $800,000 would be paid from escrow upon the transfer, assignment, or other disposition of the Sports Illustrated license.

89. Those representations were false or materially misleading when made. Gilmore lacked authority to bind all necessary parties and entities to a final enforceable settlement agreement, the

necessary approvals and signatures had not been obtained, and the escrow representation created the false impression that funds had been secured, reserved, committed, or otherwise made available in a manner sufficient to support and complete the settlement process being presented to Plaintiff.

90. Gilmore made these representations intentionally or with reckless disregard for their truth for the purpose of inducing Plaintiff to compromise his legal-fee claims and delay litigation.

91. Plaintiff reasonably relied upon those representations in New York when he executed the settlement agreement on December 11, 2023, agreed to reduce and compromise his legal-fee claims, and refrained from immediately pursuing attachment, restraint, turnover, injunctive relief, expedited discovery, and other enforcement and collection remedies that otherwise would have been pursued to preserve assets available to satisfy Plaintiff's claims.

92. As a direct and proximate result of that reliance, Plaintiff suffered damages in an amount to be determined at trial but not less than $2.2 million, together with consequential losses arising from delay, obstruction, diminished recoverability, continued diversion and concealment of assets, and the resulting impairment of Plaintiff's ability to recover amounts otherwise due and owing.

## FOURTH CAUSE OF ACTION

**Aiding and Abetting Fraud**
(Against Frank C. Gilmore and The Gilmore Law Group PLLC)

93. Plaintiff repeats and realleges paragraphs 1 through 92 as though fully set forth herein.

94. Upon information and belief, Joseph R. Cellura and Emelia Baer Cellura engaged in fraudulent conduct by, among other things, diverting corporate funds belonging to ADMI and related entities, transferring and concealing those funds through affiliated accounts, entities, and structures, and inducing Plaintiff to participate in a purported settlement process while the funds that should have been available to satisfy Plaintiff's legal-fee claims were being removed,

dissipated, or concealed.

95. At all relevant times, Defendant Frank C. Gilmore, Esq. had actual knowledge of facts sufficient to understand the fraudulent nature of this conduct, including but not limited to (i) the existence of disputes concerning corporate authority and control, (ii) the absence of valid authority under the purported Voting Trust or related structures to bind the entities to the settlement terms he advanced, (iii) the incomplete, unexecuted, or otherwise unauthorized nature of the proposed settlement agreement, and (iv) the diversion, unavailability, or concealment of corporate funds necessary to satisfy Plaintiff's claims.

96. Despite such knowledge, Gilmore knowingly and substantially assisted the underlying fraud by, among other things, (i) drafting, transmitting, and promoting a settlement agreement as authorized and capable of execution, (ii) representing, directly and indirectly, that funds—including an $800,000 payment tied to an escrow or licensing transaction—were available or would be available to satisfy the settlement obligations, (iii) creating and reinforcing the false impression that the settlement process was legitimate and capable of performance, and (iv) continuing to advance such representations in communications and litigation-related submissions despite knowledge of material inconsistencies and lack of authorization.

97. Gilmore's assistance was substantial, direct, and a proximate cause of Plaintiff's injury.

His conduct induced Plaintiff to delay enforcement of his legal-fee claims, to refrain from pursuing available remedies, and to rely upon a settlement framework that was not genuine, thereby enabling the continued diversion, concealment, and dissipation of assets that should have been available to satisfy Plaintiff's claims.

98. By reason of the foregoing, Defendants Frank C. Gilmore and The Gilmore Law Group PLLC are liable to Plaintiff for aiding and abetting fraud.

## FIFTH CAUSE OF ACTION

**Fraudulent Conveyance / Voidable Transfers**
(Against Emelia Baer Cellura, the Estate, LeGoy, the Trust, Malibu55, Half Crazy Mama, Flock, JOHN DOE Trusts 1–5, JOHN DOE Trustees 1–5)

99. Plaintiff repeats and realleges paragraphs 1 through 98 as though fully set forth herein.

100. At the time the transfers described above were made, the corporate entities were indebted to Plaintiff for legal services rendered, and Joseph and Emelia Cellura knew or should have known of Plaintiff's claims and of the broader corporate obligations to creditors and investors.

101. The transfers of corporate-derived funds into Malibu55, Half Crazy Mama, Flock, affiliated accounts, the Estate, and trust structures were made without fair consideration or for grossly inadequate consideration and were made with actual intent to hinder, delay, or defraud creditors, including Plaintiff, or under circumstances rendering the transferors insolvent or unable to satisfy reasonably foreseeable obligations.

102. Plaintiff therefore seeks avoidance of the transfers to the extent necessary to satisfy Plaintiff's claims, together with attachment, restraint, or turnover of transferred assets and such other remedies as are available under New York law.

## SIXTH CAUSE OF ACTION

**Conversion**
(Against Emelia Baer Cellura, the Estate, the Trust, Malibu55, Half Crazy Mama, and Flock)

103. Plaintiff repeats and realleges paragraphs 1 through 102 as though fully set forth herein.

104. The funds diverted from ADMI and related entities were specific and identifiable corporate assets, including licensing proceeds, investor-related funds, and related corporate receivables that should have remained available to satisfy corporate obligations. By exercising unauthorized dominion and control over those funds, transferring them into affiliated entities, and using them for personal or non-corporate purposes, Defendants converted property in which Plaintiff, as a

creditor of the corporate obligors and the intended recipient of payment from corporate proceeds, had a direct and protectable interest.

105. Plaintiff has been damaged by that conversion in an amount to be determined at trial but not less than the amount by which the diverted and converted assets prevented or impaired the payment of Plaintiff's claims.

## SEVENTH CAUSE OF ACTION

**Constructive Trust**
(Against Emelia Baer Cellura, the Estate, the Trust, Malibu55,
Half Crazy Mama, Flock, JOHN DOE Trusts 1–5, JOHN DOE Trustees 1–5)

106. Plaintiff repeats and realleges paragraphs 1 through 105 as though fully set forth herein.

107. Joseph Cellura occupied a fiduciary or quasi-fiduciary position with respect to corporate and trust-governed assets, and Emelia Cellura participated in or benefitted from the misuse of those assets. Funds and property derived from the diversion of corporate assets were transferred into entities, accounts, estate holdings, and trust structures controlled by or for the benefit of the Celluras. Those assets are presently held under circumstances such that equity and good conscience require that they be impressed with a constructive trust for the benefit of rightful claimants, including Plaintiff to the extent necessary to satisfy his fee claims.

## EIGHTH CAUSE OF ACTION

**Breach of Fiduciary Duty**
(Against the Estate of Joseph R. Cellura)

108. Plaintiff repeats and realleges paragraphs 1 through 107 as though fully set forth herein.

109. Joseph Cellura owed fiduciary duties under the Voting Trust structure and within the broader corporate governance framework governing the distribution and handling of proceeds derived from corporate assets and transactions. Those duties included the obligation to act loyally, to account for funds, to avoid self-dealing, and to ensure that corporate obligations,

Case 1:26-cv-07073-MKV Document 23-2 Filed 08/05/26 Page 29 of 109

including debt and professional obligations, were not defeated through unauthorized diversion of assets.

110. By diverting funds into entities controlled by himself and his spouse, using corporate money for personal or non-corporate purposes, and acting outside the authority granted by the Voting Trust structure, Joseph Cellura breached those fiduciary duties, and his estate is liable to the extent it holds or benefitted from resulting proceeds.

**NINTH CAUSE OF ACTION**

**Unjust Enrichment**
(Against All Defendants Other Than the Nominal Corporate Defendants, in the Alternative)

111. Plaintiff repeats and realleges paragraphs 1 through 110 as though fully set forth herein.

112. To the extent any Defendant received, retained, controlled, or benefitted from funds that should have been available to satisfy Plaintiff's legal-fee claims, such Defendant has been unjustly enriched at Plaintiff's expense.

113. It would be inequitable to permit those Defendants to retain the benefit of diverted corporate assets while Plaintiff remains unpaid for the services that benefitted the same enterprise from which the diverted funds were derived.

**TENTH CAUSE OF ACTION**
**Concerted Action and Joint Liability Arising from Underlying Fraudulent Conduct**

(Against Frank C. Gilmore, Emelia Baer Cellura, the Estate, the Trust, Malibu55, Half Crazy Mama, Flock and LeGoy)

114. Plaintiff repeats and realleges paragraphs 1 through 113 as though fully set forth herein.

115. The conduct of Joseph Cellura, Emelia Cellura, Frank Gilmore, and the affiliated entities and structures through which diverted funds were received, transferred, sheltered, concealed, or redistributed was coordinated, mutually reinforcing, and undertaken in furtherance of the underlying fraudulent conduct, diversion of corporate assets, concealment of funds, obstruction of

creditor recovery, and delay of Plaintiff's enforcement efforts as alleged herein.

116. The diversion of corporate funds removed the assets needed to satisfy corporate obligations; the use of Malibu55, Half Crazy Mama, Flock, affiliated accounts, the Estate, the Trust, and related trust structures helped conceal, hold, transfer, and redistribute those assets; and Gilmore's settlement representations and litigation conduct induced Plaintiff to delay suit, compromise his claims, and refrain from immediate enforcement efforts while the diversion, concealment, and dissipation of assets continued.

117. By reason of this concerted action, each such Defendant is jointly and severally liable to the extent permitted by New York law for the damages and equitable relief sought herein.

**DAMAGES, EQUITABLE RELIEF, AND PRESERVATION OF ASSETS**

118. As a direct and foreseeable result of Defendants' conduct, Plaintiff has suffered damages in an amount not less than $2.2 million, together with interest, consequential damages resulting from delay and obstruction, costs of investigation, attorneys' fees where recoverable, and such other damages as may be proven at trial.

119. Plaintiff further seeks equitable relief including but not limited to avoidance of voidable transfers, imposition of constructive trusts, injunctive relief preventing the further transfer, concealment, or dissipation of assets, tracing of diverted funds through all intermediary accounts and entities, an accounting, turnover of traceable property and funds, and such other relief as may be necessary to restore assets wrongfully diverted and to satisfy Plaintiff's claims.

**JURY DEMAND**

120. Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

**A.** On the First and Second Causes of Action, for damages against the nominal corporate defendants in an amount not less than $2.2 million, together with pre-judgment and post-judgment

interest as permitted by law;

**B.** On the Third and Fourth Causes of Action, for damages against Defendants Frank C. Gilmore and The Gilmore Law Group PLLC for fraudulent inducement and aiding and abetting fraud, in an amount to be determined at trial but not less than the amount of Plaintiff's compromised and unpaid fee claim, together with consequential damages, costs, and interest;

**C.** On the Fifth through Tenth Causes of Action, for damages and equitable relief against all transferee defendants, including but not limited to the Estate, any trust entities including John Doe Trusts 1–5, any trustees or persons exercising control over such trusts including John Doe Trustees 1–5, and all participating tortfeasors, including, without limitation, relief for avoidance of fraudulent transfers, the imposition of constructive trusts, a full accounting, turnover of assets, tracing of funds, and injunctive relief.

**D.** For an Order directing Defendants, and each of them, to identify, preserve, and account for all assets traceable to the diverted corporate funds described herein, including the disclosure of all accounts, custodians, and financial institutions holding or having held such assets;

**E.** For an Order imposing a constructive trust upon any and all assets, wherever located, that are traceable to the diversion of corporate funds described herein;

**F.** For an Order restraining Defendants, and all persons acting in concert with them, from transferring, encumbering, concealing, dissipating, or otherwise disposing of any assets traceable to the transactions described herein during the pendency of this action;

**G.** For an Order directing tracing, restraint, attachment, and turnover of any assets held by or through any trust, business trust, custodial arrangement, account, or financial intermediary, including but not limited to those held by John Doe Trusts 1–5 and/or John Doe Trustees 1–5, to the extent such assets are traceable to the diverted corporate funds described herein;

**H.** For costs and disbursements of this action, together with attorneys' fees to the extent permitted by contract, statute, or common law;

**I.** For such other and further relief as the Court deems just and proper.

Dated: July 7, 2026
Orange County, New York

Respectfully submitted:

**LAW OFFICES OF DOUGLAS R. DOLLINGER, P.C.**

By: *Douglas R. Dollinger, Esq.*
Douglas R. Dollinger, Esq.
Attorney for Plaintiffs
570 County Rt. 49
Middletown, New York 10940
Tel: 845.741.9363
Email: ddollingeresq@gmail.com

**VERIFICATION**

STATE OF NEW YORK )
) ss:
COUNTY OF ORANGE )

I, DOUGLAS R. DOLLINGER, depose and say:

I am the Plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The same is true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

The reason this verification is made by me and not by another party is that I am familiar with the facts and circumstances set forth herein.

I affirm this under penalty of perjury pursuant to CPLR §2106.

Dated: July 7, 2026
Orange County, New York

Respectfully submitted:

Douglas R. Dollinger, Esq.

Douglas R. Dollinger, Esq.
570 County Rt. 49
Middletown, New York 10940
Tel: 845.741.9363
Email: ddollingeresq@gmail.com

# EXHIBIT A

**MUTUAL SETTLEMENT AGREEMENT**
**WITH RELEASE OF ALL CLAIMS**

This Settlement and Mutual Release Agreement (the "Agreement") is made and entered into as of the last date on the signature page of this Agreement (the "Effective Date"), between and among DOUGLAS R. DOLLINGER, individually, and The LAW OFFICE OF DOUGLAS R. DOLLINGER, PC (collectively "Dollinger"), on the one hand, and JOSEPH R. CELLURA, EMELIA BEAR CELLURA, MICHAEL F. GHISELLI, TIMOTHY WILBANKS, MALIBU55 INC, ADMI INC., EP5 INC., F/K/A TARSIN MOBILE INC., EPISODE5 INC. (collectively the "Clients"), on the other hand. Each settling party shall be a "Party" and collectively shall be the "Parties."

WHEREAS, Dollinger had been engaged by Clients, directly or indirectly, to provide legal representation, counseling, and services over the course of the past several years;

WHEREAS, Clients wish to disengage Dollinger as legal counsel and terminate the relationship between Dollinger and Clients as set forth below;

WHEREAS, on or about February 18, 2023, Dollinger and certain Clients executed the General Release and Settlement Agreement ("First Settlement"), upon which Dollinger received

Share of Sport Illustrated Resorts, as public company or to any assignee of the Sports Illustrated License Agreement ("SIL"), issued by Authentic Brands Group at the election of Dollinger. A dispute between the parties has arisen regarding the enforcement and breach of the First Settlement;

WHEREAS, in order to mutually terminate the relationship between Clients and Dollinger, and to avoid the cost, uncertainty, and inconvenience of further disputes between the Parties regarding the First Settlement, the Parties have agreed to fully and completely resolve, compromise, and settle all disputes, claims, causes of action, actions, liabilities, and damages that either of the Parties have or may have against each other, including, without

limitation, arising out of, based upon, or relating to (i) the First Settlement; (ii) the GLOBAL BRANDS CAPITAL CORPORATION/BAYNON transaction between GHISELLI and Pasquale Catizone and Carmine Catizone; (iii) the ADMI transaction; and (iv) any other equity transactions or litigation in which Dollinger represented Clients, or in which Dollinger claims an actual or equitable equity interest in any of the Client's affiliated entities (collectively, the "Claims").

AGREEMENT

Therefore, in consideration of the above Recitals, which are incorporated herein by reference, and the mutual promises, agreements, and releases set forth herein, the Parties hereby agree as follows:

1. Payment to Dollinger. Clients shall remit payment to Dollinger in the amount of

the "Settlement Payment"). The Settlement Payment shall be made in two (2) equal payments of

a. The first payment shall be paid upon the execution of this Agreement.

b. The second payment shall be paid at the time of sale, transfer, or assignment of the last remaining ADMI INC, interest in the Sports Illustrated License ("SIL"), as issued by Authentic Brands Group to Sports Hospitality Ventures LLC ("SHV") and ADMI INC. (the "SHV Transaction"), to be paid from an attorney escrow at the time of closing of the SHV Transaction. In the event that the SHV Transaction is not consummated, Clients shall pay Dollinger annual interest payments equal to of the outstanding amount of the Settlement Payment, which interest payments shall be secured by any revenue due and payable to ADMI from SIL and associated ventures or the

sale of ADMI assets from March 1, 2024 until paid in full.

3. Release of Claims by Clients.

a. Subject to the provisions of subparagraph 3(d) of this Agreement, and conditioned on the full and complete performance by Clients under paragraphs 1 & 2 of this Agreement, upon the Effective Date, Clients, on behalf of themselves and, as appropriate, any of its present or former parent entities, subsidiaries, affiliates, divisions, successors, officers, directors, members, managers, partners, co-venturers, agents, employees, heirs, assigns, insurers, representatives, accountants, lawyers, and all persons acting by, through, or in concert with them (collectively, the "Client Releasors"), hereby fully and completely release and forever discharge DOLLINGER, and, as appropriate, any of its present or former parent entities, subsidiaries, affiliates, divisions, successors, officers, directors, members, managers, partners, co-venturers, agents, employees, heirs, assigns, insurers, representatives, accountants, lawyers, and all persons acting by, through, or in concert with them (collectively, the "DOLLINGER Releasees") of and from any and all manner of action or actions, cause or causes of action, in law or in equity, and any suits, debts, liens, contracts, agreements, promises,

liabilities, claims, demands, damages, losses, attorneys' fees, costs, and expenses, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent (hereinafter collectively called "Claims") that any of the Clients Releasors have had or now have against the DOLLINGER Releasees, from the beginning of time to the Effective Date, including, but not limited to, Claims arising out of, based upon, or relating to the Disputes.

b. Clients acknowledge, understand, and agree that this is a full, complete, and final general release of any and all Claims, and that it shall apply to all unknown, unanticipated, unsuspected, and undisclosed Claims, demands, liabilities, actions, or causes of action, in law, equity, or otherwise as well as those which are now known, anticipated, suspected, or disclosed concerning the Parties, including the Disputes.

c. Clients represent and warrant that they are the only persons or entities who hav any interest in any of the matters herein released, that no other person or entity has any interest in any of the matters herein released, and that there has been no assignment or other transfer of any interest in any of the Claims which they may have against the DOLLINGER Releasees. Clients agree to defend, indemnify, and hold the DOLLINGER Releasees harmless against any Claims that result from anyone asserting any such assignment or transfer. Clients agree that if the Client Releasors, or any of them, hereafter commence, join in, or in any manner seek relief through any suit or action arising out of, based upon, or relating to any of the Claims released herein, or in any manner assert against the DOLLINGER Releasees any of the Claims released hereunder, then the responsible Client Releasors shall pay to the DOLLINGER Releasees, in addition to any other damages caused to the DOLLINGER Releasees thereby, all attorneys' fees incurred by the DOLLINGER Releasees in defending or otherwise responding to said suit or Claim.

d. Nothing in this paragraph 3 shall be construed as a release by the Client Releasors of any of the rights, duties, obligations, or entitlements created by this Agreement.

4. Release of Claims by DOLLINGER.

a. Subject to the provisions of subparagraph 4(d) of this Agreement, and conditioned on the full and complete performance by Clients under paragraph 1 & 2 of this Agreement, upon the Effective Date, DOLLINGER, on behalf of himself, and, the Law Office of Douglas R. Dollinger, PC, as appropriate, any of his present or former parent entities, subsidiaries, affiliates, divisions, successors, officers, directors, members, managers, partners, co-venturers, agents, employees, heirs, assigns, insurers, representatives, accountants, lawyers, and all persons acting by, through, or in concert with them (collectively, the "DOLLINGER Releasors"), hereby fully and completely release and forever discharge Clients, on behalf of themselves and, as appropriate, any of its present or former parent entities, subsidiaries, affiliates, divisions, successors, officers, directors, members, managers, partners, co-venturers, agents, employees, heirs, assigns, insurers, representatives, accountants, lawyers, and all persons acting by, through, or in concert with them (collectively, the "Client Releasees") of and from any and all manner of action or actions, cause or causes of action, in law or in equity, and any suits, debts, liens, contracts, agreements, promises, liabilities, Claims, demands, damages, losses, attorneys' fees, costs, and expenses, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent that any of the DOLLINGER Releasors have had or now have against the Client Releasees, from the beginning of time to the Effective Date, including, but not limited to, Claims arising out of, based upon, or relating to the Disputes.

b. DOLLINGER acknowledges, understands, and agrees that this is a full, complete, and final general release of any and all Claims, and that it shall apply to all unknown, unanticipated, unsuspected, and undisclosed Claims, demands, liabilities, actions, or causes of action, in law, equity, or otherwise as well as those which are now known, anticipated, suspected, or disclosed concerning the Parties, including the Disputes.

c. DOLLINGER represents and warrants that they are the only persons or entities who have any interest in any of the matters herein released, that no other person or entity has any interest in any of the matters herein released, and that there has been no assignment or other transfer of any interest in any of the Claims which it may have against the Client Releasees. DOLLINGER agrees to defend, indemnify, and hold the Client Releasees harmless against any Claims that result from anyone asserting any such assignment or transfer. DOLLINGER agrees that if the DOLLINGER Releasors, or any of them, hereafter commence, join in, or in any manner seek relief through any suit or action arising out of, based upon, or relating to any of the Claims released herein, or in any manner assert against the Client Releasees any of the Claims released hereunder, then the responsible DOLLINGER Releasors shall pay to the Client Releasees, in addition to any other damages caused to the Client Releasees thereby, all attorneys' fees incurred by the Client Releasees in defending or otherwise responding to said suit or Claim.

d. Dollinger shall execute a resignation from any office he holds or has held in any of Clients' entities, and he simultaneously quitclaims and interest he holds in any of Clients' entities, whether that interest is held actually, constructively, or equitably.

e. Nothing in this paragraph 4 shall be construed as a release by the DOLLINGER Releasors of any of the rights, duties, obligations, or entitlements created by this Agreement.

5. Confidentiality. The Parties agree that the promises of confidentiality herein are a material inducement to the execution of this Agreement. Accordingly, the Parties and their respective employees, agents, representatives, and attorneys agree to keep the content of the settlement negotiations and the specific terms and conditions of this Agreement (collectively, the "Settlement Terms") confidential. The Parties agree that they will not disclose the Settlement Terms to any third party without the other Party's prior, express, written

consent, except (i) as required by applicable law, rule, or regulation, or (ii) to comply with the terms of this Agreement itself. Notwithstanding the foregoing, a Party may disclose the Settlement Terms to its agents, attorneys, auditors, accountants, and tax advisors with a need to know, provided they likewise agree to maintain the confidentiality of the information. In the event a Party receives a subpoena or order of a court of competent jurisdiction that requires the production of this Agreement or the disclosure of the Settlement Terms, the receiving Party agrees to give the other Party(ies) prompt notice at least five (5) business days in advance of production or disclosure so that any of the non-receiving Party(ies) may seek an appropriate protective order. Notwithstanding the foregoing, in response to any questions about the Disputes or the Action, the Parties may disclose the fact that the Disputes between the Parties have been amicably resolved on terms which are confidential. Any breach of this paragraph shall constitute a breach of the Agreement, which will entitle the aggrieved Party (or Parties) to injunctive relief and/or monetary damages in an amount according to proof against the offending Party.

6. Non-Disparagement and Non-Solicitation. The Parties agree that they shall not disparage each other to any third-person, whether by oral or written (electronic) medium. This provision is a material term of the Agreement, a violation of which will constitute a full material breach of this Agreement. Dollinger shall not attempt to communicate, solicit, contact, approach, or engage any Client or any of Clients' employees, family members, known business associates, or affiliates for any reason without Clients' express written permission. The Parties agree that in the event of a breach of this paragraph, the aggrieved party will have suffered an immediate and/or irreparable injury, and the aggrieved party shall be entitled to injunctive relief without the requirement of proving to a court in equity that the disparagement presents an immediate and/or irreparable injury, and without notice as provided for under the applicable rules of civil procedure. Moreover, no bond or other undertaking shall be required to obtain

injunctive relief.

7. Attorney-Client Privilege. Clients own and maintain the attorney-client privilege in accordance with the applicable state laws. Clients do not intend to waive the privilege or release Dollinger from his obligations to strictly maintain the privilege in accordance with state law. Dollinger shall, in accordance with his professional and ethical duties to the client, maintain all privileged materials and communications. Dollinger shall, upon any request of any Client, transmit all Client materials, documents, work-product, files, notes, memos, pleadings, moving papers, communications, correspondence, and other property (whether or not in electronic form)("Client Files") to the Clients upon their written request. After a request has been made by a Client to receive its Client Files, Dollinger shall not keep copies of any Client Files without the express written consent of the Client. Dollinger agrees to assist Clients in obtaining and maintaining Client files from any associate of Dollinger.

8. Tax Responsibility. The Parties agree that they will each bear their individual respective tax liabilities that may arise from the Agreement or the carrying out of its provisions. The Parties acknowledge that no Party has any recourse against any other Party under the Agreement regarding any tax consequence of any payment or transaction pursuant to the Agreement.

9. No Admission. This Agreement effects a settlement of claims which are contested and denied. Nothing herein shall be construed as an admission by any Party of any liability of any kind to the other Party or Parties except as created or referred to herein.

10. Entire Agreement. This Agreement contains the entire understanding and agreement between the Parties with respect to the settlement of the Claims and disputes and the subjects referenced in this Agreement. No other representations, covenants, undertakings, or other prior or contemporaneous agreements, oral or written, respecting such matters, which are not specifically incorporated herein, shall be deemed in any way to exist or bind any of the

Parties. The Parties each acknowledge that they have not executed this Agreement in reliance on any such representations, covenants, undertakings, or other prior or contemporaneous agreements. The First Settlement is expressly voided and all obligations and responsibilities of each Party thereto is hereby released and waived.

11. Severability. If any provision of this Agreement as applied to any Party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void and unenforceable, the same shall in no way affect:

a. Any other provision in this Agreement;

b. The application of such provision in any other circumstances; or

c. The validity or enforceability of the Agreement as a whole.

12. Binding On Successors. This Agreement and the covenants and conditions contained herein shall apply to, be binding upon, and inure to the respective administrators, trustees, executors, legal representatives, assignees, successors, agents, assigns, and estates of each of the Parties.

13. Construction. This Agreement was the product of negotiation between the Parties and shall be construed as if all Parties jointly prepared this Agreement. The language of the Agreement shall not be construed for or against any particular Party.

14. Governing Law. This Agreement is to be interpreted, enforced, and governed by and under the laws of the State of Nevada. The Parties agree that this Agreement was made in the County of Washoe, State of Nevada, and Dollinger consents to personal jurisdiction in the State of Nevada for this purpose.

15. Dispute Resolution. Prior to any Party seeking judicial intervention to enforce, interpret, void, or challenge the terms of this Agreement – other than to seek injunctive relief as set forth herein -- the Parties must first engage in mandatory non-binding mediation with a mediator to be appointed by the American Arbitration Association ("AAA") and in accordance

with the AAA Commercial Arbitration Rules and Mediation Procedures.

16. Modification. This Agreement shall not be modified by any Party by oral representation made before or after the execution of this Agreement. All modifications must be in writing and signed by all Parties.

17. Enforcement. If any Party to this Agreement brings an action to interpret this Agreement or enforce that Party's rights with respect to a breach hereunder, then the prevailing Party shall be entitled to recover his, her, or its costs and expenses, including reasonable attorneys' fees, if any, incurred in connection with such proceeding.

18. Further Documents and Acts. The Parties shall execute and deliver all documents and perform all further acts that may be reasonably necessary to effectuate the provisions of this Agreement.

19. Counterparts. This Agreement may be executed in counterparts. Execution of counterparts shall have the same force and effect as if all Parties had signed the same instrument. Counterparts shall be deemed to be an original for all purposes and shall be effective as of the Effective Date.

20. Facsimile/Scanned Signatures. This Agreement may be executed by facsimile or by scanning the original signature into .pdf format and communicating said signature via email ("Scanned Signature"). A facsimile signature or Scanned Signature shall be deemed to be an original signature on this Agreement.

21. Warranty of Understanding and Authority. The Parties have been represented by counsel of their choosing in connection with the execution of this Agreement and in the negotiations leading up to the execution of this Agreement. Each of the Parties represents that the terms of this Agreement have been completely read and explained to it and that the terms of this Agreement are fully understood and voluntarily accepted by such Party, without any duress or undue influence. Each person who executes this Agreement represents and warrants

that he or she has the express or implied authority of, as appropriate, the spouse, trustees, beneficiaries, members, officers, directors, employees, employers, or partners necessary to do so, and agrees to indemnify and hold harmless each other Party from any claims that such authority did not exist.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates indicated below.

[redacted]

| | |
|---|---|
| JOSEPH R. CELLURA, Individually | EMELIA BEAR CELLURA |
| MICHAEL F. GHISELLI, Individually | TIMOTHY WILBANKS, Individually |
| 12/18/2023<br>MALIBU55 INC<br>By [redacted]<br>Its: President | 12/18/2023<br>ADMI INC<br>By [redacted]<br>Its: President |
| EP5 INC F/K/A TARSIN MOBILE INC,<br>12/18/2023<br>[redacted]<br>Its: President | EPISODE5 INC 12/18/2023<br>By: [redacted]<br>Its: President |

**RESIGNATION FROM CORPORATE OFFICE AND TENDER OF SHARES**

DOUGLAS R. DOLLINGER, individually, and The LAW OFFICE OF DOUGLAS R. DOLLINGER, PC (collectively "Dollinger"), does hereby resign any position he holds, or has ever held, as an officer or general counsel of MALIBU55 INC, ADMI INC., EP5 INC., F/K/A TARSIN MOBILE INC., EPISODE5 INC., and of any entity owned or controlled by JOSEPH R. CELLURA, EMELIA BEAR CELLURA, MICHAEL F. GHISELLI, and TIMOTHY WILBANKS.

To the extent Dollinger claims any ownership interest or any equity interest in MALIBU55 INC, ADMI INC., EP5 INC., F/K/A TARSIN MOBILE INC., EPISODE5 INC., and of any entity owned or controlled by JOSEPH R. CELLURA, EMELIA BEAR CELLURA, MICHAEL F. GHISELLI, and TIMOTHY WILBANKS, he does quitclaim and tender those interests to Joseph R. Cellura.

Dated this 11th day of December 2023.

[redacted]

## CERTIFICATE OF SUBSCRIBING WITNESS

State of New York )
) ss.:
County of Orange )

On the 12/11/2023 day of December in the year 2023 before me, the undersigned, a Notary Public in and for said State, personally appeared DOUGLAS DOLLINGER the subscribing witness to the foregoing MUTUAL SETTLEMENT AGREEMENT WITH RELEASE OF ALL CLAIMS and RESIGNATION FROM CORPORATE OFFICE AND TENDER OF SHARES, with whom I am personally acquainted, or whose identify has been proven to me, who, being by me duly sworn, did depose and say that he/she/they reside(s) in

570 County Route 49 Middletown NY 10940

(if the place of residence is in a city, include the street and street number, if any, thereof); that he/she/they know(s) DOUGLAS DOLLINGER to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said DOUGLAS DOLLINGER execute the same; and that said witness at the same time subscribed his/her/their name(s) as a witness thereto.

(Signature and office of individual taking proof.)

[redacted]

[redacted]

# EXHIBIT B

Case 1:25-cv-07307-MKV Document 23-2 Filed 08/25/26 Page 49 of 110

On Jan 17, 2024, at 12:16 PM, John Shackelford [redacted]

I represent Tim Wilbanks and your letter to Bruce Houle dated January 11th 2024 was sent to me and Mr. Wilbanks has requested I respond to factually incorrect assertions made about him in your letter. You do not, nor have you ever, represented Mr. Wilbanks regarding Bruce Houle or regarding anything else. Further, Mr. Wilbanks is not nor has he ever been a principal of ADMI, Inc. (ADMI). Mr. Wilbanks did permit himself to be installed as CEO and Chairman of the Board of SIR Incorporated (SIR) and he authorizes me to advise you and as counsel to Joe Cellura that effective immediately he hereby resigns any and all positions he may have or had in SIR, including being CEO and Chairman of the Board. Lastly, please cease from representing to any one that you represent Mr. Wilbanks or that he was a principal of ADMI.

John

John C. Shackelford, Esq.

Shackelford, Bowen, McKinley & Norton, LLP

[redacted]

SHACKELFORD, BOWEN, McKINLEY & NORTON, LLP E-MAIL NOTICE - This transmission may be: (1) subject to the Attorney-Client Privilege, (2) an attorney work product, or (3) strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy or disseminate this information. If you have received this in error, please reply and notify the sender (only) and delete the message. Unauthorized interception of this e-mail is a violation of federal criminal law.

Unless it specifically so states, this communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means. Unless it specifically so states, nothing contained in this message or in any attachment shall satisfy the requirements for a writing, and nothing contained herein shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act, or any other statute governing electronic transactions.

# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ORANGE**

DOUGLAS R. DOLLINGER, individually, and THE LAW OFFICES OF DOUGLAS R. DOLLINGER, P.C.,

Plaintiffs,

-against-

FRANK C. GILMORE, ESQ.; THE GILMORE LAW GROUP PLLC; EMELIA BAER CELLURA, individually and as Trustee of the JOSEPH R. CELLURA LIVING TRUST, if any, and doing business as HALF CRAZY MAMA; FLOCK PRESENTS, LLC; MOLLY M. LEGOY, ESQ., as Special Administrator of the ESTATE OF JOSEPH R. CELLURA; THE JOSEPH R. CELLURA LIVING TRUST, if any; MALIBU55, INC.; JOHN DOE TRUSTS 1–5, and JOHN DOE TRUSTEES 1–5,

Defendants,

-and-

ADMI INC, TARSIN MOBILE, INC.; SIR INC.; and GLOBAL BRANDS CAPITAL CORP.,

Nominal Defendants.

Index No. ________

Purchased: July 7, 2026

# NOTICE OF ELECTRONIC FILING

**PLEASE TAKE NOTICE** that this case has been commenced in the New York State Courts Electronic Filing System ("NYSCEF"), and that all documents in this case will be filed, served, and maintained electronically pursuant to Uniform Rule 202.5-bb.

This means that:

1. **You must immediately record your representation** within the NYSCEF system upon service of the summons and complaint; and
2. **You must file and serve all documents electronically** in accordance with NYSCEF procedures.

If you have not yet registered for NYSCEF, you may do so at:

www.nycourts.gov/efile

Unrepresented parties are entitled to opt out of e-filing by filing a Notice of Opt-Out Form.

Additional information regarding electronic filing procedures is available on the NYSCEF website.

Dated: New York, New York
July 7, 2026

*Douglas R. Dollinger, Esq.*

Douglas R. Dollinger, Esq.
Attorney for Plaintiff
570 County Rt 49
Middletown, New York 10940
845.741.9363
ddollingeresq@gmail.com

# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ORANGE**

DOUGLAS R. DOLLINGER, individually, and THE LAW OFFICES OF DOUGLAS R. DOLLINGER, P.C.,

Plaintiffs,

-against-

FRANK C. GILMORE, ESQ.; THE GILMORE LAW GROUP PLLC; EMELIA BAER CELLURA, individually and as Trustee of the JOSEPH R. CELLURA LIVING TRUST, if any, and doing business as HALF CRAZY MAMA; FLOCK PRESENTS, LLC; MOLLY M. LEGOY, ESQ., as Special Administrator of the ESTATE OF JOSEPH R. CELLURA; THE JOSEPH R. CELLURA LIVING TRUST, if any; MALIBU55, INC.; JOHN DOE TRUSTS 1–5, and JOHN DOE TRUSTEES 1–5,

Defendants,

-and-

ADMI INC, TARSIN MOBILE, INC.; SIR INC.; and GLOBAL BRANDS CAPITAL CORP.,

Nominal Defendants.

Index No. ________

Purchased: July 7, 2026

# NOTICE OF ELECTRONIC FILING

**PLEASE TAKE NOTICE** that this case has been commenced in the New York State Courts Electronic Filing System ("NYSCEF"), and that all documents in this case will be filed, served, and maintained electronically pursuant to Uniform Rule 202.5-bb.

This means that:

1. **You must immediately record your representation** within the NYSCEF system upon service of the summons and complaint; and
2. **You must file and serve all documents electronically** in accordance with NYSCEF procedures.

If you have not yet registered for NYSCEF, you may do so at:

www.nycourts.gov/efile

Unrepresented parties are entitled to opt out of e-filing by filing a Notice of Opt-Out Form.

Additional information regarding electronic filing procedures is available on the NYSCEF website.

Dated: New York, New York
July 7, 2026

*Douglas R. Dollinger, Esq.*

Douglas R. Dollinger, Esq.
Attorney for Plaintiff
570 County Rt 49
Middletown, New York 10940
845.741.9363
ddollingeresq@gmail.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ORANGE**

| | |
|---|---|
| DOUGLAS R. DOLLINGER, individually, and THE LAW OFFICES OF DOUGLAS R. DOLLINGER, P.C.,<br>Plaintiffs,<br>-against-<br><br>FRANK C. GILMORE, ESQ.; THE GILMORE LAW GROUP PLLC; EMELIA BAER CELLURA, individually and as Trustee of the JOSEPH R. CELLURA LIVING TRUST, if any, and doing business as HALF CRAZY MAMA; FLOCK PRESENTS, LLC; MOLLY M. LEGOY, ESQ., as Special Administrator of the ESTATE OF JOSEPH R. CELLURA; THE JOSEPH R. CELLURA LIVING TRUST, if any; MALIBU55, INC.; JOHN DOE TRUSTS 1–5, and JOHN DOE TRUSTEES 1–5,<br>Defendants,<br>-and-<br><br>ADMI, INC., TARSIN MOBILE, INC.; SIR INC.; and GLOBAL BRANDS CAPITAL CORP.,<br>Necessary Parties. | **Amended Summons**<br><br>Index No. **EF007240-2026**<br><br>Purchased: July 7, 2026 |

To the above named Defendant(s):

| | | |
|---|---|---|
| FRANK C. GILMORE, ESQ.<br>1495 Ridgeview Drive, Ste. 90<br>Reno, Nevada 89519 | THE GILMORE LAW GROUP PLLC.<br>1495 Ridgeview Drive, Ste. 90<br>Reno, Nevada 89519 | EMELIA BAER CELLURA<br>309 Marewood Ct<br>Reno, Nevada 89511 |
| HALF CRAZY MAMA<br>309 Marewood Ct<br>Reno, Nevada 89511 | THE JOSEPH R. CELLURA LIVING TRUST<br>309 Marewood Ct<br>Reno, NV 89511 | MOLLY M. LEGOY, ESQ.<br>702 Plumas St.<br>Reno, Nevada 89509 |
| MALIBU55, INC.<br>309 Marewood Ct<br>Reno, NV 89511 | FLOCK PRESENTS, LLC<br>440 N. Barranca Avenue, #4955<br>Covina, California 91723 | TARSIN MOBILE, INC.<br>10580 N. McCarran Blvd<br>#115-256 Reno, NV 89503 |
| SIR INC.<br>10580 N. McCarran Blvd<br>#115-256 Reno, NV 89503 | GLOBAL BRANDS CAPITAL CORP.<br>10580 N. McCarran Blvd #115-256<br>Reno, NV 89503 | ADMI, INC.<br>570 County Rt. 49<br>Middletown, New York 10940 |

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is Plaintiffs' place of business and location of legal services rendered.

Dated: Orange County, New York
July 15, 2026

*Douglas R. Dollinger, Esq.*

DOUGLAS R. DOLLINGER, ESQ.
Plaintiff Entity and Pro Se
570 County Route 49
Middletown, New York 10940
ddollingeresq@gmail.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ORANGE**

| | |
|---|---|
| DOUGLAS R. DOLLINGER, individually, and THE LAW OFFICES OF DOUGLAS R. DOLLINGER, P.C.,<br><br>Plaintiffs,<br>-against-<br><br>FRANK C. GILMORE, ESQ.; THE GILMORE LAW GROUP PLLC; EMELIA BAER CELLURA, individually and as Trustee of the JOSEPH R. CELLURA LIVING TRUST, if any, and doing business as HALF CRAZY MAMA; FLOCK PRESENTS, LLC; MOLLY M. LEGOY, ESQ., as Special Administrator of the ESTATE OF JOSEPH R. CELLURA; THE JOSEPH R. CELLURA LIVING TRUST, if any; MALIBU55, INC.; JOHN DOE TRUSTS 1–5, and JOHN DOE TRUSTEES 1–5,<br><br>Defendants,<br>-and-<br><br>ADMI, INC., TARSIN MOBILE, INC.; SIR INC.; and GLOBAL BRANDS CAPITAL CORP.,<br><br>Necessary Parties. | **FIRST AMENDED VERIFIED COMPLAINT**<br><br>Index No. **EF007240-2026**<br><br>Purchased: July 7, 2026 |

**NOW COMES**, Plaintiffs Douglas R. Dollinger, individually, and The Law Offices of Douglas R. Dollinger, P.C. (collectively, "Plaintiff"), allege, upon knowledge as to themselves and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. This action arises from a fraudulent scheme through which Plaintiff Douglas R. Dollinger, a New York attorney, was induced to compromise and delay enforcement of more than $2.2 million in earned legal fees owed by Joseph Cellura, Emelia Baer Cellura the associated entity Defendants, and misappropriated from the necessary party Defendants, ADMI, Inc., Tarsin Mobile, Inc., SIR Inc., Global Brands Capital Corp., and related entities, based upon false

representations that a binding and funded settlement agreement had been properly authorized and would be performed.

2. Beginning in or about 2020, Plaintiff rendered extensive legal services to ADMI, Tarsin Mobile, SIR, Global Brands Capital Corp., and affiliated entities in connection with corporate governance, licensing rights, investor disputes, litigation, protection of corporate assets, and related business matters. By February 2023, the unpaid legal fees owed to Plaintiff exceeded approximately $2.2 million.

3. In or about September 2023, Defendant Frank C. Gilmore, Esq., a Nevada attorney, entered the matter and represented that he had authority to negotiate and finalize a settlement of Plaintiff's legal-fee claims on behalf of the relevant entities and principals. Between approximately October 2023 and December 2023, Gilmore directed interstate communications, settlement drafts, and legal representations into New York for the purpose of inducing Plaintiff to compromise his claims and refrain from immediate enforcement proceedings.

4. On December 11, 2023, in reliance upon Gilmore's representations, Plaintiff executed a proposed settlement agreement reducing his claim from approximately $2.2 million to approximately $1.6 million payable in installments, including a second payment represented to be secured through escrow proceeds arising from the transfer, assignment, or disposition of interests associated with the Sports Illustrated licensing structure. Plaintiff relied upon representations that the settlement had been authorized by the necessary parties, that the agreement would be fully executed, and that funds existed and were on hand to satisfy the settlement obligations.

5. Those representations were knowingly false. Plaintiff later discovered that the settlement agreement had not been approved or executed by all essential parties, that Gilmore lacked authority to bind the entities and parties as represented, that required signatures and approvals had never been obtained, and that the purported escrow structure did not exist in the manner represented to

Plaintiff. Plaintiff would not have compromised his legal-fee claims or delayed enforcement had the true facts been disclosed.

6. At the same time Plaintiff was being induced to compromise and delay collection efforts, substantial corporate and investor funds belonging to ADMI and related entities were being diverted into accounts and entities controlled by Joseph R. Cellura and Emelia Baer Cellura, including Malibu55, Inc., Half Crazy Mama, and Flock Presents LLC. Upon information and belief, those diverted funds exceeded $18 million and included proceeds from ADMI transactions, Travel + Leisure Co.-related financing, and Sports Hospitality Ventures ("SHV")-related licensing proceeds.

7. Plaintiff further alleges that Defendant Gilmore knowingly participated in and facilitated the fraudulent settlement process by misrepresenting settlement authority, execution status, and escrow funding, and later compounded that conduct by using inconsistent and unauthorized versions of the purported settlement agreement in judicial proceedings while Plaintiff's ability to recover his fees continued to deteriorate.[1]

8. Plaintiff brings this action to recover damages arising from fraudulent inducement, aiding and abetting fraud, attorney deceit, and related misconduct; to recover unpaid legal fees; to trace and recover diverted corporate funds; to impose constructive trusts and equitable restraints over assets traceable to those diversions; and to prevent further concealment or dissipation of assets that should have remained available to satisfy Plaintiff's claims.

## THE PARTIES

9. Plaintiff Douglas R. Dollinger is a natural person residing at 570 County Route 49, Middletown, New York 10940, and is an attorney duly licensed to practice law in the State of New York.

[1] Certain disputes involving related parties were previously litigated in the United States District Court for the Southern District of New York and subsequently transferred to Nevada. The present action concerns separate claims arising from alleged fraudulent inducement, diversion of corporate funds, attorney deceit, and related conduct arising from Plaintiff's New York-based legal-fee claims and does not seek review or modification of any prior federal court rulings.

10. Plaintiff The Law Offices of Douglas R. Dollinger, P.C. is a New York professional corporation with its principal office at 570 County Route 49, Middletown, New York 10940.

11. ADMI is a Nevada corporation headquartered in New York and is joined as a Necessary Party pursuant to CPLR 1001 because Plaintiff rendered legal services to ADMI, ADMI incurred the legal-fee obligations that form the basis of this action, and complete relief cannot be afforded without its presence. ADMI does not dispute the existence of the debt and is not alleged to have engaged in the wrongful conduct described herein. ADMI is included so that the Court may determine the amount owed, declare the parties' respective rights and obligations, and address the diversion of corporate funds that impaired ADMI's ability to satisfy that obligation.

12. Defendant Frank C. Gilmore, Esq. is, upon information and belief, a resident of Nevada and an attorney admitted to practice in Nevada who, at all relevant times, acted individually and through Defendant The Gilmore Law Group PLLC and represented himself as counsel authorized to negotiate and finalize settlement of Plaintiff's fee claims on behalf of one or more of the individuals and entities involved in this matter.

13. Defendant The Gilmore Law Group PLLC is, upon information and belief, a Nevada professional limited liability company with its principal place of business in Reno, Nevada, through which Gilmore practiced law and through which he conducted the settlement negotiations and related communications described herein.

14. Defendant Emelia Baer Cellura is sued individually and in her capacities as an officer of Malibu55 and as a trustee of a trust believed to hold or control assets derived from the transactions described herein. Upon information and belief, Emelia Baer Cellura also conducted financial transactions and maintained bank accounts under the name "Half Crazy Mama" and Flock Presents LLC through related entities or business names used by her in connection with the diversion, transfer, movement, concealment, and retention of funds described in this Complaint.

15. Upon Information and belief, Emelia Baer Cellura participated in or benefitted from the transfer of assets traceable to diverted corporate funds into personal, affiliated, estate-related, or trust-related accounts and structures. She is therefore a proper defendant and necessary party to permit the Court to grant complete relief.

16. Defendant Half Crazy Mama is, upon information and belief, an alter ego of and controlled by Emelia Baer Cellura and was used to receive or disburse funds derived from diverted corporate or related assets and to support personal or non-corporate expenditures.

17. Defendant Flock Presents LLC is, upon information and belief, an alter ego of and controlled by Emelia Baer Cellura and was used to receive or disburse funds derived from diverted corporate or related assets and to support personal or non-corporate expenditures.

18. Defendant Molly M. LeGoy, Esq. is sued in her capacity as Special Administrator of the Estate of Joseph R. Cellura and, upon information and belief, individually to the extent she personally participated in the direction, facilitation, preservation, concealment, or transfer of assets traceable to the diverted corporate funds described herein.

19. Defendant The Joseph R. Cellura Living Trust, if any, is sued because, upon information and belief, assets formerly associated with Joseph R. Cellura deceased June 21, 2025, and/or assets derived from the diversion of corporate funds were transferred into, held by, or administered through that trust or a substantially similar trust vehicle for the benefit of Emelia Baer Cellura or related interests.

20. Defendant Malibu55, Inc. is, upon information and belief, a Nevada corporation controlled by Joseph and/or Emelia Cellura and was used as a recipient and redistribution point for diverted corporate funds.

21. Defendants "John Doe Trusts 1–5" are unknown trust entities, including but not limited to business trusts or similar structures, that upon information and belief received, held, controlled, or

Case 1:26-cv-07073-MKV Document 23-2 Filed 08/26/26 Page 63 of 110

facilitated the transfer of assets traceable to the diverted corporate funds described herein. Their true names and capacities are presently unknown to Plaintiff, who therefore sues such defendants by fictitious names and will amend this Complaint when their identities are ascertained.

22. Defendants "John Doe Trustees 1–5" are individuals or entities who serve or served as trustees, administrators, or persons exercising control over such trust entities, and who may have possession, custody, or control of assets traceable to the diverted funds. Their identities are presently unknown.

23. Tarsin Mobile, Inc. is joined as a Necessary Party pursuant to CPLR 1001 because its rights and obligations may be affected by the relief sought herein, and complete relief cannot be accorded among the existing parties in its absence. Plaintiff does not allege that Tarsin committed the wrongful conduct described herein except as specifically alleged in the causes of action asserted against any particular party.

24. SIR Inc. is joined as a Necessary Party pursuant to CPLR 1001 because its rights and obligations may be affected by the relief sought herein, and complete relief cannot be accorded among the existing parties in its absence. Plaintiff does not allege that SIR committed the wrongful conduct described herein except as specifically alleged in the causes of action asserted against any particular party.

25. Global Brands Capital Corp. is joined as a Necessary Party pursuant to CPLR 1001 because its rights and obligations may be affected by the relief sought herein, and complete relief cannot be accorded among the existing parties in its absence. Plaintiff does not allege that GBCC committed the wrongful conduct described herein except as specifically alleged in the causes of action asserted against any particular party.

26. The remaining nonresident defendants knowingly authorized, benefitted from, ratified, or accepted the benefits of Gilmore's New York-directed settlement negotiations and

communications, which were undertaken on their behalf and for their benefit for purposes of resolving Plaintiff's New York-based legal-fee claims. Those defendants further accepted and retained the benefits of Plaintiff's delay in enforcement and collection efforts resulting from the settlement process directed into New York.

27. The corporate necessary defendants are named because they incurred the fee obligations at issue, because their assets and transactions form the source of the diversions alleged herein, and because complete relief requires adjudication of Plaintiff's fee claims and tracing of the related corporate funds.

28. Plaintiff does not allege that the necessary defendants, as entities, were the principal tortfeasors in the diversion scheme; rather, they are the corporate obligors and corporate victims whose presence is necessary to grant full relief.

**JURISDICTION AND VENUE**

29. This Court has subject-matter jurisdiction over this action because the claims asserted arise under the common law and statutes of the State of New York, including claims sounding in breach of contract, account stated, fraudulent inducement, aiding and abetting fraud, attorney deceit under fraudulent conveyance or voidable transfer, conversion, constructive trust, unjust enrichment, and related equitable relief.

30. This Court has personal jurisdiction over Defendant Gilmore pursuant to CPLR 302(a)(1) because Gilmore transacted business within New York and purposely availed himself of the privilege of conducting activities within this State by directing settlement negotiations, legal communications, and proposed contractual instruments into New York to Plaintiff, a New York attorney, for the purpose of inducing Plaintiff to compromise a New York-centered legal-fee claim. Between approximately October 2023 and December 2023, Gilmore transmitted multiple

settlement drafts, emails, and legal communications to Plaintiff in New York, and those communications were the principal mechanism through which Gilmore sought to procure Plaintiff's execution of the settlement agreement.

31. This Court also has personal jurisdiction over Defendant Gilmore pursuant to CPLR 302(a)(1) and 302(a)(3) because Gilmore committed tortious acts outside New York causing injury to Plaintiff within New York, including false representations concerning corporate authority, the existence or availability of escrow funding, and the validity of the settlement process, all of which induced Plaintiff in New York to compromise and delay enforcement of a fee claim exceeding $2.2 million.

32. This Court has personal jurisdiction over Defendant Emelia Baer Cellura pursuant to CPLR 302(a)(1) and 302(a)(3) because she participated in, received, controlled, and benefitted from the legal services; the diversion and concealment of corporate funds that should have remained available to satisfy obligations owed in New York, including Plaintiff's legal fees, and because the resulting injury to Plaintiff in New York was foreseeable and intended.

33. This Court has personal jurisdiction over the Cellura Estate, the Trust, Malibu55, Inc., Half Crazy Mama, and Flock, pursuant to CPLR 302(a)(1) and 302(a)(3) because they received, held, transferred, concealed, or benefitted from corporate funds diverted in derogation of obligations owed to Plaintiff in New York, and because those acts form part of an interstate scheme whose consequences in New York were foreseeable and intended.

34. This Court has personal jurisdiction over Defendant Molly M. LeGoy, Esq. pursuant to CPLR 302(a)(1) and 302(a)(3). Upon information and belief, LeGoy, in her capacity as Special Administrator of the Estate of Joseph R. Cellura and/or individually, participated in or directed activities related to the receipt, preservation, administration, or transfer of assets traceable to the

diversion of corporate funds that give rise to Plaintiff's claims. Such conduct forms part of the same transaction or series of transactions at issue in this action and has caused injury to Plaintiff within the State of New York. Upon information and belief, such injury in New York was foreseeable, and Defendant derived substantial benefit from interstate activities connected to those transactions.

35. This Court has personal jurisdiction over Defendants John Doe Trusts 1–5 pursuant to CPLR 302(a)(1) and 302(a)(3). Upon information and belief, such defendants are trust entities, including but not limited to business trusts or similar structures, that received, held, controlled, or facilitated the transfer of assets traceable to the diverted corporate funds described herein. Such conduct constitutes the transaction of business and/or the commission of tortious acts outside the State causing injury within the State of New York. Upon information and belief, such defendants purposefully availed themselves of interstate financial systems and instruments, and the resulting injury to Plaintiff in New York was foreseeable.

36. This Court has personal jurisdiction over Defendants John Doe Trustees 1–5 pursuant to CPLR 302(a)(1) and 302(a)(3). Upon information and belief, such defendants are individuals or entities acting as trustees, administrators, or persons exercising custody or control over trust assets, including assets traceable to the diverted corporate funds described herein. Such defendants, through their control and administration of such assets, participated in transactions and/or conduct that constitute the transaction of business and/or tortious activity giving rise to Plaintiff's claims and causing injury within the State of New York. Upon information and belief, such injury was foreseeable, and such defendants derived substantial benefit from interstate financial activity connected to those transactions.

37. Venue is proper in Orange County pursuant to CPLR 503 because Plaintiff resides in Orange County and because substantial events giving rise to the claims asserted herein, including Plaintiff's reliance upon Defendants' communications and the injury to Plaintiff's

New York practice and receivables, occurred in this County.

38. ADMI, Inc., Tarsin Mobile, Inc., SIR Inc., and Global Brands Capital Corp. are joined herein as necessary defendants because Plaintiff's legal services were performed on their behalf, substantial corporate funds and transactions involving those entities are implicated in the relief sought herein, and complete relief cannot be accorded among the parties without their presence. Each of said entities retained or benefitted from legal services rendered by Plaintiff in New York, transacted business through interstate and New York-directed activities, and is subject to the jurisdiction of this Court pursuant to CPLR §§ 301 and 302.

**PLAINTIFF'S LEGAL SERVICES AND THE FEE DEBT**

39. Beginning no later than 2019, Plaintiff served as legal counsel to ADMI, Tarsin Mobile, SIR, Global Brands Capital, and affiliated entities in a broad range of matters involving corporate governance, investor communications, licensing rights, protection of company assets, dispute resolution, contract negotiation, and the investigation and recovery of misappropriated funds.

40. Plaintiff's services were not peripheral; they were central to the corporate enterprise and were rendered over a sustained period in reliance upon the understanding that the corporate entities would satisfy the professional obligations they incurred.

41. By February 2023, the total legal fees owed to Plaintiff for services rendered to the corporate entities exceeded $2.2 million. That debt was known to the relevant actors, formed the subject of negotiations in late 2023, and was sufficiently concrete that Gilmore later proposed a settlement under which Plaintiff's claim would be reduced to approximately $1.6 million, thereby confirming the existence of an underlying legal-fee obligation of a greater amount.

42. The corporate entities had the ability, or would have had the ability but for the diversions alleged herein, to satisfy Plaintiff's fee claims. The Sports Illustrated licensing venture, related

Case 1:25-cv-07073-MKV Document 23-42 Filed 08/26/26 Page 68 of 110

transactions, associated asset sales, and investor-related proceeds generated or were expected to generate substantial funds, and the Voting Trust structure contemplated that proceeds from corporate assets and transactions would be used to satisfy corporate obligations, including professional service debts such as those owed to Plaintiff.

**THE VOTING TRUST STRUCTURE AND THE LIMITS OF CELLURA'S AUTHORITY**

43. Corporate governance of the entities was structured through Voting Trust Agreements executed in April 2020, pursuant to which Joseph R. Cellura was appointed trustee with limited authority to negotiate certain corporate transactions involving the entities and their shareholders. The Voting Trust structure contemplated that proceeds from corporate assets and transactions would be distributed among shareholders and used to satisfy corporate debt obligations, including investor notes and professional fees incurred by the entities.

44. Importantly, the Voting Trust structure did not authorize Joseph Cellura or Emelia Baer Cellura to bind the corporate entities to a global settlement of Plaintiff's legal-fee claims, nor did it authorize them unilaterally to impose nondisclosure or related provisions restricting disclosure of alleged corporate misconduct, nor did it grant them unfettered authority to divert licensing-related proceeds into personal or affiliated entities.

45. That authority was ultimately terminated in or about June 2023, after corporate officers and stakeholders began questioning the movement of corporate funds and the handling of corporate assets.

46. Plaintiff's later review of the governing documents and declarations confirmed that the authority Gilmore represented to Plaintiff in late 2023 was inconsistent with the actual authority granted under the Voting Trust structure. In other words, the very premise of the settlement negotiations—that Gilmore could secure binding authority through Joseph or Emelia Cellura alone—was materially false or, at minimum, materially misleading.

## DISCOVERY OF THE DIVERSION OF CORPORATE FUNDS

47. Following the termination of Joseph Cellura's authority and the growing internal concern about missing corporate assets, internal reviews of financial records revealed that commencing January 2023 and continuing to date, substantial funds belonging to ADMI and related entities had been diverted into entities controlled by Joseph and Emelia Cellura, including Malibu55, Inc., Half Crazy Mama, and Flock. These funds were not being used to satisfy corporate debt obligations, investor obligations, or Plaintiff's legal-fee claims. Instead, they were being routed into affiliated entities, held in intermediary accounts, and used for personal or non-corporate expenditures.

48. Upon information and belief, and based on the financial reviews, declarations, and records produced to date, the diversions included approximately $7.8 million from ADMI-associated funds, approximately $6 million from Travel + Leisure Co.-related funds, and approximately $4.5 million from SHV-related proceeds. Whether those figures are ultimately refined in discovery, the pattern is already clear: large sums that should have remained within the corporate enterprise or been available to satisfy corporate obligations were transferred into entities and accounts controlled by the Celluras.

49. Upon information and belief, after the diversion of corporate funds from ADMI, Inc. and related entities and their deposit into accounts associated with Malibu55, Inc., Half Crazy Mama, Flock, and other accounts controlled by Joseph R. Cellura and Emelia Baer Cellura, portions of those funds were further transferred, assigned, or placed into additional financial accounts, trusts, custodial accounts, or similar arrangements established for the benefit of members of the Cellura family. Such transfers included, upon information and belief, accounts or trusts created for the benefit of minor children or other family beneficiaries. These subsequent transfers were made without fair consideration and occurred after substantial corporate obligations, including Plaintiff's legal fee claims, had accrued. The transfers were undertaken for the purpose of concealing the

location of the diverted funds and hindering the ability of creditors, including Plaintiff, to recover those assets. Plaintiff therefore seeks discovery concerning the identity of all transferees, intermediaries, custodians, trustees, and financial institutions through which such funds were moved, and seeks appropriate equitable relief including avoidance of fraudulent transfers, the imposition of a constructive trust, disgorgement, and recovery of any assets traceable to the diverted corporate funds.

50. A substantial part of the scheme operated through what Plaintiff refers to as the "Malibu Accounts"—accounts and related financial channels controlled by Joseph Cellura and Emelia Baer Cellura that functioned as intermediary clearing accounts for the receipt, transfer, and redistribution of corporate funds and, upon information and belief, were utilized to conceal, layer, and transfer those funds through a trust structure allegedly created for the benefit of Joseph Cellura and Emelia Baer Cellura, thereby hindering the tracing and recovery of those assets. Plaintiff further alleges, upon information and belief, that the manner in which those accounts and trust structures were utilized raises substantial questions concerning the reporting and treatment of the funds for tax and accounting purposes.

51. Corporate funds were transferred into the Malibu Accounts, commingled with other funds, and redistributed into additional entities and accounts controlled by the Celluras. The use of these intermediary accounts obscured both the origin and the ultimate destination of the diverted corporate funds and prevented corporate creditors, including Plaintiff, from tracing and recovering those assets.

52. Upon information and belief, funds transferred through the Malibu Accounts were subsequently distributed to additional entities, accounts, and financial arrangements controlled directly or indirectly by the Celluras.

53. The evidence produced to date also reveals substantial balances and recurring transfers into Emelia Cellura's personal and affiliated accounts, including regular support transfers into a Wells Fargo business checking account in the name of Half Crazy Mama and a large balance in an American Express high-yield savings account in her own name. Those accounts are relevant not because every dollar therein is presently proven to be corporate property, but because their balances and funding pattern are consistent with Plaintiff's allegation that personal and affiliated accounts were used to warehouse or recycle value derived from diverted corporate funds.

54. These diversions occurred while Plaintiff's legal fees remained unpaid and while the corporate entities otherwise lacked or were caused to lack sufficient funds to satisfy the obligations they had incurred to Plaintiff.

55. In practical terms, Defendants stripped or concealed the very assets from which Plaintiff's fees should have been paid.

**GILMORE'S ENTRY INTO THE MATTER AND THE SETTLEMENT NEGOTIATIONS**

56. In or about September 2023, Gilmore informed corporate officers and related actors that he had been retained to replace Plaintiff as counsel to ADMI, SIR and GBCC to address corporate litigation and settlement issues. Gilmore then began communicating with corporate officers and requesting corporate records and financial documents while simultaneously falsely presenting himself to Plaintiff as counsel authorized to negotiate a resolution of Plaintiff's fee claims on behalf of the relevant entities and individuals.

57. Between approximately October 2023 and December 2023, Gilmore transmitted multiple drafts of a proposed settlement agreement to Plaintiff through interstate communications directed into New York. Those communications represented that the proposed settlement agreement would resolve Plaintiff's outstanding legal-fee claims against the corporate entities and that the agreement

had been authorized or would be authorized by the parties necessary to bind the entities.

58. On December 11, 2023, Plaintiff executed the settlement agreement transmitted by Gilmore. (A true and correct copy of the agreement executed by Plaintiff is annexed hereto as **Exhibit "A").** That agreement reduced Plaintiff's claim from approximately $2.2 million to approximately $1.6 million and provided for payment in two installments, including a second payment that the agreement stated would be paid from escrow upon the transfer, assignment, or other disposition of VTA beneficiaries' interest concerning ADMI's shareholder interest in SHV, the holder of the Sports Illustrated license.

59. The inclusion of that escrow provision was materially important. It represented, expressly and by necessary implication, that escrow funding existed or would be available from the contemplated licensing transaction to satisfy the second payment. Plaintiff understood this to mean that the payment source was real and tied to a transaction that would generate proceeds available to him.

60. Upon information and belief, at the time Gilmore drafted and circulated the settlement agreement he knew, or recklessly disregarded, that no such escrow funds then existed that would satisfy the promised payment, and yet he nevertheless presented the settlement structure as a legitimate and funded mechanism through which Plaintiff would be paid. Plaintiff relied upon that representation when he executed the settlement agreement and delayed litigation.

61. The Sports Illustrated license was subsequently assumed by Travel + Leisure Co. from SHV in July 2024, which was the very term expressed concerning transfer, assignment, or disposition contemplated by the settlement language requiring the $800,000 in escrowed funds to be paid to Dollinger. Yet despite the occurrence of such a transaction, Plaintiff never received the promised escrow payment.

62. This confirms that the escrow representation was false or materially misleading when made and that Plaintiff was induced to compromise his claim by reference to a payment mechanism that did not exist in the manner represented.

**DISCOVERY THAT THE SETTLEMENT WAS NOT AUTHORIZED OR EXECUTED**

63. After Plaintiff executed the settlement agreement and sought confirmation that the agreement had been fully executed by the other parties, Gilmore failed to produce a fully executed copy. Plaintiff later discovered that key parties required to bind the entities had never signed the agreement and that the necessary approvals had not been obtained.

64. Plaintiff further discovered that Gilmore did not represent the parties as claimed, and in fact did not possess authority to bind the entities in the manner represented and that the corporate officers or stakeholders and individuals whose authorization was required had not approved the settlement as Gilmore had led Plaintiff to believe. Plaintiff would not have executed the settlement agreement or compromised his legal-fee claims had he known these facts. (A true and correct copy of an email from John C. Shackelford, Esq. the attorney for Timothy Wilbanks a named party to the settlement advising Gilmore to "cease his claim he represented Mr. Wilbanks **Exhibit "B"). In pertinent part he states:**

> On Jan 17, 2024, at 12:16 PM, John Shackelford <jshack@shackelford.law> wrote:
>
> I represent Tim Wilbanks and your letter to Bruce Houle dated January 11th 2024 was sent to me and Mr. Wilbanks has requested I respond to factually incorrect assertions made about him in your letter. You do not, nor have you ever, represented Mr. Wilbanks regarding Bruce Houle or regarding anything else. Further, Mr. Wilbanks is not nor has he ever been a principal of ADMI, Inc. (ADMI). Mr. Wilbanks did permit himself to be installed as CEO and Chairman of the Board of SIR Incorporated (SIR) and he authorizes me to advise you and as counsel to Joe Cellura that effective immediately he hereby resigns any and all positions he may have or had in SIR, including being CEO and Chairman of the Board. Lastly, please cease from representing to any one that you represent Mr. Wilbanks or that he was a principal of ADMI.
>
> John
>
> John C. Shackelford, Esq.

Case 1:26-cv-07073-MKV Document 23-42 Filed 08/26/26 Page 74 of 110

65. Other text messages and related communications produced to date further reinforce Plaintiff's allegation that Gilmore knew the execution of the settlement documents was incomplete, that the settlement process was irregular, and that it was nevertheless pursued without the authority of the individuals identified as necessary signatories to the Settlement. These communications further support Plaintiff's allegation that Gilmore falsely represented that he was authorized to act for, and represented, each of those parties in order to induce Plaintiff to rely upon the purported settlement, when, in fact, those individuals had not authorized Gilmore to act on their behalf and were not represented by him. Plaintiff confirms that Ghiselli and other necessary parties did not sign the final December 11, 2023 settlement, based on their discovery of the missing funds; that required signatures were absent, and that Plaintiff was never provided with a properly executed final agreement wherein Gilmore's acts constitute material acts of deceit and fraud.

**THE FEDERAL FILING AND THE INCONSISTENT SETTLEMENT VERSIONS**

66. Matters were aggravated further when Gilmore later submitted to a federal court a declaration stating that the settlement attached thereto was a "true and accurate copy" of the operative settlement agreement, despite the existence of materially inconsistent versions and despite the absence of valid execution by all necessary parties. By presenting one version as authentic while other versions and surrounding facts showed execution irregularities and missing authority, Gilmore further entrenched the deception surrounding the settlement process and impaired Plaintiff's ability to obtain a straightforward adjudication of the fee dispute.

67. The use of inconsistent settlement versions is not alleged merely as a technical irregularity. It is alleged because it reinforces Plaintiff's contention that the settlement was used as a device to delay and obstruct Plaintiff's fee recovery while the funds that should have satisfied those fees were being diverted and concealed, and because it supports Plaintiff's claim that Gilmore engaged in intentional attorney deceit.

## THE ESTATE, THE TRUST, AND THE CONTINUED SHELTERING OF ASSETS

68. Joseph R. Cellura died on June 21, 2025, and his estate is represented by Molly M. LeGoy, Esq., as Special Administrator. Upon information and belief, by the time of his death substantial assets that should have remained reachable by creditors or traceable to diverted corporate funds had already been removed from his estate, placed into affiliated entities, or transferred into trust structures for the benefit of Emelia Baer Cellura and related interests.

69. Upon information and belief, trust documents were circulated after Gilmore had notice of disputes concerning diverted corporate funds, disputes over authority under the Voting Trust structure, and claims asserted by ADMI, GBCC, and related stakeholders. Plaintiff alleges that the trust structure was used, at least in part, to receive, hold, or shield assets derived from or connected to the same diverted corporate funds that should have been available to satisfy Plaintiff's fee claims and related corporate obligations.

70. Upon information and belief, after disputes arose concerning the diversion of corporate funds belonging to ADMI and related entities and after notice of Plaintiff's claims for unpaid legal fees exceeding $2.2 million, additional asset-concealment structures were created or activated for the purpose of further concealing and shielding the diverted funds. Upon information and belief, among those structures was the creation or use of one or more trust entities, including but not limited to business trusts, whose identities are presently unknown and are therefore designated herein as John Doe Trusts 1–5. Upon information and belief, funds traceable to the corporate assets diverted by Joseph R. Cellura and Emelia Baer Cellura were transferred into, through, or otherwise held by accounts or trust structures associated with such John Doe Trusts. The creation and use of these trust structures occurred after disputes had arisen concerning the diversion of corporate assets and after the accrual of substantial creditor claims, including Plaintiff's legal fee claims.

71. Plaintiff therefore alleges that such John Doe Trust structures, together with any accounts or custodial arrangements administered by unknown trustees designated herein as John Doe Trustees 1–5, were used as mechanisms to conceal, transfer, or hold assets derived from the diversion of corporate funds, and that discovery is required concerning the formation of such trusts, the identity of their beneficiaries, the source of funds deposited into such trusts, and the financial institutions through which those funds were transferred.

72. Upon information and belief, Defendants designated herein as John Doe Trustees 1–5, acting as trustees, administrative trustees, or persons exercising control over the John Doe Trusts, presently exercise custody, direction, or control over one or more accounts, trust assets, custodial arrangements, or financial instruments into which assets traceable to the diverted corporate funds were transferred. The possession, custody, and control of such assets by the John Doe Trustees make them necessary parties for purposes of tracing, restraint, attachment, constructive trust, accounting, and turnover relief.

73. The estate and trust are therefore necessary parties because, absent their inclusion, Plaintiff cannot obtain complete relief with respect to assets traceable to the diversions alleged herein, nor can the Court impose appropriate equitable remedies over the full body of property derived from those diversions.

**RELIANCE, INJURY, AND NEW YORK CONNECTION**

74. The settlement negotiations conducted by Gilmore were directed to Plaintiff in the State of New York through interstate electronic communications including emails and transmitted settlement drafts. Gilmore knowingly engaged in these communications with a New York attorney concerning the resolution of legal-fee claims arising from services substantially performed in New York.

75. Plaintiff reviewed, negotiated, and ultimately executed the settlement agreement within the

State of New York in reliance upon the representations made by Gilmore regarding authority, execution, and the availability of settlement funds.

76. As a direct and foreseeable result of Gilmore's conduct, Plaintiff suffered injury in the State of New York, including the compromise of legal-fee claims exceeding $2.2 million and the delay and impairment of Plaintiff's ability to recover those fees while corporate funds were being diverted and concealed.

77. Had Plaintiff known that the settlement agreement lacked required authorization and execution, that the represented escrow structure did not exist as represented, and that corporate funds were being diverted and concealed, Plaintiff would have immediately pursued litigation, attachment, injunctive relief, expedited discovery, restraint, and turnover remedies directed at preserving assets available to satisfy Plaintiff's claims.

## FIRST CAUSE OF ACTION

**Breach of Contract / Contractual Fee Liability**
**(Against Necessary Defendants**
(ADMI, Inc., Tarsin Mobile, Inc., SIR Inc., and Global Brands Capital Corp.)

78. Plaintiff repeats and realleges paragraphs 1 through 77 as though fully set forth herein.

79. Plaintiff rendered extensive legal services to the necessary corporate defendants, which services were requested, accepted, used, and relied upon by those entities and their principals in connection with corporate governance, licensing, investor matters, protection of company assets, and related legal affairs.

80. By February 2023, the legal fees owed to Plaintiff for those services exceeded $2.2 million, and the existence of a substantial fee obligation was acknowledged by the later settlement negotiations that sought to reduce Plaintiff's claim to approximately $1.6 million.

81. The necessary corporate defendants incurred contractual obligations to Plaintiff for those services and failed to pay the amounts due. To the extent those entities were stripped of the means to satisfy Plaintiff's invoices by reason of the diversions alleged herein, such diversions do not

extinguish the entities' underlying fee liability.

82. By reason of the foregoing, Plaintiff is entitled to damages against the necessary corporate defendants in an amount not less than $2.2 million, together with interest and such other relief as the Court deems just.

**SECOND CAUSE OF ACTION**

**Account Stated**
(Against Necessary Defendants ADMI, Tarsin Mobile, SIR and Global Brands Capital Corp)

83. Plaintiff repeats and realleges paragraphs 1 through 82 as though fully set forth herein.

84. Plaintiff rendered invoices and/or statements for legal services to the necessary corporate defendants, who accepted the services, retained their benefit, and did not timely object to the fee balances in the ordinary course.

85. The subsequent negotiation of a settlement reducing Plaintiff's claim from approximately $2.2 million to approximately $1.6 million further confirms that a substantial fee debt was acknowledged and treated as real by the parties involved.

86. By reason of the foregoing, an account was stated in Plaintiff's favor in an amount not less than $2.2 million, or, alternatively, in the amount acknowledged in the settlement negotiations, together with interest and costs.

**THIRD CAUSE OF ACTION**

**Fraudulent Inducement**
(Against Frank C. Gilmore and The Gilmore Law Group PLLC)

87. Plaintiff repeats and realleges paragraphs 1 through 86 as though fully set forth herein.

88. Gilmore made material misrepresentations of existing fact to Plaintiff, including that he possessed authority to negotiate and finalize a binding settlement on behalf of the corporate entities and relevant principals, that the settlement had been or would be authorized by the necessary parties, and that the second payment of $800,000 would be paid from escrow upon the transfer,

assignment, or other disposition of the Sports Illustrated license.

89. Those representations were false or materially misleading when made. Gilmore lacked authority to bind all necessary parties and entities to a final enforceable settlement agreement, the necessary approvals and signatures had not been obtained, and the escrow representation created the false impression that funds had been secured, reserved, committed, or otherwise made available in a manner sufficient to support and complete the settlement process being presented to Plaintiff.

90. Gilmore made these representations intentionally or with reckless disregard for their truth for the purpose of inducing Plaintiff to compromise his legal-fee claims and delay litigation.

91. Plaintiff reasonably relied upon those representations in New York when he executed the settlement agreement on December 11, 2023, agreed to reduce and compromise his legal-fee claims, and refrained from immediately pursuing attachment, restraint, turnover, injunctive relief, expedited discovery, and other enforcement and collection remedies that otherwise would have been pursued to preserve assets available to satisfy Plaintiff's claims.

92. As a direct and proximate result of that reliance, Plaintiff suffered damages in an amount to be determined at trial but not less than $2.2 million, together with consequential losses arising from delay, obstruction, diminished recoverability, continued diversion and concealment of assets, and the resulting impairment of Plaintiff's ability to recover amounts otherwise due and owing.

## FOURTH CAUSE OF ACTION

### Aiding and Abetting Fraud

(Against Frank C. Gilmore and The Gilmore Law Group PLLC)

93. Plaintiff repeats and realleges paragraphs 1 through 92 as though fully set forth herein.

94. Upon information and belief, Joseph R. Cellura and Emelia Baer Cellura engaged in fraudulent conduct by, among other things, diverting corporate funds belonging to ADMI and

related entities, transferring and concealing those funds through affiliated accounts, entities, and structures, and inducing Plaintiff to participate in a purported settlement process while the funds that should have been available to satisfy Plaintiff's legal-fee claims were being removed, dissipated, or concealed.

95. At all relevant times, Defendant Frank C. Gilmore, Esq. had actual knowledge of facts sufficient to understand the fraudulent nature of this conduct, including but not limited to (i) the existence of disputes concerning corporate authority and control, (ii) the absence of valid authority under the purported Voting Trust or related structures to bind the entities to the settlement terms he advanced, (iii) the incomplete, unexecuted, or otherwise unauthorized nature of the proposed settlement agreement, and (iv) the diversion, unavailability, or concealment of corporate funds necessary to satisfy Plaintiff's claims.

96. Despite such knowledge, Gilmore knowingly and substantially assisted the underlying fraud by, among other things, (i) drafting, transmitting, and promoting a settlement agreement as authorized and capable of execution, (ii) representing, directly and indirectly, that funds—including an $800,000 payment tied to an escrow or licensing transaction—were available or would be available to satisfy the settlement obligations, (iii) creating and reinforcing the false impression that the settlement process was legitimate and capable of performance, and (iv) continuing to advance such representations in communications and litigation-related submissions despite knowledge of material inconsistencies and lack of authorization.

97. Gilmore's assistance was substantial, direct, and a proximate cause of Plaintiff's injury.

His conduct induced Plaintiff to delay enforcement of his legal-fee claims, to refrain from pursuing available remedies, and to rely upon a settlement framework that was not genuine, thereby enabling the continued diversion, concealment, and dissipation of assets that should have been

available to satisfy Plaintiff's claims.

98. By reason of the foregoing, Defendants Frank C. Gilmore and The Gilmore Law Group PLLC are liable to Plaintiff for aiding and abetting fraud.

## FIFTH CAUSE OF ACTION

**Fraudulent Conveyance / Voidable Transfers**
(Against Emelia Baer Cellura, the Estate, LeGoy, the Trust, Malibu55, Half Crazy Mama, Flock, JOHN DOE Trusts 1–5, JOHN DOE Trustees 1–5)

99. Plaintiff repeats and realleges paragraphs 1 through 98 as though fully set forth herein.

100. At the time the transfers described above were made, the corporate entities were indebted to Plaintiff for legal services rendered, and Joseph and Emelia Cellura knew or should have known of Plaintiff's claims and of the broader corporate obligations to creditors and investors.

101. The transfers of corporate-derived funds into Malibu55, Half Crazy Mama, Flock, affiliated accounts, the Estate, and trust structures were made without fair consideration or for grossly inadequate consideration and were made with actual intent to hinder, delay, or defraud creditors, including Plaintiff, or under circumstances rendering the transferors insolvent or unable to satisfy reasonably foreseeable obligations.

102. Plaintiff therefore seeks avoidance of the transfers to the extent necessary to satisfy Plaintiff's claims, together with attachment, restraint, or turnover of transferred assets and such other remedies as are available under New York law.

## SIXTH CAUSE OF ACTION

**Conversion**
(Against Emelia Baer Cellura, the Estate, the Trust, Malibu55, Half Crazy Mama, and Flock)

103. Plaintiff repeats and realleges paragraphs 1 through 102 as though fully set forth herein.

104. The funds diverted from ADMI and related entities were specific and identifiable corporate assets, including licensing proceeds, investor-related funds, and related corporate receivables that

should have remained available to satisfy corporate obligations. By exercising unauthorized dominion and control over those funds, transferring them into affiliated entities, and using them for personal or non-corporate purposes, Defendants converted property in which Plaintiff, as a creditor of the corporate obligors and the intended recipient of payment from corporate proceeds, had a direct and protectable interest.

105. Plaintiff has been damaged by that conversion in an amount to be determined at trial but not less than the amount by which the diverted and converted assets prevented or impaired the payment of Plaintiff's claims.

## SEVENTH CAUSE OF ACTION

### Constructive Trust

(Against Emelia Baer Cellura, the Estate, the Trust, Malibu55,
Half Crazy Mama, Flock, JOHN DOE Trusts 1–5, JOHN DOE Trustees 1–5)

106. Plaintiff repeats and realleges paragraphs 1 through 105 as though fully set forth herein.

107. Joseph Cellura occupied a fiduciary or quasi-fiduciary position with respect to corporate and trust-governed assets, and Emelia Cellura participated in or benefitted from the misuse of those assets. Funds and property derived from the diversion of corporate assets were transferred into entities, accounts, estate holdings, and trust structures controlled by or for the benefit of the Celluras. Those assets are presently held under circumstances such that equity and good conscience require that they be impressed with a constructive trust for the benefit of rightful claimants, including Plaintiff to the extent necessary to satisfy his fee claims.

## EIGHTH CAUSE OF ACTION

### Breach of Fiduciary Duty

(Against the Estate of Joseph R. Cellura)

108. Plaintiff repeats and realleges paragraphs 1 through 107 as though fully set forth herein.

109. Joseph Cellura owed fiduciary duties under the Voting Trust structure and within the

broader corporate governance framework governing the distribution and handling of proceeds derived from corporate assets and transactions. Those duties included the obligation to act loyally, to account for funds, to avoid self-dealing, and to ensure that corporate obligations, including debt and professional obligations, were not defeated through unauthorized diversion of assets.

110. By diverting funds into entities controlled by himself and his spouse, using corporate money for personal or non-corporate purposes, and acting outside the authority granted by the Voting Trust structure, Joseph Cellura breached those fiduciary duties, and his estate is liable to the extent it holds or benefitted from resulting proceeds.

## NINTH CAUSE OF ACTION

**Unjust Enrichment**
(Against All Defendants Other Than the Necessary Corporate Defendants, in the Alternative)

111. Plaintiff repeats and realleges paragraphs 1 through 110 as though fully set forth herein.

112. To the extent any Defendant received, retained, controlled, or benefitted from funds that should have been available to satisfy Plaintiff's legal-fee claims, such Defendant has been unjustly enriched at Plaintiff's expense.

113. It would be inequitable to permit those Defendants to retain the benefit of diverted corporate assets while Plaintiff remains unpaid for the services that benefitted the same enterprise from which the diverted funds were derived.

## TENTH CAUSE OF ACTION

**Concerted Action and Joint Liability Arising from Underlying Fraudulent Conduct**
(Against Frank C. Gilmore, Emelia Baer Cellura, the Estate, the Trust, Malibu55, Half Crazy Mama, Flock and LeGoy)

114. Plaintiff repeats and realleges paragraphs 1 through 113 as though fully set forth herein.

115. The conduct of Joseph Cellura, Emelia Cellura, Frank Gilmore, and the affiliated entities

Case 1:26-cv-07073-VMK Document 23-2 Filed 08/05/26 Page 84 of 110

and structures through which diverted funds were received, transferred, sheltered, concealed, or redistributed was coordinated, mutually reinforcing, and undertaken in furtherance of the underlying fraudulent conduct, diversion of corporate assets, concealment of funds, obstruction of creditor recovery, and delay of Plaintiff's enforcement efforts as alleged herein.

116. The diversion of corporate funds removed the assets needed to satisfy corporate obligations; the use of Malibu55, Half Crazy Mama, Flock, affiliated accounts, the Estate, the Trust, and related trust structures helped conceal, hold, transfer, and redistribute those assets; and Gilmore's settlement representations and litigation conduct induced Plaintiff to delay suit, compromise his claims, and refrain from immediate enforcement efforts while the diversion, concealment, and dissipation of assets continued.

117. By reason of this concerted action, each such Defendant is jointly and severally liable to the extent permitted by New York law for the damages and equitable relief sought herein.

## ELEVENTH CAUSE OF ACTION

**Declaratory Judgment (CPLR 3001)**
(Against All Defendants and Necessary Parties)

118. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 117 of this Verified Complaint as though fully set forth herein.

119. An actual, present, and justiciable controversy exists among Plaintiff, Defendants, and the Necessary Parties concerning the validity, legal effect, and enforceability of the document dated December 11, 2023, identified by Defendants as a settlement agreement, together with the authority of the persons who purported to negotiate, approve, execute, or bind the parties thereto, the continuing legal-fee obligations owed to Plaintiff, and the respective rights and obligations of the parties arising from the transactions described herein.

120. Plaintiff alleges that the purported December 11, 2023 Settlement Agreement never became a valid and enforceable agreement because it was not approved or executed by all persons

and entities whose authorization and execution were required, because Defendant Frank C. Gilmore, Esq. materially misrepresented his authority and the authority of others to bind the parties, and because Plaintiff's execution of the document was procured through material misrepresentations concerning authority, execution, and the existence and availability of the escrow payment mechanism described therein.

121. Plaintiff further alleges that, because the purported Settlement Agreement never became binding and enforceable, it did not release, extinguish, compromise, novate, or otherwise impair Plaintiff's preexisting legal-fee claims, contractual rights, equitable remedies, or other causes of action asserted in this Complaint.

122. Plaintiff further alleges that the conduct, negotiations, communications, draft agreements, executed documents, and sworn testimony relating to the purported Settlement Agreement remain relevant and admissible, where otherwise permitted by law, as evidence concerning the existence of Plaintiff's legal-fee claims, the parties' knowledge of those claims, the authority or lack of authority of those participating in the settlement process, and the representations made to Plaintiff in inducing his execution of the document.

123. The Necessary Parties are properly joined pursuant to CPLR 1001 because the declarations sought herein necessarily affect their contractual obligations, corporate rights, property interests, and the equitable relief requested throughout this Complaint, and complete relief cannot be granted in their absence.

124. Plaintiff therefore seeks a declaration pursuant to CPLR 3001:

> **(a)** that the purported December 11, 2023 Settlement Agreement never became a valid and enforceable agreement;
>
> **(b)** that Defendant Frank C. Gilmore, Esq. lacked the authority he represented he possessed to bind all necessary parties to that purported agreement;

Case 1:25-cv-07073-MKV Document 23-2 Filed 08/07/26 Page 86 of 109

**(c)** that Plaintiff's execution of the purported Settlement Agreement was procured through material misrepresentations concerning authority, execution, and funding;

**(d)** that Plaintiff's original legal-fee claims and related contractual and equitable rights were not extinguished or released by the purported Settlement Agreement;

**(e)** declaring the respective rights, duties, and obligations of Defendants and the Necessary Parties concerning Plaintiff's legal-fee claims and the corporate obligations described in this Complaint; and

**(f)** granting such further declaratory relief as the Court deems just and proper.

## DAMAGES, EQUITABLE RELIEF, AND PRESERVATION OF ASSETS

125. As a direct and foreseeable result of Defendants' conduct, Plaintiff has suffered damages in an amount not less than $2.2 million, together with interest, consequential damages resulting from delay and obstruction, costs of investigation, attorneys' fees where recoverable, and such other damages as may be proven at trial.

126. Plaintiff further seeks equitable relief including but not limited to avoidance of voidable transfers, imposition of constructive trusts, injunctive relief preventing the further transfer, concealment, or dissipation of assets, tracing of diverted funds through all intermediary accounts and entities, an accounting, turnover of traceable property and funds, and such other relief as may be necessary to restore assets wrongfully diverted and to satisfy Plaintiff's claims.

## JURY DEMAND

127. Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

**A.** On the First and Second Causes of Action, for damages against the Necessary Parties ADMI, Inc., Tarsin Mobile, Inc., SIR Inc., and Global Brands Capital Corp. in an amount not less than $2.2 million, together with pre-judgment and post-judgment interest as permitted by law;

**B.** On the Third and Fourth Causes of Action, for damages against Defendants Frank C. Gilmore and The Gilmore Law Group PLLC for fraudulent

inducement and aiding and abetting fraud, in an amount to be determined at trial but not less than the amount of Plaintiff's compromised and unpaid fee claim, together with consequential damages, costs, and interest;

**C.** On the Fifth through Tenth Causes of Action, for damages and equitable relief against all transferee defendants, including but not limited to the Estate, any trust entities including John Doe Trusts 1–5, any trustees or persons exercising control over such trusts including John Doe Trustees 1–5, and all participating tortfeasors, including, without limitation, relief for avoidance of fraudulent transfers, the imposition of constructive trusts, a full accounting, turnover of assets, tracing of funds, and injunctive relief.

**D.** On the Eleventh Cause of Action, declaring pursuant to CPLR 3001 that: (i) the purported December 11, 2023 Settlement Agreement never became a valid and enforceable agreement; (ii) Plaintiff's execution thereof was procured through material misrepresentations concerning authority, execution, and funding; (iii) Plaintiff's underlying legal-fee claims and related contractual and equitable rights were not released or extinguished by the purported Settlement Agreement; (iv) Defendant Frank C. Gilmore, Esq. lacked the authority he represented he possessed to bind all necessary parties to the purported Settlement Agreement; and (v) declaring the respective rights and obligations of Defendants and the Necessary Parties concerning Plaintiff's legal-fee claims and the relief sought herein.

**E.** For an Order directing Defendants, and each of them, to identify, preserve, and account for all assets traceable to the diverted corporate funds described herein, including the disclosure of all accounts, custodians, and financial institutions holding or having held such assets;

**F.** For an Order imposing a constructive trust upon any and all assets, wherever located, that are traceable to the diversion of corporate funds described herein;

**G.** For an Order restraining Defendants, and all persons acting in concert with them, from transferring, encumbering, concealing, dissipating, or otherwise disposing of any assets traceable to the transactions described herein during the pendency of this action;

**H.** For an Order directing tracing, restraint, attachment, and turnover of any assets held by or through any trust, business trust, custodial arrangement, account, or financial intermediary, including but not limited to those held by John Doe Trusts 1–5 and/or John Doe Trustees 1–5, to the extent such assets are traceable to the diverted corporate funds described herein;

**I.** For costs and disbursements of this action, together with attorneys' fees to the extent permitted by contract, statute, or common law;

**J.** For such other and further relief as the Court deems just and proper.

Dated: July 15, 2026
Orange County, New York

Respectfully submitted:

**LAW OFFICES OF DOUGLAS R. DOLLINGER, P.C.**

By: *Douglas R. Dollinger, Esq.*
Douglas R. Dollinger, Esq.
Attorney for Plaintiffs
570 County Rt. 49
Middletown, New York 10940
Tel: 845.741.9363
Email: ddollingeresq@gmail.com

## VERIFICATION

STATE OF NEW YORK )
) ss:
COUNTY OF ORANGE )

I, DOUGLAS R. DOLLINGER, depose and say:

I am the Plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The same is true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

The reason this verification is made by me and not by another party is that I am familiar with the facts and circumstances set forth herein.

I affirm this under penalty of perjury pursuant to CPLR §2106.

Dated: July 15, 2026
Orange County, New York

Respectfully submitted:

*Douglas R. Dollinger, Esq.*

Douglas R. Dollinger, Esq.
570 County Rt. 49
Middletown, New York 10940
Tel: 845.741.9363
Email: ddollingeresq@gmail.com

Case 7:26-cv-07073-KMK Document 1-1 Filed 08/25/26 Page 90 of 110

# EXHIBIT A

# MUTUAL SETTLEMENT AGREEMENT
## WITH RELEASE OF ALL CLAIMS

This Settlement and Mutual Release Agreement (the "Agreement") is made and entered into as of the last date on the signature page of this Agreement (the "Effective Date"), between and among DOUGLAS R. DOLLINGER, individually, and The LAW OFFICE OF DOUGLAS R. DOLLINGER, PC (collectively "Dollinger"), on the one hand, and JOSEPH R. CELLURA, EMELIA BEAR CELLURA, MICHAEL F. GHISELLI, TIMOTHY WILBANKS, MALIBU55 INC, ADMI INC., EP5 INC., F/K/A TARSIN MOBILE INC., EPISODE5 INC. (collectively the "Clients"), on the other hand. Each settling party shall be a "Party" and collectively shall be the "Parties."

WHEREAS, Dollinger had been engaged by Clients, directly or indirectly, to provide legal representation, counseling, and services over the course of the past several years;

WHEREAS, Clients wish to disengage Dollinger as legal counsel and terminate the relationship between Dollinger and Clients as set forth below;

WHEREAS, on or about February 18, 2023, Dollinger and certain Clients executed the General Release and Settlement Agreement ("First Settlement"), upon which Dollinger received

Share of Sport Illustrated Resorts, as public company or to any assignee of the Sports Illustrated License Agreement ("SIL"), issued by Authentic Brands Group at the election of Dollinger. A dispute between the parties has arisen regarding the enforcement and breach of the First Settlement;

WHEREAS, in order to mutually terminate the relationship between Clients and Dollinger, and to avoid the cost, uncertainty, and inconvenience of further disputes between the Parties regarding the First Settlement, the Parties have agreed to fully and completely resolve, compromise, and settle all disputes, claims, causes of action, actions, liabilities, and damages that either of the Parties have or may have against each other, including, without

limitation, arising out of, based upon, or relating to (i) the First Settlement; (ii) the GLOBAL BRANDS CAPITAL CORPORATION/BAYNON transaction between GHISELLI and Pasquale Catizone and Carmine Catizone; (iii) the ADMI transaction; and (iv) any other equity transactions or litigation in which Dollinger represented Clients, or in which Dollinger claims an actual or equitable equity interest in any of the Client's affiliated entities (collectively, the "Claims").

AGREEMENT

Therefore, in consideration of the above Recitals, which are incorporated herein by reference, and the mutual promises, agreements, and releases set forth herein, the Parties hereby agree as follows:

1. Payment to Dollinger. Clients shall remit payment to Dollinger in the amount of

the "Settlement Payment"). The Settlement Payment shall be made in two (2) equal payments of

a. The first payment shall be paid upon the execution of this Agreement.

b. The second payment shall be paid at the time of sale, transfer, or assignment of the last remaining ADMI INC, interest in the Sports Illustrated License ("SIL"), as issued by Authentic Brands Group to Sports Hospitality Ventures LLC ("SHV") and ADMI INC. (the "SHV Transaction"), to be paid from an attorney escrow at the time of closing of the SHV Transaction. In the event that the SHV Transaction is not consummated, Clients shall pay Dollinger annual interest payments equal to of the outstanding amount of the Settlement Payment, which interest payments shall be secured by any revenue due and payable to ADMI from SIL and associated ventures or the

sale of ADMI assets from March 1, 2024 until paid in full.

3. Release of Claims by Clients.

a. Subject to the provisions of subparagraph 3(d) of this Agreement, and conditioned on the full and complete performance by Clients under paragraphs 1 & 2 of this Agreement, upon the Effective Date, Clients, on behalf of themselves and, as appropriate, any of its present or former parent entities, subsidiaries, affiliates, divisions, successors, officers, directors, members, managers, partners, co-venturers, agents, employees, heirs, assigns, insurers, representatives, accountants, lawyers, and all persons acting by, through, or in concert with them (collectively, the "Client Releasors"), hereby fully and completely release and forever discharge DOLLINGER, and, as appropriate, any of its present or former parent entities, subsidiaries, affiliates, divisions, successors, officers, directors, members, managers, partners, co-venturers, agents, employees, heirs, assigns, insurers, representatives, accountants, lawyers, and all persons acting by, through, or in concert with them (collectively, the "DOLLINGER Releasees") of and from any and all manner of action or actions, cause or causes of action, in law or in equity, and any suits, debts, liens, contracts, agreements, promises,

liabilities, claims, demands, damages, losses, attorneys' fees, costs, and expenses, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent (hereinafter collectively called "Claims") that any of the Clients Releasors have had or now have against the DOLLINGER Releasees, from the beginning of time to the Effective Date, including, but not limited to, Claims arising out of, based upon, or relating to the Disputes.

b. Clients acknowledge, understand, and agree that this is a full, complete, and final general release of any and all Claims, and that it shall apply to all unknown, unanticipated, unsuspected, and undisclosed Claims, demands, liabilities, actions, or causes of action, in law, equity, or otherwise as well as those which are now known, anticipated, suspected, or disclosed concerning the Parties, including the Disputes.

c. Clients represent and warrant that they are the only persons or entities who hav any interest in any of the matters herein released, that no other person or entity has any interest in any of the matters herein released, and that there has been no assignment or other transfer of any interest in any of the Claims which they may have against the DOLLINGER Releasees. Clients agree to defend, indemnify, and hold the DOLLINGER Releasees harmless against any Claims that result from anyone asserting any such assignment or transfer. Clients agree that if the Client Releasors, or any of them, hereafter commence, join in, or in any manner seek relief through any suit or action arising out of, based upon, or relating to any of the Claims released herein, or in any manner assert against the DOLLINGER Releasees any of the Claims released hereunder, then the responsible Client Releasors shall pay to the DOLLINGER Releasees, in addition to any other damages caused to the DOLLINGER Releasees thereby, all attorneys' fees incurred by the DOLLINGER Releasees in defending or otherwise responding to said suit or Claim.

d. Nothing in this paragraph 3 shall be construed as a release by the Client Releasors of any of the rights, duties, obligations, or entitlements created by this Agreement.

4. Release of Claims by DOLLINGER.

a. Subject to the provisions of subparagraph 4(d) of this Agreement, and conditioned on the full and complete performance by Clients under paragraph 1 & 2 of this Agreement, upon the Effective Date, DOLLINGER, on behalf of himself, and, the Law Office of Douglas R. Dollinger, PC, as appropriate, any of his present or former parent entities, subsidiaries, affiliates, divisions, successors, officers, directors, members, managers, partners, co-venturers, agents, employees, heirs, assigns, insurers, representatives, accountants, lawyers, and all persons acting by, through, or in concert with them (collectively, the "DOLLINGER Releasors"), hereby fully and completely release and forever discharge Clients, on behalf of themselves and, as appropriate, any of its present or former parent entities, subsidiaries, affiliates, divisions, successors, officers, directors, members, managers, partners, co-venturers, agents, employees, heirs, assigns, insurers, representatives, accountants, lawyers, and all persons acting by, through, or in concert with them (collectively, the "Client Releasees") of and from any and all manner of action or actions, cause or causes of action, in law or in equity, and any suits, debts, liens, contracts, agreements, promises, liabilities, Claims, demands, damages, losses, attorneys' fees, costs, and expenses, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent that any of the DOLLINGER Releasors have had or now have against the Client Releasees, from the beginning of time to the Effective Date, including, but not limited to, Claims arising out of, based upon, or relating to the Disputes.

b. DOLLINGER acknowledges, understands, and agrees that this is a full, complete, and final general release of any and all Claims, and that it shall apply to all unknown, unanticipated, unsuspected, and undisclosed Claims, demands, liabilities, actions, or causes of action, in law, equity, or otherwise as well as those which are now known, anticipated, suspected, or disclosed concerning the Parties, including the Disputes.

c. DOLLINGER represents and warrants that they are the only persons or entities who have any interest in any of the matters herein released, that no other person or entity has any interest in any of the matters herein released, and that there has been no assignment or other transfer of any interest in any of the Claims which it may have against the Client Releasees. DOLLINGER agrees to defend, indemnify, and hold the Client Releasees harmless against any Claims that result from anyone asserting any such assignment or transfer. DOLLINGER agrees that if the DOLLINGER Releasors, or any of them, hereafter commence, join in, or in any manner seek relief through any suit or action arising out of, based upon, or relating to any of the Claims released herein, or in any manner assert against the Client Releasees any of the Claims released hereunder, then the responsible DOLLINGER Releasors shall pay to the Client Releasees, in addition to any other damages caused to the Client Releasees thereby, all attorneys' fees incurred by the Client Releasees in defending or otherwise responding to said suit or Claim.

d. Dollinger shall execute a resignation from any office he holds or has held in any of Clients' entities, and he simultaneously quitclaims and interest he holds in any of Clients' entities, whether that interest is held actually, constructively, or equitably.

e. Nothing in this paragraph 4 shall be construed as a release by the DOLLINGER Releasors of any of the rights, duties, obligations, or entitlements created by this Agreement.

5. Confidentiality. The Parties agree that the promises of confidentiality herein are a material inducement to the execution of this Agreement. Accordingly, the Parties and their respective employees, agents, representatives, and attorneys agree to keep the content of the settlement negotiations and the specific terms and conditions of this Agreement (collectively, the "Settlement Terms") confidential. The Parties agree that they will not disclose the Settlement Terms to any third party without the other Party's prior, express, written

consent, except (i) as required by applicable law, rule, or regulation, or (ii) to comply with the terms of this Agreement itself. Notwithstanding the foregoing, a Party may disclose the Settlement Terms to its agents, attorneys, auditors, accountants, and tax advisors with a need to know, provided they likewise agree to maintain the confidentiality of the information. In the event a Party receives a subpoena or order of a court of competent jurisdiction that requires the production of this Agreement or the disclosure of the Settlement Terms, the receiving Party agrees to give the other Party(ies) prompt notice at least five (5) business days in advance of production or disclosure so that any of the non-receiving Party(ies) may seek an appropriate protective order. Notwithstanding the foregoing, in response to any questions about the Disputes or the Action, the Parties may disclose the fact that the Disputes between the Parties have been amicably resolved on terms which are confidential. Any breach of this paragraph shall constitute a breach of the Agreement, which will entitle the aggrieved Party (or Parties) to injunctive relief and/or monetary damages in an amount according to proof against the offending Party.

6. Non-Disparagement and Non-Solicitation. The Parties agree that they shall not disparage each other to any third-person, whether by oral or written (electronic) medium. This provision is a material term of the Agreement, a violation of which will constitute a full material breach of this Agreement. Dollinger shall not attempt to communicate, solicit, contact, approach, or engage any Client or any of Clients' employees, family members, known business associates, or affiliates for any reason without Clients' express written permission. The Parties agree that in the event of a breach of this paragraph, the aggrieved party will have suffered an immediate and/or irreparable injury, and the aggrieved party shall be entitled to injunctive relief without the requirement of proving to a court in equity that the disparagement presents an immediate and/or irreparable injury, and without notice as provided for under the applicable rules of civil procedure. Moreover, no bond or other undertaking shall be required to obtain

injunctive relief.

7. Attorney-Client Privilege. Clients own and maintain the attorney-client privilege in accordance with the applicable state laws. Clients do not intend to waive the privilege or release Dollinger from his obligations to strictly maintain the privilege in accordance with state law. Dollinger shall, in accordance with his professional and ethical duties to the client, maintain all privileged materials and communications. Dollinger shall, upon any request of any Client, transmit all Client materials, documents, work-product, files, notes, memos, pleadings, moving papers, communications, correspondence, and other property (whether or not in electronic form)("Client Files") to the Clients upon their written request. After a request has been made by a Client to receive its Client Files, Dollinger shall not keep copies of any Client Files without the express written consent of the Client. Dollinger agrees to assist Clients in obtaining and maintaining Client files from any associate of Dollinger.

8. Tax Responsibility. The Parties agree that they will each bear their individual respective tax liabilities that may arise from the Agreement or the carrying out of its provisions. The Parties acknowledge that no Party has any recourse against any other Party under the Agreement regarding any tax consequence of any payment or transaction pursuant to the Agreement.

9. No Admission. This Agreement effects a settlement of claims which are contested and denied. Nothing herein shall be construed as an admission by any Party of any liability of any kind to the other Party or Parties except as created or referred to herein.

10. Entire Agreement. This Agreement contains the entire understanding and agreement between the Parties with respect to the settlement of the Claims and disputes and the subjects referenced in this Agreement. No other representations, covenants, undertakings, or other prior or contemporaneous agreements, oral or written, respecting such matters, which are not specifically incorporated herein, shall be deemed in any way to exist or bind any of the

Parties. The Parties each acknowledge that they have not executed this Agreement in reliance on any such representations, covenants, undertakings, or other prior or contemporaneous agreements. The First Settlement is expressly voided and all obligations and responsibilities of each Party thereto is hereby released and waived.

11. Severability. If any provision of this Agreement as applied to any Party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void and unenforceable, the same shall in no way affect:

a. Any other provision in this Agreement;

b. The application of such provision in any other circumstances; or

c. The validity or enforceability of the Agreement as a whole.

12. Binding On Successors. This Agreement and the covenants and conditions contained herein shall apply to, be binding upon, and inure to the respective administrators, trustees, executors, legal representatives, assignees, successors, agents, assigns, and estates of each of the Parties.

13. Construction. This Agreement was the product of negotiation between the Parties and shall be construed as if all Parties jointly prepared this Agreement. The language of the Agreement shall not be construed for or against any particular Party.

14. Governing Law. This Agreement is to be interpreted, enforced, and governed by and under the laws of the State of Nevada. The Parties agree that this Agreement was made in the County of Washoe, State of Nevada, and Dollinger consents to personal jurisdiction in the State of Nevada for this purpose.

15. Dispute Resolution. Prior to any Party seeking judicial intervention to enforce, interpret, void, or challenge the terms of this Agreement – other than to seek injunctive relief as set forth herein -- the Parties must first engage in mandatory non-binding mediation with a mediator to be appointed by the American Arbitration Association ("AAA") and in accordance

with the AAA Commercial Arbitration Rules and Mediation Procedures.

16. Modification. This Agreement shall not be modified by any Party by oral representation made before or after the execution of this Agreement. All modifications must be in writing and signed by all Parties.

17. Enforcement. If any Party to this Agreement brings an action to interpret this Agreement or enforce that Party's rights with respect to a breach hereunder, then the prevailing Party shall be entitled to recover his, her, or its costs and expenses, including reasonable attorneys' fees, if any, incurred in connection with such proceeding.

18. Further Documents and Acts. The Parties shall execute and deliver all documents and perform all further acts that may be reasonably necessary to effectuate the provisions of this Agreement.

19. Counterparts. This Agreement may be executed in counterparts. Execution of counterparts shall have the same force and effect as if all Parties had signed the same instrument. Counterparts shall be deemed to be an original for all purposes and shall be effective as of the Effective Date.

20. Facsimile/Scanned Signatures. This Agreement may be executed by facsimile or by scanning the original signature into .pdf format and communicating said signature via email ("Scanned Signature"). A facsimile signature or Scanned Signature shall be deemed to be an original signature on this Agreement.

21. Warranty of Understanding and Authority. The Parties have been represented by counsel of their choosing in connection with the execution of this Agreement and in the negotiations leading up to the execution of this Agreement. Each of the Parties represents that the terms of this Agreement have been completely read and explained to it and that the terms of this Agreement are fully understood and voluntarily accepted by such Party, without any duress or undue influence. Each person who executes this Agreement represents and warrants

that he or she has the express or implied authority of, as appropriate, the spouse, trustees, beneficiaries, members, officers, directors, employees, employers, or partners necessary to do so, and agrees to indemnify and hold harmless each other Party from any claims that such authority did not exist.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates indicated below.

[redacted]

| | |
|---|---|
| JOSEPH R. CELLURA, Individually | EMELIA BEAR CELLURA |
| MICHAEL F. GHISELLI, Individually | TIMOTHY WILBANKS, Individually |
| 12/18/2023<br>MALIBU55 INC<br>By [redacted]<br>Its: President | 12/18/2023<br>ADMI INC<br>By [redacted]<br>Its: President |
| EP5 INC F/K/A TARSIN MOBILE INC,<br>12/18/2023<br>[redacted]<br>Its: President | EPISODE5 INC 12/18/2023<br>By: [redacted]<br>Its: President |

**RESIGNATION FROM CORPORATE OFFICE AND TENDER OF SHARES**

DOUGLAS R. DOLLINGER, individually, and The LAW OFFICE OF DOUGLAS R. DOLLINGER, PC (collectively "Dollinger"), does hereby resign any position he holds, or has ever held, as an officer or general counsel of MALIBU55 INC, ADMI INC., EP5 INC., F/K/A TARSIN MOBILE INC., EPISODE5 INC., and of any entity owned or controlled by JOSEPH R. CELLURA, EMELIA BEAR CELLURA, MICHAEL F. GHISELLI, and TIMOTHY WILBANKS.

To the extent Dollinger claims any ownership interest or any equity interest in MALIBU55 INC, ADMI INC., EP5 INC., F/K/A TARSIN MOBILE INC., EPISODE5 INC., and of any entity owned or controlled by JOSEPH R. CELLURA, EMELIA BEAR CELLURA, MICHAEL F. GHISELLI, and TIMOTHY WILBANKS, he does quitclaim and tender those interests to Joseph R. Cellura.

Dated this 11th day of December 2023.

[redacted]

# CERTIFICATE OF SUBSCRIBING WITNESS

State of New York )
) ss.:
County of Orange )

On the 12/11/2023 day of December in the year 2023 before me, the undersigned, a Notary Public in and for said State, personally appeared DOUGLAS DOLLINGER the subscribing witness to the foregoing MUTUAL SETTLEMENT AGREEMENT WITH RELEASE OF ALL CLAIMS and RESIGNATION FROM CORPORATE OFFICE AND TENDER OF SHARES, with whom I am personally acquainted, or whose identify has been proven to me, who, being by me duly sworn, did depose and say that he/she/they reside(s) in

570 County Route 49 Middletown NY 10940

(if the place of residence is in a city, include the street and street number, if any, thereof); that he/she/they know(s) DOUGLAS DOLLINGER to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said DOUGLAS DOLLINGER execute the same; and that said witness at the same time subscribed his/her/their name(s) as a witness thereto.

(Signature and office of individual taking proof.)

[redacted] [redacted]

EXHIBIT B

On Jan 17, 2024, at 12:16 PM, John Shackelford [redacted]

I represent Tim Wilbanks and your letter to Bruce Houle dated January 11th 2024 was sent to me and Mr. Wilbanks has requested I respond to factually incorrect assertions made about him in your letter. You do not, nor have you ever, represented Mr. Wilbanks regarding Bruce Houle or regarding anything else. Further, Mr. Wilbanks is not nor has he ever been a principal of ADMI, Inc. (ADMI). Mr. Wilbanks did permit himself to be installed as CEO and Chairman of the Board of SIR Incorporated (SIR) and he authorizes me to advise you and as counsel to Joe Cellura that effective immediately he hereby resigns any and all positions he may have or had in SIR, including being CEO and Chairman of the Board. Lastly, please cease from representing to any one that you represent Mr. Wilbanks or that he was a principal of ADMI.

John

John C. Shackelford, Esq.

Shackelford, Bowen, McKinley & Norton, LLP

[redacted]

[redacted]

SHACKELFORD, BOWEN, McKINLEY & NORTON, LLP E-MAIL NOTICE - This transmission may be: (1) subject to the Attorney-Client Privilege, (2) an attorney work product, or (3) strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy or disseminate this information. If you have received this in error, please reply and notify the sender (only) and delete the message. Unauthorized interception of this e-mail is a violation of federal criminal law.

Unless it specifically so states, this communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means. Unless it specifically so states, nothing contained in this message or in any attachment shall satisfy the requirements for a writing, and nothing contained herein shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act, or any other statute governing electronic transactions.

# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ORANGE**

| | |
|---|---|
| DOUGLAS R. DOLLINGER, individually, and THE LAW OFFICES OF DOUGLAS R. DOLLINGER, P.C.,<br><br>Plaintiffs,<br>-against-<br><br>FRANK C. GILMORE, ESQ.; THE GILMORE LAW GROUP PLLC; EMELIA BAER CELLURA, individually and as Trustee of the JOSEPH R. CELLURA LIVING TRUST, if any, and doing business as HALF CRAZY MAMA; FLOCK PRESENTS, LLC; MOLLY M. LEGOY, ESQ., as Special Administrator of the ESTATE OF JOSEPH R. CELLURA**;** THE JOSEPH R. CELLURA LIVING TRUST, if any; MALIBU55, INC.; JOHN DOE TRUSTS 1–5, and JOHN DOE TRUSTEES 1–5,<br><br>Defendants,<br>-and-<br><br>ADMI INC, TARSIN MOBILE, INC.; SIR INC.; and GLOBAL BRANDS CAPITAL CORP.,<br><br>Necessary Parties. | Index No. EF007240-2026<br><br>Purchased: July 7, 2026 |

# NOTICE OF ELECTRONIC FILING

**PLEASE TAKE NOTICE** that this case has been commenced in the New York State Courts Electronic Filing System ("NYSCEF"), and that all documents in this case will be filed, served, and maintained electronically pursuant to Uniform Rule 202.5-bb.

This means that:

1. **You must immediately record your representation** within the NYSCEF system upon service of the summons and complaint; and
2. **You must file and serve all documents electronically** in accordance with NYSCEF procedures.

If you have not yet registered for NYSCEF, you may do so at:

👉 www.nycourts.gov/efile

Unrepresented parties are entitled to opt out of e-filing by filing a Notice of Opt-Out Form.

Additional information regarding electronic filing procedures is available on the NYSCEF website.

Dated: New York, New York
July 7, 2026

Douglas R. Dollinger, Esq.

Douglas R. Dollinger, Esq.
Attorney for Plaintiff
570 County Rt 49
Middletown, New York 10940
845.741.9363
ddollingeresq@gmail.com

**AFFT**
Law Offices of Douglas R. Dollinger P.C.
Douglas R. Dollinger, Esq.
570 County Route 49
Middletown , NY 10940
State Bar No.:
Attorney(s) for: Plaintiff(s)

**SUPREME COURT**
**ORANGE COUNTY, NEW YORK**

| | |
|---|---|
| **Douglas R. Dollinger, individually; et al.** *Plaintiff(s)* *vs* **Frank C. Gilmore, Esq.; et al.** *Defendant(s)* | Index No.: **EF007240-2026** Date: Time: **AFFIDAVIT OF SERVICE** |

I, **Nathan Michael Kechely**, being duly sworn deposes and says: That at all times herein affiant was and is a citizen of the United States, over 18 years of age, licensed to serve civil process in the State of Nevada under license #604, and not a party to or interested in the proceeding in which this affidavit is made. The affiant received **1** copy(ies) of the: **Amended Summons; First Amended Verified Complaint ; Exhibits** on the **27th** day of **July**, **2026** and served the same on the **27th** day of **July**, **2026** at **1:15 PM** by serving the **Defendant(s)**, **The Gilmore Law Group PLLC** by personally delivering and leaving a copy at **Frank C. Gilmore, 1495 Ridgeview Dr., Suite 90, Reno, NV 89519** with **Mary Carroll Davis, Legal Assistant** pursuant to NRS 14.020 as a person of suitable age and discretion at the above address, which address is the address of the registered agent as shown on the current certificate of designation filed with the Secretary of State.

Pursuant to NRS 239B.030 this document does not contain the social security number of any person.

NOTARY PUBLIC
STATE OF NEVADA
County of Washoe
B. CURCI
Appt. No. 23-1967-02
My Appt. Expires Aug. 30, 2027

**State of Nevada, County of Washoe**
Signed and sworn to (or affirmed) before me on
28th day of July 2026
by Nathan Michael Kechely.

Notary Public

**Nathan Michael Kechely # R-2024-05369**
**Legal Process Service** License # 604
WorkOrderNo **2603736**

Legal Process Service, 724 S. 8th Street, Las Vegas, NV 89101 (702) 471-7255

215

NYSCEF - New York State Courts Electronic Filing (Live System)

<< Return to **Search Results**

## EF007240-2026 - Orange County Supreme Court

Short Caption: **DOUGLAS R DOLLINGER ESQ et al v. FRANK C GILMORE ESQ et al**
Case Type: **Commercial - Contract**
Case Status: **Pre-RJI**
eFiling Status: **Partial Participation Recorded**

E-mail Participating Parties

Print Document List

**Narrow By Options**

Document Type: Filed By:

Motion Info: Filed Date:

thru

Document #:

Show Motion Folders ONLY

**Sort By:** Document #

| # | Document | Filed By | Status |
|---|---|---|---|
| 1 | SUMMONS *Corrected* *SUMMONS* | DOLLINGER, DOUGLAS RICHARD Filed: 07/07/2026 *Received: 07/08/2026* | **Processed** Confirmation Notice |
| 2 | COMPLAINT *Corrected* *COMPLAINT* | DOLLINGER, DOUGLAS RICHARD Filed: 07/07/2026 *Received: 07/08/2026* | **Processed** Confirmation Notice |
| 3 | EXHIBIT(S) - EXA *Corrected* *SETTLMENT AGREEMENT* | DOLLINGER, DOUGLAS RICHARD Filed: 07/07/2026 *Received: 07/08/2026* | **Processed** Confirmation Notice |
| 4 | EXHIBIT(S) - EXB *Corrected* *E-MAIL* | DOLLINGER, DOUGLAS RICHARD Filed: 07/07/2026 *Received: 07/08/2026* | **Processed** Confirmation Notice |
| 5 | EXHIBIT(S) - EXC *Corrected* *NYSCEF NOTICE ELECTRONIC FILING* | DOLLINGER, DOUGLAS RICHARD Filed: 07/07/2026 *Received: 07/08/2026* | **Processed** Confirmation Notice |
| 6 | SUMMONS (PRE RJI) (AMENDED) *Change Parry Designation.* | DOLLINGER, DOUGLAS RICHARD Filed: 07/16/2026 *Received: 07/16/2026* | **Processed** Confirmation Notice |
| 7 | COMPLAINT (AMENDED) *Change Parry Designation.* | DOLLINGER, DOUGLAS RICHARD Filed: 07/16/2026 *Received: 07/16/2026* | **Processed** Confirmation Notice |
| 8 | EXHIBIT(S) - EXA *SETTLEMENT AGREEMENT* | DOLLINGER, DOUGLAS RICHARD Filed: 07/16/2026 *Received: 07/16/2026* | **Processed** Confirmation Notice |
| 9 | EXHIBIT(S) - EXB *EMAIL* | DOLLINGER, DOUGLAS RICHARD Filed: 07/16/2026 *Received: 07/16/2026* | **Processed** Confirmation Notice |
| 10 | EXHIBIT(S) - EXC *NOTICE NYSCEF ELECTRONIC FILING* | DOLLINGER, DOUGLAS RICHARD Filed: 07/16/2026 *Received: 07/16/2026* | **Processed** Confirmation Notice |
| 11 | AFFIRMATION/AFFIDAVIT OF SERVICE *PROFF OR SERVICE* | DOLLINGER, DOUGLAS RICHARD Filed: 08/09/2026 *Received: 08/09/2026* | **Processed** Confirmation Notice |

<< Return to **Search Results**